**GLOBAL LEGAL LAW FIRM**
Christopher Robin Dryden, Esq. (State Bar No. 234476)
James Cannon Huber, Esq. (State Bar No. 269488)
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
Tel.:     (888) 846-8901
Fax:     (888) 846-8902
Email:  jhuber@attorneygl.com

Attorneys for Plaintiff Commerce Point Capital, Inc. d/b/a Bank Transactions, Inc.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMERCE POINT CAPITAL, INC. a Nevada corporation registered as a foreign business entity in California d/b/a Bank Transactions, Inc.<br><br>Plaintiff,<br><br>v.<br><br>FIRST DATA CORPORATION, a Delaware corporation; FIRST DATA MERCHANT SERVICES, LLC f/k/a FIRST DATA MERCHANT SERVICES CORPORATION a Florida corporation; WELLS FARGO BANK, n.a. a Delaware corporation; and DOES 1 through 10 inclusive,<br><br>Defendants. | Civil Action No. 3:19-cv-00556-BEN-LL<br><br>SECOND AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br><br>**Judge: Thomas J. Whelan**<br><br>**State Court Action filed: July 18, 2018**<br><br>**Removal filed: March 26, 2019** |

Plaintiff COMMERCE POINT CAPITAL, INC., for its second amended complaint against Defendants First Data Corporation and First Data Merchant Services, LLC f/k/a First Data Merchant Services Corporation by its counsel, states and alleges as follows:

## THE PARTIES

1.     Plaintiff Commerce Point Capital, Inc. doing business as Bank Transactions, Inc. (hereinafter "CPC" and/or "Plaintiff") is a Nevada corporation

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

registered as a foreign business entity in California with its principal place of business at 10855 Sorrento Valley Road, Suite 201, San Diego, CA 92101.

2.      Defendant First Data Corporation (hereinafter "FDC") is a Delaware corporation and is the parent company to defendant First Data Merchant Services, LLC f/k/a First Data Merchant Services Corporation, a Florida corporation (hereinafter "FDMS, LLC", and collectively with FDC, "FDMS"). FDC owns 100% of FDMS, LLC.   FDC and FDMS, LLC share offices, common ownership, employees, and are one entity for all intents and purposes.   FDMS, LLC is a mere shell for FDC.   FDC controls all aspects of FDMS LLC's management, operations, staff, and agreements.   FDC aided, abetted and ratified all acts of FDMS, LLC as set forth herein.   At certain points during the events that occurred below, FDC acted unilaterally without FDMS, LLC as FDMS, LLC was then not an operating entity and all acts were performed, directed, and ratified by FDC; at other points FDMS, LLC acted unilaterally without FDC as FDC was then not an operating entity and all acts were performed, directed and ratified by FDMS, LLC.   At all other times, FDMS, LLC acted as FDC's agent.

3.      Bancorpsouth, Inc. (hereinafter "Bancorpsouth") is a Mississippi corporation with its principal place of business in Mississippi.   Bancorpsouth is a party to the original agreement at dispute.   Bancorpsouth served as the settlement bank that provides for funding and financing regarding the parties' business relationship.

4.      Defendant Wells Fargo Bank, n.a. (hereinafter "Wells Fargo") is a Delaware corporation.   At some point in time after 2006, FDMS and Bancorpsouth assigned Bancorpsout's obligations under a marketing agreement entered into on July 1, 2006 (hereinafter, the "2006 Agreement") to Wells Fargo. Following that assignment, Wells Fargo served as the settlement bank that provides for funding and financing regarding the parties' business relationship. Wells Fargo is a party to multiple amendments to the 2006 Agreement.

5.    CPC is currently unaware of the true names and capacities of Does 1 through 10, inclusive, whether individual, partnership, corporation, unincorporated association, foreign individual or entity, or otherwise, and therefore sue these defendants by such fictitious names. After discovery, which is necessary to ascertain the true names and capacities of these defendants, CPC will amend the pleadings to allege the necessary identifying details. CPC is informed and believes, and on that basis alleges that at all material times, each of the Defendants, including Does 1 through 10, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the others, had full knowledge of and gave substantial assistance to the alleged activities, and in doing the things alleged, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others. (Defendants FDMS, Wells Fargo, and Does 1-10 shall hereinafter collectively be referred to as "Defendants.")

6.    CPC is informed and believes and thereon alleges that: (a) there existed and now exists a unity of interest, ownership and operation between Defendants such that the individuality and separateness of Defendants has ceased or never existed; and, (b) their failure to disregard the separate corporate entity would sanction a fraud or promote injustice. CPC is further informed and believes that recognition of the privilege of separate existence of the Defendants would promote injustice because Defendants, and each of them, in bad faith dominated and controlled each other as follows:

(a)    They have been and/or are now a mere shell and naked framework which they have used as a conduit for the conduct of their business,

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

property and affairs;

(b)    They commingled funds and other assets of each other with their own funds and other assets for their own convenience and to assist in evading obligations;

(c)    They used funds for something other than corporate uses;

(d)    They purported to, and did, work through each other during the negotiations and performance, and interpretation, of the contracts and services set forth herein;

(e)    They used each other as mere shells, instrumentalities and/or conduits for their own actions, and negotiated the terms of the subject contracts and/or individually changed and/or breached the contracts for their own benefits and/or diverted funds, customers and other assets of each other for other than corporate uses and/or to defraud Plaintiff and others;

(f)    They treated the assets of each other as their own;

(g)    They failed to maintain minutes and/or adequate corporate records of each other, created confusion of the records of the separate entities, and/or failed to maintain other corporate formalities;

(h)    They failed to maintain arm's length relationships among each other;

(i)    They used each other to procure labor, services or merchandise for the other;

(j)    They used the same directors and officers of each other;

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

(k)    They used the same office or business location;

(l)    They employed the same employees, agents, and/or attorneys; and,

(m)    Other representations, acts, or omissions subject to proof.

7.    CPC is informed and believes and thereon alleges that, at all times relevant hereto, Defendants, acted for each other in connection with the conduct hereinafter alleged and that each of them performed the acts complained of herein or breached the duties herein complained of as agents of each other and each is therefore fully liable for the acts of the other.

## JURISDICTION, VENUE, AND APPLICABLE LAW

8.    This Court has jurisdiction over the Defendants under 28 U.S. Code § 1332 because the Defendants regularly conduct business in California and/or derive substantial benefits and revenues from California. The amount in controversy exceeds the sum or value of $75,000, exclusive of interests or costs.

9.    Venue is proper in this court pursuant to 29 U.S.C. § 1391(b) because the Defendants' acts and omissions leading to CPC's injuries were committed in San Diego North County, and because the financial impact of the Defendants' acts and omissions is sustained by Plaintiff in this judicial district.

10.    FDMS and CPC specifically negotiated the agreements at dispute to exclude a forum selection clause to allow for CPC to file any dispute near its business offices in San Diego, California. A true and correct copy of the 2006 Agreement is attached as **Exhibit A**.

## FACTS COMMON TO ALL ALLEGATIONS

11.    FDMS is one of the world's largest payment processors that allows for merchants to process electronic payments.

12.    FDMS derives its revenue by collecting a percentage of the transactions

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

1  processed by a merchant and charging additional fees.

2      13.    FMDS has contracted with certain financial institutions, such as Wells

3  Fargo, to underwrite and settle transactions processed through FDMS.  FDMS

4  directs Wells Fargo to make payments to cardholders, ISOs, like CPC, and FDMS.

5      14.    FDMS and Wells Fargo do not generally provide payment processing

6  services directly to merchants. Instead, FDMS and Wells Fargo contract with

7  independent sales organizations (hereinafter an "ISO", or "ISOs") like CPC to allow

8  for the ISOs to broker agreements on behalf of FDMS and Wells Fargo with

9  merchants. FDMS does this to shield itself from liability and hold the ISOs

10  responsible. In exchange, FDMS agrees to share its profits with ISOs related to

11  merchants' use of FDMS's services.

12      15.    FDMS provides monthly compensation reports to ISOs, like CPC, to

13  show the charges, fees and compensation related to an ISO. These reports, often

14  referred to as MM-101 or profitability reports, can consist of hundreds of thousands

15  of pages of data. FDMS purposefully changes the fee descriptors, rates, format, and

16  technology required to access those reports in an effort to make it extremely

17  difficult, if not impossible, for an ISO like CPC to reconcile the fees paid and owed

18  under the respective agreements.

19      16.    FDMS's purposeful business practice therefore prohibits CPC and other

20  similarly situated ISOs from discovering errors and inaccuracies in the payments

21  that FDMS owes to ISOs like CPC.  This business practice also makes it difficult

22  for ISOs to assist their customers with questions and inquiries and to themselves

23  ensure that FDMS is not overcharging merchants.

24      17.    An ISO's only pipeline of communication to FDMS is through an

25  FDMS employee, with a title like "regional business director," who manages the

26  relationship with the ISO. CPC relied on its various regional business directors'

27  promises, assurances, and agreements as each regional business director held itself

28  out as having actual and ostensible authority to bind Defendants to agreements.

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

FDMS systematically switches these employees and their titles. FDMS does this purposefully to make it extremely difficult for an ISO to communicate with FDMS regarding issues or errors, and in any case creates substantial work for an ISO to bring the new employee up to speed regarding the agreed upon performance required.

18.   Because FDMS controls the ISO's compensation, FDMS dangles the threat of cutting off an ISO's compensation if the ISO complains too much.  ISOs are systematically threatened into compliance due to that the residual income from FDMS is the ISO's only revenue stream.   FDMS's agreements with ISOs often prohibit the ISO from charging any fees direct to merchants thereby tightening its stronghold on the ISO's lifeblood.

19.   Further, the products and services offered by FDMS require ISOs and merchants alike to purchase multiple ancillary products and services that leave little choice for an ISO or merchant to offer competitive services.

### The July 1, 2006 Marketing Agreement between CPC and FDMS

20.   On July 1, 2006, Plaintiff CPC entered into the 2006 Agreement with FDMS.  At that time, FDMS was one of the only entities that could offer the brokerage services to ISOs.  FDMS had extremely superior bargaining power. Under the 2006 Agreement, FDMS granted CPC the authority to broker agreements with merchants to process electronic payment transactions. FDMS and CPC agreed to multiple amendments and extensions to the 2006 Agreement (all amendments to, and extensions to, the 2006 Agreement are collectively referred to as the "Agreement," unless otherwise noted.)  *See* **Exhibit A**.

21.   Under section 10 of the 2006 Agreement, FDMS agreed to pay CPC on a monthly basis as set forth under "Schedule A" of the 2006 Agreement. The Schedule A sets forth certain rates that CPC is charged related to various transactions that a merchant processes.  CPC's role was to broker agreements with

merchants and set rates above those in the Schedule A.  Then, CPC and FDMS would share in the revenue derived from such fees above FDMS's purported costs. CPC has the ability to mark certain fees up so that it makes an additional percentage or fee related to merchants processing transactions under their respective agreements with FDMS that CPC brokered.  FDMS's true costs, however, were well below its purported costs in the Schedule A.

22.    Under the 2006 Agreement, FDMS was required to provide reporting on fees, costs, and charges related to all merchants' processing transactions under their respective agreements.

### **FDMS' Limited Ability to Increase Charges to CPC**

23.    Under the 2006 Agreement at section 10(b), FDMS could increase only its non-controllable cost, third-party costs, and charges set forth on Schedule A, which included, Address Verification Voice Fee, Back Office Services, Service Calls, Merchant Account on File Fee, Plastic Cards, and Voice Authorization Inquiry. But FDMS could only do so in an amount not to exceed the percentage increase in the Consumer Price Index.

24.    For any increase in fees to CPC, and other similarly situated ISOs, FDMS sends "Client Alerts" to indicate that FDMS is increasing fees or charges.

25.    Since 2006, FDMS systematically increased fees, rates, and charges to CPC, and other ISOs with agreements similar to CPC, in violation of such agreements.  FDMS often purported to increase its rates based on increases in the "interchange" rates charged by the major card brands, such as Visa Inc. and MasterCard Incorporated.  These fees and charges include Merchant Account on File, Chargeback and Adjustment, Authorization, Discount, External Authorization, Merchant Ticket Batch Header, Non-Dial Authorizations, IP Authorizations, Dial Authorizations, New Accounts, Address Verification Acquiring, Client Workstation, eMerchant Workstation, Downgrade Surcharge, Service Calls,

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

Buypass, to name a few. FDMS would increase these fees through convoluted amendments that purported to increase CPC's revenue by masking a higher percentage share on higher rates, lower percentage on lower rates, bucketed tiers, and other complex schemes to lead CPC to believe that it would increase its compensation by agreeing to an amendment, when in fact the amendment would only benefit FDMS. *See* Bank Transaction Major Merchant Pricing Amendment 7030 Retail ISO 110103, a true and correct copy of which is attached hereto as **Exhibit B**.

26. FDMS also requires that ISOs adhere to its "Program Standards," which contain FDMS's policies, procedures, rules, and operating instructions for ISOs that FDMS requires ISOs to adhere to, without providing any choice in the matter. FDMS simply publishes these standards and expects that ISOs will download and review them. FDMS periodically updates its Program Standards without advance notice and then and arbitrarily enforces those standards.

27. Neither the Agreement, nor the Program Standards allow FDMS to increase or add fees arbitrarily.

## FDMS Charged PCI Compliance Fees in Violation of the Agreement

28. The PCI Security Standards Council instituted the Payment Card Industry (hereinafter "PCI") Data Security Standard (hereinafter "DSS") as the framework for detecting and reacting to data security issues within the industry.

29. The PCI Security Standards Council mandates that all entities that process, transmit or store cardholder data must maintain PCI DSS compliance at all times. This mandate includes all merchants. Acquirers, such as FDMS, are required to validate that merchants for whom they process are compliant with PCI DSS at the appropriate level. Level 4 merchants are required to complete an annual self-assessment questionnaire (hereinafter "SAQ")

30. On June 25, 2009, FDMS notified CPC that it would be updating the

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

Program Standards to require the maintenance of a merchant PCI compliance verification program.

31.     FDMS's notice offered ISOs two options (1) FDMS to offer PCI compliance direct to CPC's merchants for an exorbitant fee (the "FDMS PCI Compliance Program,"); or (2) CPC to offer PCI compliance direct to CPC's merchants according to FDMS guidelines at no fee and CPC could bill the merchant direct (hereinafter the "ISO PCI Compliance Program."). The latter required that CPC mail questionnaires to merchants and track its merchants' PCI compliance.

32.     On August 21, 2009, CPC chose the ISO PCI Compliance Service Program and entered into another amendment to the 2006 Agreement. *See* "2009 PCI Compliance Letter and Agreement," a true and correct copy of which is attached hereto as **Exhibit C.**

33.     In October 2009, FDMS updated the Program Standards to include the two PCI compliance programs.

34.     CPC ran its ISO PCI Compliance Program starting in 2009 and followed all of FDMS's requirements. For about three years following implementation, FDMS did not charge CPC or CPC's merchants any fees or fines related to PCI compliance.

35.     On May 3, 2011, FDMS sent CPC a Client Alert outlining that FDMS would charge a new annual fee for CPC's use of the FDMS system to bill merchants fees associated with PCI compliance and other fees. In the communication it stated, "If you use the FDMS system for charging and/ or communicating to merchants annually for utilizing a third party for PCI compliance, an annual fee of using the tiers below: 0-2,500 merchants $5,000, 2,501 – 5,000 merchants $10,000; 5,000+ $15,000."

36.     On September 21, 2012, FDMS notified CPC of amendments to the Program Standards effective October 1, 2012. The Program Standards imposed a fine amount based on the tiered compliance status of CPC's portfolio for each

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

merchant who is non-compliant with PCI standards. The Non-Receipt of PCI Data Validation rages from $5 to $15, depending on the compliance rate of the portfolio.

37.    In January 2013, FDMS began billing CPC for PCI fines. FDMS has charged CPC over $81,000 in PCI fines since January 2013, and $40,000 in annual FDMS system fees.

38.    Essentially, FDMS lured CPC into executing the 2009 PCI Compliance Letter and Agreement (**Exhibit C**) with the intent to later force substantial fees on CPC, and similarly situated ISOs as CPC and other ISOs had no ability to charge such fees direct to merchants because FDMS prohibited that.

### FMDS Improperly Billed CPC Related to Buypass Fees

39.    Section 1 of the 2006 Agreement, "Buypass Transactions" was defined as "each instance during which Concord . . . or FDMS has electronic contract with a point of sale device of a Merchant of ISO for the purpose of processing a transactions, credit, or refund." *See* **Exhibit A.**

40.    The Agreement defined "Concord" as "Concord EFS, Inc. and any entity which, directly or indirectly, owns or controls, or is owned or controlled by, or is under common ownership or common control with, Concord EFS, Inc." Concord provided certain services to FDMS and provided certain reporting and statements to CPC and merchants to facilitate CPC's and merchants' use of FDMS's services.

41.    On July 1, 2006, FDMS agreed to the First Amendment to the Agreement. *See* July 1, 2006 Amendment, a true and correct copy of which is attached hereto as **Exhibit D**. Under the July 1, 2006 Amendment, CPC agreed to pay FDMS the fees set forth in Schedule 1 thereto for the processing services on the Buypass platform offered by FDMS.

42.    Under Section 7, subsection (a), the July 1, 2006 Amendment states that "FDMS shall invoice the ISO for any fees and charges incurred by ISO and its

Merchants as set forth in this Amendment, including any Schedules, for services provided pursuant to this Amendment and shall deduct such fees and charges via ACH from a bank account of ISO or other similar arrangement agreed upon by FDMS and ISO. Fees for services provided pursuant to this Amendment (excluding any Third Party Fees (as defined in Section 7(c) of this Amendment, Special Fees, or similar fees or interest payments) shall be included in Processing Fees as appropriate for the purposes of calculating Minimum Processing Fees and the Growth Incentive Rebate under the Agreement. FDMS may increase the fees set forth in this Amendment pursuant to the terms of this Amendment or the Agreement." *See* **Exhibit D**.

43.     Under Section 7, subsection (c), the July 1, 2006 Amendment states that "ISO will pay all Third Party Fees, as such may be adjusted or amended from time to time. ISO shall at all times be responsible for payment of all fees and charged of any Transactions Card issuer, Network, telecommunications provider, equipment manufacturer or vendor, processor, third party service provider, federal, state or local governmental authority in connection with the services provided under this Amendment (hereinafter each a "Third Party"), including without limitation, any switch fee, issuer reimbursement fee, adjustment fee, interchange fee, assessment fee, access fee or other pass through fee (hereinafter collectively, "Third Party Fees"). Concord and FDMS shall be entitled, without prior notice to the ISO, to pass through to the ISO any increases in communications costs or telephone tariffs subsequent to the Effective Date that affects the services provided by Concord. Should Concord or FDMS incur an increase in Third Party Fees, Concord and FDMS shall be entitled to increase Third Party Fees to ISO and such increases shall become effective on the date Concord or FDMS notifies ISO of such increases in writing." *See* **Exhibit D**

44.     The Base Rate per Buypass Transactions set forth in the July 1, 2006 Amendment was $0.0550 per transaction for transactions 1-250,000, $0.0525 per

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

transactions for transactions 250,001-500,000, and $0.050 per transactions for 500,000 transactions and above. *See* **Exhibit D**.

45.     In 2013, CPC noticed that the number of Buypass transactions on certain CPC Merchants' Buypass bills did not match the merchant statements that CPC received from Concord.

46.     After substantial auditing and back and forth with FDMS, CPC discovered that thousands of transactions that were processed on Buypass for CPC merchants were not charged through to those merchants. Instead CPC was billed for those fees, and FDMS did not charge that to merchants.

47.     CPC later learned from FDMS staff and former executives that when FDMS purchased and merged with Concord in 2004, and subsequently combined the Buypass Network owned by Concord with the Omaha network owned by FDMS, it caused errors, including that transactions that FDMS should have billed to merchants were not billed correctly or not billed at all to merchants; and that FDMS billed those and other related transactions improperly to CPC and other ISOs.

48.     On April 2, 2014, CPC notified FDMS by letter regarding discrepancies between the Buypass network fees and related billing errors to merchants.

49.     FDMS intentionally failed to correct that error for CPC and other many ISOs.

50.     In total, the Buypass error, caused losses to CPC of approximately $8,000 per month for a total of $576,000 in damages to CPC.

## FDMS Improperly Billed Fees Related to Pin-Debit Transactions Processed on FDMS's Omaha Platform

51.     Initially, under the 2006 Agreement, CPC had access to one network owned by FDMS known as the "Omaha" network or platform. Unbeknownst to CPC, the Omaha network had a major flaw. It did not allow CPC to charge authorization fees to merchants for PIN (Personal Identification Number) based

debit transactions, despite that FDMS charged CPC an additional $.0128 fee for PIN-based debit transactions.

52.    Since 2006 through present, certain PIN-debit transactions were declined due to this error as part of the "Authorization" service, which confirmed that a cardholder had sufficient funds as mandated by FDMS. CPC's gas station clients, for example, had hundreds of Authorizations which were not approved due to FDMS's error.

53.    Meanwhile, FDMS charged CPC for each Authorization, knowing that such Authorizations would be declined.

54.    As a consequence, CPC was not compensated for PIN based Authorizations that were are not approved or otherwise failed due to FDMS's error.

55.    Because of this, CPC has been damaged by FDMS's flaw in its Omaha network, which CPC could not reasonably discover, and that FDMS's convoluted and misleading reporting prevented CPC from discovering the full extent of the damages.

## FDMS Improperly Charged Fees Related to Dial and Non-Dial Authorizations

56.    Under the 2006 Agreement, Schedule A, FDMS set billing elements based on how the authorizations were communicated from the merchant to FDMS, whether by a "Dial," or "Non-Dial."

57.    Traditionally, the technical differences between Dial and Non-Dial are that a Dial transaction uses analog communication services and a Non-Dial uses internet, digital, or IP based communication services.

58.    FDMS has a lower cost basis for Non-Dial authorizations, as reflected in pricing on the Schedule A between Non-Dial Authorization at $.035 per Authorization; and Dial Authorizations at $.055 per Authorization. At the time CPC executed the Agreement, most merchants used Dial communication methods for

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

1   authorizations.

2   59.   The 2006 Agreement defines Dial Authorizations as "Each Dial-up

3   point-of-sale terminal attempted inquiry serviced by FDMS for Merchants of

4   Customer by the use of a Dial-up point-of-sale terminal. Per attempt fee for each

5   authorization request received by FDMS from a certified Internet-enabled POS

6   device via an Internet Protocol Network (IPN) transaction. Internet connectivity not

7   included. Customer shall pay FDMS for each instance during which a batch is closed

8   and/or FDMS had electronic contact with a Merchant of Customer and receives the

9   Merchant number, including batch closing. . ."  *See* **Exhibit A**.

10   60.   The 2006 Agreement defines Non-Dial Authorizations: "Each Non-Dial

11   authorization inquiry received in FDMS protocol via a computer to computer (CPU-

12   to-CPU), CRT terminals, Batch or Internet or leased line point-of-sale terminals that

13   are on the premises of Customer or Customer's Merchant, where FDMS captures

14   the identification number of Customer's Merchant . . ."  *See* **Exhibit A**.

15   61.   Both transaction types therefore include internet-based transactions.

16   62.   In the merchant services industry, however, and in the general public,

17   "Dial up" transactions refer to the use of a telephone or modem (as various credit

18   card terminals do), and does not use an internet-based protocol.

19   63.   Conversely, FDMS misstates the type of transaction for Dial as if it is

20   internet based, improperly grouping internet protocol transactions with Dial. FDMS

21   does this to allow it to charge inflated rates for Dial Authorizations which have a

22   lower cost basis.

23   64.   Since 2006 through present, FDMS's deceptive reporting made it

24   impossible for CPC to discover the extent of the damages related to FDMS

25   improperly classifying Dial transactions and Non-Dial. CPC estimates that the

26   damages are $.02 per transaction at an approximate transaction volume of 100,000

27   per month for a total of $2,000 per month, or $24,000 per year for a total of $168,000

28   since 2012.

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

**FDMS Failed to Lower the Datawire Fee**

65.     On August 5, 2009, CPC's President, Adam Friedman, emailed Erick Nicholson, FDMS's Regional Business Manager, regarding a previous conversation where FDMS would reduce CPC's Datawire fee to the same rate as the CPU fee. Mr. Nicholson confirmed in writing that the Datawire fee reduction would begin on July 1, 2009, thereby amending the Agreement.  See attached as **Exhibit E Erick Nicholson Datawire Reduction Confirmation.**

66.     FDMS did not reduce the Datawire fee despite CPC's repeated requests.

67.     Between July 2009 through the present, FDMS's deceptive reporting made it impossible for CPC to discover the extent of the damages related to the Datawire fee, but CPC estimates that FDMS has overcharged CPC over $200,000.

**FDMS Improperly Charged CPC Regulatory Bundle and IRS/TIN Fees**

68.     In 2011, FDMS created an IRS/ TIN Reporting Fee in response to the IRS mandated regulations that required payment processors, like FDMS, and other financial institutions to report income to the IRS via 1099k notices.

69.     The IRS regulations, however, prohibited payment processors from passing along or charging for the new reporting requirement. To sidestep that prohibition, FDMS renamed the fee to a "Regulatory Product Bundle Fee."

70.     In mid-2011, Marcy Grimm, FDMS's Business Manager, sent multiple emails to CPC that demanded that CPC agree to allow FDMS to charge its merchants for the Regulatory Product Bundle Fee that included additional fees of $3.95 and $9.95 for Invalid TIN Fees. Ms. Grimm's email set forth that "if CPC did not sign the form to increase fees, CPC would be charged the fees, and it was [CPC's] business decision to have the fees passed on or not."

71.     CPC refused to agree to such amendment to the Agreement.

72.     On August 26, 2011, facing extreme pressure from FDMS and the

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

potential implementation of fees that would cripple CPC, CPC executed the Regulatory Product Bundle Fee authorization form, but signed it "under protest." *See* Regulatory Product TIN Fee, a true and correct copy of which is attached hereto as **Exhibit E**.

73. On September 20, 2011, CPC again provided FDMS with written notice that CPC did not wish to participate in the IRS/TIN Program.

74. In October 2011, FDMS began charging CPC an Invalid Tin Fee of $9.95 for each merchant in CPC's portfolio that was not in compliance with IRS TIN reporting.

75. Between August 2011 through the present, FDMS's deceptive reporting made it impossible for CPC to discover the extent of the damages related the Invalid TIN Fees, but CPC estimates that it has been damaged by FDMS in the sum of $16,025.95 for Regulatory Bundle Fees and $66,707.45 for Invalid TIN Fees.

## FDMS Improperly Charged CPC Zip Code Verification under the Address Verification Acquiring Elements

76. FDMS's service includes a feature for gas station merchants to help prevent card fraud related to pay-at-the-pump transactions where a cardholder enters their zip code. If the zip code entered at the pump did not match the zip code associated with the card, the card transaction was declined. Under the 2006 Agreement, this feature was provided to CPC at no cost.

77. Another type of security feature in the credit card processing industry is the Address Verification System (hereinafter "AVS"). An AVS transaction is used mostly in eCommerce or card-not-present transactions whereby a merchant may input the full address of a cardholder to verify the cardholder's identity. The use of the AVS service allows the merchant to get a lower fee for the transaction.

78. The zip code verification, however, does not provide for a lower fee for the transaction.

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

79.     Under the 2006 Agreement, FDMS charged CPC a $0.01 fee per inquiry for each time a merchant used the AVS service.

80.     The 2006 Agreement did not include a fee for a merchant's use of the zip code verification. Under the Agreement, zip code verification was a free service afforded to CPC merchants.

81.     In or around 2009, FDMS started charging AVS fees when cardholders entered their zip code.  Neither merchants nor CPC had control over whether the zip code verification service was used versus the AVS service.  Had CPC known, it would have remedied the situation.

82.     Since in or around 2009, FDMS's deceptive reporting, however, made it impossible for CPC to discover the extent of the damages related to the zip code verification charges, but CPC estimates that FDMS has over charged CPC $149,023.53 for overcharges related to FDMS unilaterally implementing an AVS verification, when in fact  zip code verifications.

**FDMS Improperly Charged CPC for Closed Merchant Accounts**

83.     Since late 2006, FDMS has continually and consistently charged CPC and merchants for accounts that CPC has requested that FDMS close due to the merchants' respective requests to cancel its agreement with FDMS

84.     FDMS charges a fee of $5.00 per merchant account, which is represented on the Schedule A of the 2006 Agreement as the "Merchant on File Fee" and it states: "Each account of a Merchant of Customer that remains on Customer's master file at FDMS on the last processing day of the calendar month as defined on the MM-101 Merchant Profitability report or an equivalent." *See* **Exhibit A**.

85.     Occasionally, in response to CPC's complaints to FDMS regarding that fee, FDMS would stop billing CPC for closed merchant accounts for several months, but would then charge the fee again and would require CPC to send an additional request to remove or cancel a merchant account several months after CPC's initial

1   request to remove the $5.00 fee related to closed merchant accounts.

2   86.   Since late 2006, FDMS's deceptive reporting made it impossible for

3   CPC to discover the extent of the damages related to closed merchant accounts. But

4   CPC estimates that since 2009, FDMS has wrongly charged over $111,000.00 to

5   inactive and closed merchant accounts.

## FDMS Purposefully Delayed Implementation of the Stratus Split Funding Amendment to the Agreement

87.   On October 6, 2009, CPC and FDMS executed an Amendment to the Agreement (the "Stratus Amendment.") *See* the First Stratus Amendment and the Second Stratus Amendment, true and correct copies of which are attached hereto as **Exhibits F and G** respectively.

88.   The Stratus Amendment enabled CPC to board merchants through FDMS's affiliate CTS Holdings, LLC on a Stratus platform operated by Stratus. The processing fees for the Stratus platform were different than the processing fees set forth in Section 1, subsection (c), of Schedule A of the Agreement. The Stratus Amendment added the "Omaha Platform Processing Fees Schedule" to the Processing Fees schedule in Section 1, subsection (c), of Schedule A of the Agreement. The fees under the Stratus Amendment were substantially lower.

89.   CPC relied on the Stratus Amendment to offer the services thereunder to its merchants.

90.   FDMS purposefully delayed the implementation of the Stratus platform for CPC and refused to allow CPC to sign up merchants for the platform thereby requiring CPC and merchants to pay fees above those agreed upon by FDMS in the Stratus Amendment.

91.   In early 2010, once CPC was finally set up on the Stratus network, FDMS ceased offering that service, causing additional damages to BTI and refused to communicate with BTI.

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

92.     Since early 2010 through 2012, as a result of FDMS purposeful delays, and cutoff of the offering for the Stratus split funding program, CPC has lost, business and revenue in an amount to be proven through discovery.

## FDMS Tortuously Interfered with CPC's Business Relationship With Merchants

93.     FDMS systematically and repeatedly breached the 2006 Agreement by failing to adjust CPC's merchants' fees following a request from CPC.

94.     The Agreement requires FDMS to adjust certain fees upon CPC's request.

95.     Since inception, FDMS failed to adjust certain fees related to CPC's merchants, mostly of which included lowering fees to merchants, thereby lowering the fees that FDMS collected.

96.     This would occur in multiple situations where, for example, CPC set certain pricing based on a merchant's processing history.  If the merchant's business changed, or it was simply unaware of how it processed transactions, such as the type of card that its customers used, for example a debit vs. credit card, the merchant may end up paying more than CPC estimated when it initially brokered the agreements. In such instances, CPC would review the pricing, and request that FDMS lower the pricing.

97.     FDMS's deceptive reporting made it impossible for CPC to discover the extent of the damages related to FDMS's failure to lower fees, but CPC has been damaged in an amount to be proven through discovery.

## FDMS Improperly Billed CPC Related to American Express Transactions.

98.     In September of 2009, FDMS introduced the American Express (hereinafter "Amex") One Point Program to allow FDMS to process Amex

transactions. Prior to that, CPC did not receive any compensation related to a merchant processing an Amex transaction.

99.   On September 3, 2009 CPC executed the FDMS Amex One Point Amendment whereby CPC could convert its existing merchants to Amex One Point. See attached as **Exhibit G Amex One Point Addendum.**

100.   This conversion allowed CPC to receive compensation related to Amex transactions.

101.   In or around 2016, Amex and FDMS started the "Amex Opt Blue" program following FDMS's agreement with Amex that provided for a lower cost basis to FDMS related to Amex Transactions. Under Amex Opt Blue, FDMS allowed CPC to convert merchants from the Amex One Point Program to the Amex Opt Blue Program. This included that FDMS charged a lower fee related to a merchant's Amex transactions and accordingly provided for CPC to make more money when a merchant processed an Amex transaction.

102.   When implementing the Amex Opt Blue Program, FDMS engaged in deceptive and misleading practices whereby FDMS charged ISOs, including CPC fees in excess of what merchants were charged, causing CPC and other ISOs to pay fees on behalf of merchants.

103.   Because of this, and unbeknownst to CPC, the proper Amex charge of approximately 2.5% for all of CPC's merchants that converted to AMEX Opt Blue were not charged the appropriate rate. Instead, FDMS charged and collected from CPC the fees that should have been charged to the merchants.

104.   FDMS attempted to project the error on CPC and other ISOs by arguing that ISOs had improperly followed FDMS's instructions related to converting merchants to Amex Opt Blue. Yet, FDMS's instructions caused not only CPC, but multiple other similarly situated ISOs to suffer substantial losses.

105.   FDMS's deceptive reporting made it impossible for CPC to discover the extent of the damages related to FDMS's failure to lower fees, but CPC has been

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

1  damaged in an amount to be proven at trial.

2  106.   Further, FDMS failed to timely correct the error, and only did so after

3  nearly six months and exhaustive efforts.

4  107.   During this process, and after it was completed, FDMS representative

5  Zach Casey advised CPC that FDMS knew of this problem and several months ago

6  had created a "fix" for this company wide mistake. Apparently other ISOs like CPC

7  had been given this information provided by FDMS staff to its clients. Because of

8  this, FDMS had already rolled out this "fix" several months ago. Once Mr. Casey

9  told CPC of this "fix" FDMS prohibited Mr. Casey from any contact with CPC

10  related to this "fix" and the Amex Opt Blue mistake. CPC was never compensated

11  for this error by FDMS.

12  108.   FDMS's deceptive reporting made it impossible for CPC to discover the

13  extent of the damages related to FDMS's failure to lower fees, but CPC has been

14  damaged in an amount to be proven at trial that CPC estimates to be in excess of

15  $170,000.

16

17  **FDMS Continued to Overcharge CPC Related to the Amex Opt-Blue**

18  **Program**

19  109.   In or around 2016, when FDMS rolled out the new Amex Opt Blue

20  program, FDMS added a random fee that was above FDMS's cost and charged that

21  fee to CPC and merchants

22  110.   This fee was not an uncontrollable cost or a third-party cost. FDMS

23  charged 295% of the transaction amount to CPC.

24  111.   This fee is labeled on CPC's commission report "AXB PSF Fee" and

25  ranges from $500 to $2,000 per month in fees which should not be charged to CPC.

26  112.   FDMS's deceptive reporting made it impossible for CPC to discover the

27  extent of the damages related to FDMS's failure to lower fees, but CPC has been

28  damaged in an amount to be proven at trial that CPC estimates to be in excess of

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

$48,000.

### FDMS Failed to Provide Customer Service and Back Office Services.

113.   In violation of the 2006 Agreement, FDMS failed provide customer service and back office services to merchants. Customer service procedures, which should have been completed in house by FDMS have been pushed to CPC. The scope, pervasiveness and intention by FDMS to not provide customer service to CPC was and continues to be staggering.

114.   Section 3 of the Agreement states: "**Obligations of Service Providers.** In addition to its other obligations stated elsewhere in this Agreement, Service Providers shall be responsible for all processing and accounting functions relating to the clearing and settlement of Transactions, including (a) Merchant processing and settlement; (b) Merchant credit research (other than matters to be performed by ISO pursuant to Section 2(c) of this Agreement); (c) Merchant customer activation and credit approval; (d) Merchant security and recovery; (e) Merchant customer services; (f) Merchant Chargeback and retrieval services; (g) all other Back Office Services; (h) final classification of Merchants (e.g., high, medium or low risk) pursuant to the Program Standards in the sole discretion of Service Providers; and (i) negotiation and termination of Merchant Agreements. Service Providers may contract with other persons to perform these functions on behalf of Service Providers. All debits and credits covered by this Agreement shall be subject to audit and final checking by Service Providers, and prompt adjustment shall be made for any inaccuracies discovered." *See* **Exhibit A**.

115.   For Example, as of July 15, 2018 when a merchant calls the FDMS customer service phone number 1 (800) 858-1166 the phone prompt plays a message giving the local phone number of CPC (858) 866-4260 and instructing future callers to make calls to CPC's phone number instead of FDMSs customer service phone number.

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

116.   FDMS has willfully failed to meet its duties regarding the support functions such as processing ACH rejects, and debt collections practices, technical support, back office services, and has created a corporate culture and trained its staff to act as though ISOs like CPC were responsible for nearly all support services instead of FDMS.

117.   FDMS has leveraged the acute and urgent need of CPC, and other ISOs, to have customer service by not providing customer service so that ISOs, like CPC, would have to perform the customer service or lose business. FDMS created an ineffective and cumbersome communication system and others like it so that ISOs would perform "Back Office Services" instead of FDMS.

118.   FDMS's deceptive reporting made it impossible for CPC to discover the extent of the damages related to FDMS's failure to lower fees, but CPC estimates that FDMS's unlawful business practices with respect to these systems and structures have cost and damaged CPC approximately $4,000 per month over the last six years and an amount in excess of $288,000 to date, according to proof at trial.

## FDMS's Interference with CPC's Agreements and Relationship with Merchants

119.   Since at least 2010, FDMS through its ISO and direct sales channels, including its wholly owned subsidiary "Ignite," formerly known as FDMS Independent Sales, has systematically solicited and caused merchants from CPC to leave processing services with CPC and to process through FDMS directly.

120.   In or around mid-2010, FDMS engineered a sales force comprised of "independent" sales agents, who solicited CPC merchants equipped with CPC's confidential and proprietary information related to merchants' pricing, preferences, payment processing history, and contact information which FDMS provided to such direct sales agents in violation of the Agreement.

121.   Also, through FDMS's underwriting, FDMS knows when a merchant was previously under an agreement with CPC or another ISO as a company was always aware when a merchant account was already with FDMS through an ISO due to the underwriting tools and by simply looking at internal processing records.

122.   FDMS has interfered with CPC's contracts and business relationships, has unfairly and deceptively not compensated CPC, and has taken a great deal of business away from CPC and diverted it to its direct sales channels, including First Data Ignite, which is now CardConnect Corp., a Pennsylvania corporation.

123.   FDMS's improper business methods of allowing entities and its own independent sales channels to rewrite existing accounts of its sales partners has cannibalized its own sales and profits and is a practice which also has damages the shareholder of FDMS.

### Miscellaneous Fees and Declined Authorization Fees

124.   Since the 2006 Agreement was executed, FDMS has charged erroneous fees either contained or not contained on the Schedule A or Exhibit I addendums of the 2006 Agreement and the related addendums to the Agreement. There were transactions which were charged to CPC, which were later refunded to merchant(s) and were not refunded to CPC. These fees were erroneously charged by network errors or other causes only known by FDMS. One example of this occurred recently in March of 2019, when Diego Ruiz DC, LLC, DBA Options Rehabilitation Center ("Option Rehab"), was erroneously charged $7,582.55 in declined transaction fees by FDMS.   CPC worked with FDMS to make Option Rehab whole and to refund the erroneous decline transactions.   CPC volunteered based on the promise that CPC would be compensated on its next residual report any money refunded to the merchant.   CPC was instructed to refund $8,935.76 to Option Rehab, which occurred at the very end of March 2019 and was to be funded on April 1st 2019.   When CPC received its March 2019 commission report, there was an additional $10,326.20 fee called "March 2019 TSYS Front End Processing Charges

for Newly Boarded Accounts". In April of 2018, Options Rehab's merchant statement reflected a refund of $8,935.76, but it also showed the refund being immediately taken out of the merchant's account on the merchant statement. Despite this, CPC was still charged the refund of $8,935.76 that CPC volunteered on its April 2019 commission report. CPC was damaged by being charged a total of the random March TSYS $10,326.20 fee, and the April 1st refund of $8,935.76, for a total of $19,261.96.

## Assignment and Assumption Fees

125. In or around 2018 FDMS notified CPC it would need to sign an addendum that would allow FDMS to charge a large fee of $25,000 for the assignment of CPC's residuals for the purposes to either sell its portfolio of residuals or to assign its portfolio of residuals. This fee is not contained nor contemplated by the 2006 Agreement or any of the addendums between FDMS and CPC. This fee amounts to an attempt to coerce CPC into not obtaining financing except through FDMS's programs for financing, or to coerce CPC to not freely sell its interest in its portfolio with FDMS because CPC otherwise had the right and relied on the right to sell its portfolios. The result of this fee sent a ripple through the industry that FDMS was no longer compliant with portfolio sales, and caused potential purchasers to no longer desire to purchase FDMS portfolios. Absent this fee, CPC would have sold its portfolio.

126. CPC's damages are at least $300,000, which is a reasonable estimate of the value that CPC lost due to not being able to sell its portfolio.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

### (Against all Defendants)

127. CPC repeats and realleges all paragraphs above with the same force and

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

effect as if fully set forth herein.

128.   CPC, FDMS, and Wells Fargo as assignee from Bancorpsouth entered into a valid and binding contract on or about July 1, 2006, which was subsequently amended.  And at some point, Bancorpsouth assigned its rights and duties to Wells Fargo.  It is unclear from the agreements when the assignment occurred and whether Bancorpsouth remained a party to the 2006 Agreement and subsequent amendments.  The 2006 Agreement does not allow for an assignment, and such assignment may be void.

129.   CPC has performed all of its obligations under the Agreement and all amendments thereto by referring merchants to FDMS, paying all fees owed to FDMS, complying with all applicable rules and regulations, and remaining compliant with all material terms thereunder.

130.   Defendants have materially breached the 2006 Agreement, and the respective amendments of which the respective defendants are parties thereto, as set forth above.

131.   As a result of Defendants' material breaches of the 2006 Agreement and all amendments thereto, CPC has been damaged, and continues to be damaged, which damages are the natural and proximate consequence of FDMS' breach of the Agreement, in an amount to be determined through discovery, but no less than $3,000,000.

## SECOND CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)

### (Against all Defendants)

132.   CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

133.   Defendants FDMS and Bancorpsouth agreed to abide by the terms of the 2006 Agreement and up to some point in time, Wells Fargo assumed

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

Bancorpsouth's duties and obligations under the 2006 Agreement and became a party to the 2006 Agreement and all subsequent amendments thereto. Implied in the contractual relationship which exists between the parties was Defendants' covenant of good faith and fair dealing.

134. Defendants' actions as set forth above breached this implied covenant of good faith and fair dealing.

135. Defendants' breaches have caused and are continuing to cause substantial and imminent harm to CPC.

136. As a proximate result, CPC has suffered significant damages in excess of $3,000,000 according to proof at trial.

## THIRD CAUSE OF ACTION
### (Conspiracy)
### (Against all Defendants)

137. CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

138. At certain points in time, FDMS, LLC, FDC, and Wells Fargo were not parties to the 2006 Agreement and various amendments through assignment, restructuring, or other facts which are not presently known. Despite any lapses or absence in contractual privity, those parties continued to derive a benefit from the acts set forth above.

139. CPC is informed and believes and based thereon alleges that Defendants conspired to harm Plaintiff and perpetrate and further the acts of breach of the covenant of good faith and fair dealing, unfair business practices and/or violations of various laws governing their business, including, but not limited to, Donnelly/Cartwright Act, California Business and Professions Code §§ 17200, 17203, and 17500 et seq., California Civil Code §§ 1670 and 1671, California Penal Code § 496, fraud/intentional misrepresentation, negligent misrepresentation,

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

breach of fiduciary duty, conversion, and, intentional interference with prospective economic advantage, as set forth in this second Amended Complaint and according to proof at time of trial.

140.   Further, Defendants conspired to violate the rules and regulations promulgated by the Card Brand's that set as "self-regulations" in the electronic payment processing industry.

141.   As set forth above, FDC operates and directs FDMS.  FDMS is a mere veil for FDC to hide behind.  FDMS worked with Wells Fargo to orchestrate a scheme that allowed for Wells Fargo to collect exorbitant fees.  FDMS's delays in processing transactions allowed for Wells Fargo to hold funds and use them for its benefit.  FDMS developed this scheme with Wells Fargo and acted in concert to defraud CPC, other ISOs, and merchants.  Wells Fargo and FDMS engaged in this conspiracy prior to Wells Fargo being a party to the 2006 Agreement and one of the reasons that Wells Fargo received the assignment of the 2006 Agreement was so that Wells Fargo could aid and abet FDMS's actions and plans to continue to increase charges and fees to CPC in violation of applicable laws, rules, and regulations.

142.   CPC is informed and believes and based thereon alleges that by reason of the conduct of Defendants, and their agents, servants and employees, as alleged herein, Plaintiff have been damaged in a sum in excess of $3,000,000, according to proof at trial.

143.   CPC is informed and believes and based thereon alleges that Defendants are responsible for the harm to Plaintiff because Defendants entered into an implied or express agreement with each other to harm Plaintiff and perpetrate and further the wrongful acts described above.

144.   CPC is informed and believes and based thereon alleges that Defendants perpetrated the conspiracy in order to wrongfully obtain money from Plaintiff, among other things.

145.   Plaintiff is informed and believe that the unlawful acts of Defendants,

and their agents, servants, co-conspirators and employees, as alleged herein, were done by Defendants intentionally, willfully, fraudulently and/or maliciously and thereby deprived CPC of property and legal rights or otherwise caused injury to CPC. Said misconduct was despicable and committed with a complete and total disregard for the rights of CPC, and CPC therefore is entitled to punitive damages in an amount according to proof at time of trial.

## **FOURTH CAUSE OF ACTION**

### **(Unjust Enrichment)**

### **(Against all Defendants)**

146.   CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

147.   Defendants have wrongfully refused to abide by the terms of the 2006 Agreement, and respective amendments thereto, in many respects, including charging closed merchant accounts after CPC has requested that they cease and desist from doing so.

148.   At certain points in time, FDMS, LLC, FDC, and Wells Fargo were not parties to the 2006 Agreement and various amendments through assignment, restructuring, or other facts which are not presently known.  Despite any lapses or absence in contractual privity, those parties continued to derive a benefit from the acts set forth above.

149.   Defendants have unjustly and/or wrongfully retained a substantial benefit at the expense and detriment of CPC. CPC has an inadequate remedy at law for Defendants' unjust enrichment.

150.   By reason of the foregoing, FDMS has been unjustly enriched at the expense of CPC, and CPC has suffered damages, plus prejudgment interest at the legal rate, as well as any other damages, in excess of $3,000,000, according to proof at trial.

151.   Defendants will continue to be unjustly enriched to the substantial

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

detriment and prejudice of CPC and a constructive trust should be placed on all sums due and owing to CPC unless and until CPC is fully and justly restored, subject to proof and/or equity.

## FIFTH CAUSE OF ACTION

### (For An Accounting)

### (Against all Defendants)

152. CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

153. CPC and Defendants are in a relationship where FDMS directs Wells Fargo to pay CPC residuals in accordance with the Agreement, or are supposed to make such payments.

154. Defendants had and have a duty to properly report, account for and distribute residuals to CPC.

155. Defendants have exclusive control over and access to information related to CPC's residuals, and have denied CPC access to this information.

156. As alleged above, Defendants have never properly accounted for or completely made residual payments to CPC.

157. As alleged above, a dispute exists between CPC and Defendants respecting Defendants' failure to properly account for or make full residual payments to CPC.

158. Accordingly, CPC demands an accounting regarding the exact amount of the residuals presently due them and that will be due in the future, and it is necessary and appropriate for this Court to order an accounting to disclose this information.

## SIXTH CAUSE OF ACTION

### (Violation of Donnelly/Cartwright Act)

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

**(Against all Defendants)**

159. CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

160. Defendants' actions to eliminate competition unreasonably restrains trade and will likely continue to restrain trade in violation of the Donnelly and/or Cartwright Act.

161. For example, FDMS offers certain programs and services that it mandates that its ISOs use.  The "Clover" machine is one such example.  FDMS offered the "Clover" machine as a point of sale system for merchants to not only process transactions, but also manage their business.  FDMS made it extremely difficult for CPC to offer any other machine.

162. Also, FDMS included in the 2006 Agreement minimum processing fees. What FDMS hid from CPC was that the minimum fees would in effect force CPC to continue to refer merchants to FDMS to avoid the penalties associated with failing to meet those minimum fees.  Those minimum processing fees also incentivized CPC to increase rates and fees to CPC's customers.

163. Further, at any point when CPC would complain about FDMS's acts, FDMS would often times respond by providing an accounting to CPC that would determine that FDMS had recalculated the residuals paid to CPC and FDMS would offset that from CPC.  This forced CPC to remain silent in the face of FDMS's wrongful acts.

164. By engaging in the acts and practices described above, Defendants' have attempted to monopolize the market for payment processing in the United States.

165. Such conduct constitutes monopolization in violation of the Donnelly and/or Cartwright Act.

166. By reason of the foregoing, CPC has been damaged, which damages are the natural and proximate consequence of Defendant's monopolization of the market and are in excess of $3,000,000, according to proof at trial.

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

# SEVENTH CAUSE OF ACTION

## (Unfair Business Practices, California Business and Professions Code §§ 17200, 17203, and 17500 et seq.)

### (Against all Defendants)

167. CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

168. As more fully set forth throughout above and as will be proven at trial, Defendants have engaged and continue to engage in unfair business practices, including, but not limited to, unfair competition and other unfair, deceptive, and misleading business practices.

169. Defendants have acted, and continue to act, in violation of various laws governing their business, including, but not limited to, California Business and Professions Code §§ 17200, 17203, and 17500 et seq., among other things, as set forth above and according to proof.

170. Plaintiff is informed and believes that Defendants will continue to engage in unlawful business practices unless and until the Court orders the Defendants to cease and desist.

171. As a direct, proximate, and foreseeable result of Defendants' wrongful conduct, as alleged above, CPC has suffered pecuniary harm and has been damaged in a sum in excess of $3,000,000.00, according to proof at trial. Plaintiff and other members of the general public will continue to suffer substantial harm and injury if the Court does not provide restitution and injunctive relief, as requested herein. Plaintiff and other members of the general public do hereby seek all remedies against Defendants for such damages and for restitution and injunctive relief.

# EIGHTH CAUSE OF ACTION

## (Illegal Contract California Civil Code §§ 1670 and 1671)

**(Against all Defendants)**

172. CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

173. The 2006 Agreement, at section (b) on the Schedule A contains an illegal liquidated damages clause. *See* **Exhibit A.** The liquidated damages clause is not a reasonable calculation of the amount of damages that FDMS and Wells Fargo would suffer. The assessment of such penalty would provide a windfall for FDMS and Wells Fargo.

174. FDMS's acts encouraged CPC to terminate because not only would FDMS receive the liquidated penalty, it would also cease paying CPC and keep all of the revenue derived from the merchants that CPC referred to FDMS. FDMS also forced CPC to enter into a non-solicitation provision which would prohibit and further penalize CPC should it desire to serve its customers elsewhere.

175. CPC was forced to continue to work with FDMS due to its threatened enforcement of its liquidated damages penalty.

176. Such Agreement constitutes a violation of California Civil Code §§ 1670 and 1671.

177. By reason of the foregoing, Plaintiff has been damaged, which damages are the natural and proximate consequence of Defendants' enforcement of the illegal penalty in excess of $3,000,000, according to proof at trial.

## NINTH CAUSE OF ACTION

### (Declaratory Relief)

### (Against all Defendants)

178. CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

179. As alleged above, an actual controversy exists between the parties regarding their respective rights and obligations under the Agreement, and with respect to the calculation, reporting and payment of residuals due under the

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

Agreement, among many other things.

CPC requests a declaration with respect to the foregoing.

## **TENTH CAUSE OF ACTION**
### **(Conversion)**
### **(Against all Defendants)**

180.   CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

181.   At certain points in time, FDMS, LLC, FDC, and Wells Fargo were not parties to the 2006 Agreement and various amendments through assignment, restructuring, or other facts which are not presently known.  Despite any lapses or absence in contractual privity, those parties continued to derive a benefit from the acts set forth above.

182.   In connection with the account CPC has with Defendants, Defendants have underpaid CPC at least $3,000,000 from their failure to pay correct residual amounts. CPC has demanded the full return of their property to no avail.

183.   CPC is informed and believe and thereon allege that some or all of the funds that rightfully belong to them are being held or used personally by Defendants, and that Defendants wrongfully, knowingly and intentionally continue to exercise dominion over CPC's property by retaining at least $3,000,000 due and owing to CPC.

184. As a direct and proximate result of Defendants' actions, CPC has suffered damages in an amount of at least $3,000,000.

185. Defendants' wrongful acts as described herein were intentional, malicious, oppressive and fraudulent, and were committed with reckless disregard of harm to CPC and in willful and conscious disregard of CPC's rights, such that CPC are entitled to recover punitive damages against Defendants in an amount that is sufficient and appropriate to punish them as well as to deter them from committing

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

similar acts in the future.

## **ELEVENTH CAUSE OF ACTION**

### **(Fraud/Intentional Misrepresentation)**

### **(Against all Defendants)**

186.   CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

187.   At certain points in time, FDMS, LLC, FDC, and Wells Fargo were not parties to the 2006 Agreement and various amendments through assignment, restructuring, or other facts which are not presently known.  Despite any lapses or absence in contractual privity, those parties continued to derive a benefit from the acts set forth above.

188.   Beginning in or about September of 2009, and continuing thereafter, Defendants, individually and jointly by and through various representatives of Defendants, including, but not limited to, Erick Nicholson and Zach Casey, specifically represented to Plaintiff and agreed:

    a.  that Defendants would abide by and provide good and valuable services for Plaintiff with respect to the Agreement;

    b.  that Defendants would provide monthly residual reports they produced to CPC and other ISOs were accurate and true, and the residual payments they made were the actual amounts due and owing;

    c.  that Defendants would accurate and truly represent payments owed to CPC and other agents;

    d.  that Defendants would ensure that their residual reports properly displayed accurate data, and that payments made to CPC were the full and actual amounts due and owing;

    e.  that Defendants would not increase fees and/or charges to CPC, and other ISOs with agreements similar to CPC, in violation of such

agreements;

f.  that Defendants would not overcharge CPC;

g.  that Defendants would not underpay CPC;

h.  that Defendants would not impose unauthorized fees, charges, and/or fines of any kind to CPC, and other ISOs with agreements similar to CPC, including, but not limited to, the unauthorized fees, charges, and/or fines set forth above, such as those related to PCI fines, Buypass Fees, Pin-Debit Transactions, Dial and Non-Dial Authorizations, Datawire, Bundle and IRS/TIN, Zip Code Verification under the Address Verification Acquiring Elements, Closed Merchant Accounts, processing fees for the Stratus platform, "AXB PSF Fee", FDMS Failed to Provide Customer Service and Back Office Services, American Express Transactions, among other things;

i.  that Defendants would not improperly bill CPC for anything, including, but not limited to, for American Express transactions;

j.  that Defendants would not purposefully or otherwise delay anything, including, but not limited to, the implementation of the Stratus Split Funding Amendment;

k.  that Defendants would not engage in or cause any deceptive and/or inaccurate reporting;

l.  that Defendants would not purposefully or otherwise improperly delay the implementation of the Stratus platform for CPC and refuse to allow CPC to sign up merchants for the platform thereby requiring CPC and merchants to pay fees above those agreed upon;

m. that Defendants would not tortuously interfere with CPC's business relationship with merchants, including, but not limited to, Defendants using their ISO and direct sales channels, such as their wholly owned subsidiary "Ignite," formerly known as "FDMS Independent Sales",

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

systematically soliciting and causing merchants from CPC to leave processing services with CPC and to process through Defendants and their other entities, Defendants directly engineering a sales force comprised of "independent" sales agents who solicited CPC merchants equipped with CPC's confidential and proprietary information related to merchants' pricing, preferences, payment processing history, and contact information which Defendants provided to such direct sales agents, Defendants using their own underwriting to find out when a merchant was previously under an agreement with CPC or another ISO as a company and always became aware when a merchant account was already with Defendants through an ISO due to the underwriting tools and by simply looking at internal processing records;

n. that Defendants would not fail and/or refuse to adjust CPC's merchants' fees upon CPC's request and/or lower CPC's fees to merchants, and/or lower the fees that Defendants collected on behalf of CPC;

o. that Defendants would not fail and/or refuse to perform any required service and use their best good faith efforts, including, but not limited to, Customer Service and Back Office Services;

p. that Defendants would not fail and/or refuse to meet its duties regarding the support functions and use their best good faith efforts, including, but not limited to, processing ACH rejects, debt collections practices, technical support, back office services, and/or creating a corporate culture and training its staff to act as though ISOs like CPC were responsible for nearly all support services instead of Defendants;

q. that Defendants would not fail and/or refuse to meet its duties regarding the support functions and use their best good faith efforts, including, but not limited to, leveraging the acute and urgent need of CPC, and other ISOs, to have customer service by not providing customer service so that

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

ISOs, like CPC, would have to perform the customer service or lose business, and/or by creating an ineffective and cumbersome communication system and others like it so that CPC and other ISOs would perform have to perform such services instead of Defendants;

r. that Defendants would not engage in deceptive and misleading practices whereby Defendants charged ISOs, including CPC fees in excess of what merchants were charged, causing CPC and other ISOs to pay fees on behalf of merchants;

s. that Defendants would provide monthly residual reports to CPC and other ISOs which were accurate and true, and that the residual payments they made were the actual amounts due and owing;

t. that Defendants would provide monthly residual reports to CPC and other ISOs which were not inaccurate and/or did not falsely represent payments owed to CPC and other agents;

u. that Defendants would regularly and timely provide a thorough, complete, and accurate accounting of all monies owed to CPC; and,

v. that Defendants would not use improper business methods as set forth above and including, but not limited to, allowing entities and Defendants' own independent sales channels to rewrite existing accounts of its sales partners and cannibalizing Defendants' own sales and profits and other practices which harms CPC and other ISOs as well as Defendants' shareholders.

189. At the time Defendants' authorized representatives, and each of them, made the above referenced material representations, statements, promises, failures to disclose and/or omissions to CPC, said Defendants knew same were false and/or had no reasonable ground for believing same were true and/or made the statements with the intent to induce CPC to take the actions set forth herein and to CPC's substantial financial detriment.

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

190.   Said Defendants, and each of them, surreptitiously and without CPC's consent or knowledge, proceeded with actions and omissions as set forth above in the preceding allegations and according to proof which were contrary to what Defendants had represented and agreed.

191.   CPC in fact did reasonably rely on said Defendants' material representations, statements, promises, failures to disclose and/or omissions and did not know of said Defendants' fraud and took the material actions set forth herein and hired Defendants as Plaintiff's legal counsel and trusted that said Defendants were acting in good faith, just as CPC was acting in good faith. Plaintiff discovered said Defendants' fraud recently and continues to discover said Defendants' fraud.

192.   As a direct and legal result of the fraud of Defendants, CPC has suffered actual, consequential, and special damages in excess of $3,000,000 plus interest until the full balance due and owing is paid, subject to proof.

193.   CPC is informed and believes that the unlawful acts of Defendants, and their agents, servants, co-conspirators and employees, as alleged herein, were done by Defendants intentionally, willfully, fraudulently and/or maliciously and thereby deprived CPC of money, property and legal rights or otherwise caused injury to CPC. Said misconduct was despicable and committed with a complete and total disregard for the rights of CPC, and CPC therefore is entitled to punitive damages in an amount according to proof at time of trial.

## TWELFTH CAUSE OF ACTION
### (Negligent Misrepresentation)
### (Against all Defendants)

194.   CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

195.   In the alternative, CPC alleges on information and belief that when Defendants made the aforementioned representations of material fact, said

40

representations were made by Defendants with no reasonable grounds for believing that such misrepresentations were true. Defendants made said representations with the intent to have CPC pay money and other valuable consideration to Defendants under the auspices that Defendants would fulfill their obligations to CPC, and as set forth in the preceding allegations in this Second Amended Complaint and according to proof.

196.   At certain points in time, FDMS, LLC, FDC, and Wells Fargo were not parties to the 2006 Agreement and various amendments through assignment, restructuring, or other facts which are not presently known.  Despite any lapses or absence in contractual privity, those parties continued to derive a benefit from the acts set forth above.  And as set forth above, CPC was at many times unaware of who the individual it was working with represented, whether it be FDC, FDMS, LLC or Wells Fargo.

197.   As a direct and legal result of Defendants' negligent misrepresentations, Plaintiff has suffered actual, consequential, and special damages in excess of $3,000,000 plus interest until the full balance due and owing is paid, subject to proof, with exact damages to be determined following discovery and a thorough accounting.

198.   CPC is informed and believes that the unlawful acts of Defendants, and their agents, servants, co-conspirators and employees, as alleged herein, were done by Defendants intentionally, willfully, fraudulently and/or maliciously and thereby deprived CPC of money, property and legal rights or otherwise caused injury to CPC. Said misconduct was despicable and committed with a complete and total disregard for the rights of CPC, and CPC therefore is entitled to punitive damages in an amount according to proof at time of trial.

## THIRTEENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

### (Against all Defendants)

199.   CPC repeats and realleges all paragraphs above with the same force and

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

effect as if fully set forth herein.

200.   Defendants, and each of them, were, at all times relevant herein, legal counsel for Plaintiffs, each owing a fiduciary duty and duty of loyalty to Plaintiffs.

201.   Defendants breached their duty of loyalty and care owed to Plaintiff, as set forth in the preceding allegations in this Second Amended Complaint and according to proof.

202.   As a proximate result of Defendants' breach of fiduciary duty, Plaintiff has suffered actual, consequential, and special damages in excess of $3,000,000 plus interest until the full balance due and owing is paid, subject to proof.

203.   CPC is informed and believes that the unlawful acts of Defendants, and their agents, servants, co-conspirators and employees, as alleged herein, were done by Defendants intentionally, willfully, fraudulently and/or maliciously and thereby deprived CPC of money, property and legal rights or otherwise caused injury to CPC. Said misconduct was despicable and committed with a complete and total disregard for the rights of CPC, and CPC therefore is entitled to punitive damages in an amount according to proof at time of trial.

## FOURTEENTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)
### (Against FMDS)

204. CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

205. CPC established a substantial portfolio of merchants that it introduced to FDMS for credit card processing.

206. As alleged above, FDMS contacted merchants to solicit them for additional products, and through FDMS's agents, FDMS has converted CPC's merchant accounts.

207. Defendants' conduct constitutes deliberate interference with CPC's

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

prospective economic advantage in that, but for the illicit acts as alleged herein, CPC would otherwise have continued to earn residual income, and would have been able to continue business and to develop business with third parties.

208. As a direct result of the Defendants' interference with CPC's prospective economic advantage as alleged above, CPC has suffered damages in excess of $3,000,000, according to proof at trial.

209. Defendants' wrongful acts as described herein were intentional, malicious, oppressive and fraudulent, and were committed with reckless disregard of harm to CPC and in willful and conscious disregard of CPC's rights, such that CPC is entitled to recover punitive damages against Defendants in an amount that is sufficient and appropriate to punish them as well as to deter them from committing similar acts in the future.

## FIFTEENTH CAUSE OF ACTION
### (Violation of California Penal Code § 496)
### (Against all Defendants)

210. CPC repeats and realleges all paragraphs above with the same force and effect as if fully set forth herein.

211. As alleged above, Defendants in essence stole at least $3,000,000 from Defendants in the form of withheld residual payments.

212. California Penal Code § 496(a) provides that "every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170." Sub-section (c) of Penal Code § 496 instructs that "any person who has been injured by a violation of

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

213. As a result of Defendants' conduct as alleged herein, CPC have been damaged and are entitled to recover three times the amount of their actual damages, or at least $3,000,000, in addition to reasonable attorneys' fees. Further, as residuals come due and owing to CPC and remain unpaid from the date of this pleading onward, CPC's actual damages and treble damages will increase at a rate of $27,000 per month, or $81,000 in treble damages per month.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commerce Point Capital, Inc. prays for relief against Defendants as follows:

1.     For full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of their unfair business acts or practices, breach of contract and other violations of law.

2.     For a prohibitory injunction requiring Defendants to cease and desist from engaging in unlawful business practices, and for a mandatory injunction requiring the immediate return of all of Plaintiff's property.

3.     For compensatory damages in excess of $3,000,000, and interest thereon, according to proof at trial.

4.     For punitive damages and/or treble damages, plus any further amounts according to proof at time of trial.

5.     For all costs and expenses, including attorneys' fees.

6.     For prejudgment interest at the maximum legal rate; and

7.     For such other and further relief as the Court may deem proper.

8.

GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

1   Date: May 17, 2019

2                                                       By: _____

3                                                               James Cannon Huber, Esq.

4                                                               Attorney for Plaintiff,
                                                                      COMMERCE POINT
5                                                                     CAPITAL, INC.

6

7

8

9

10

11

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, California 92075
(888) 846-8901

**TABLE OF CONTENTS**

1. Exhibit A- 2006 Marketing Agreement…………………………………001

2. Exhibit B- Bank Transaction Major Merchant Pricing Amendment
   7030 Retail ISO 110103………………………………………………...047

3. Exhibit C- 2009 PCI Compliance Letter and Agreement………………054

4. Exhibit D- July 1, 2006 Amendment……………………………………064

5. Exhibit E- Regulatory Product TIN Fee………………………..………080

6. Exhibit F- First Stratus Amendment…………………………...………095

7. Exhibit G- Second Stratus Amendment………………………………...097

SECOND AMENDED COMPLAINT FOR DAMAGES      3:19-cv-00556-BEN-LL

# EXHIBIT A

# MARKETING AGREEMENT

This Marketing Agreement dated as of July 1, 2006 (the "Effective Date") is by and between Bank Transactions, Inc. ("ISO"), First Data Merchant Services Corporation ("FDMS"), and BancorpSouth Bank ("Bank").

## RECITALS

A. FDMS and Bank (together, the "Service Providers") have established and maintain a Merchant Program for the processing and settlement of Bank Card Transactions.

B. Service Providers wish to contract with ISO to market the Program to prospective Merchants, and ISO is willing to perform such services, on the terms and conditions set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing and the covenants and conditions contained herein, ISO, FDMS and Bank agree as follows:

1. **Definitions.** When used herein (including the recitals set forth above), the following terms shall have the meanings set forth below (each of which includes the singular and the plural):

"Back Office Services" may include receiving customer calls directly from Merchants, point-of-sale help desk services, fraud monitoring, credit approval, new account entry, and decision making with respect to retrievals and Chargebacks.

"Bank Card" means a credit card or debit card issued by a member of MasterCard, VISA or any other association or card issuing organization and bearing its respective trade names, trademarks, and/or trade symbols.

"Bank Card Sale" means each sale by a Merchant of merchandise or services through the use of a Bank Card.

"Cardholder" means any authorized user of a Bank Card.

"Chargeback" means a disputed charge by a Cardholder or rejected Sales Draft that is returned unpaid for any reason by the issuer of the Bank Card.

"Confidential Information" means all proprietary, secret or confidential information or data relating to a party and its affiliates, operations, employees, products or services, clients, customers, potential customers and Service Providers' Merchant Program. Confidential Information shall include proprietary information of MasterCard and VISA, pricing information, Merchant Applications, Merchant Agreements, Merchant accounts and records, customer lists, Cardholder account numbers, computer access codes, instruction and/or procedural manuals, and the terms and conditions of this Agreement. Information


002

shall not be considered Confidential Information to the extent, but only to the extent, that such information: (i) is already known to the receiving party free of any restriction at the time it is obtained; (ii) is subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) becomes publicly available through no wrongful act of the receiving party; (iv) is independently developed by the receiving party without reference to any Confidential Information of the other; or (v) is required to be disclosed by law.

"Credit Transaction" means the exchange, return of, and adjustment on merchandise or services sold by a Merchant in a Sales Transaction and the face amount thereof when used in this Agreement in reference to payments to the Cardholder.

"Designated Account" means a commercial account maintained by ISO with Bank as described in Section 12(a) of this Agreement.

"Discount Fee" means a percentage of the face amount of each Transaction that Service Providers may retain before payment to a Merchant as established pursuant to Section 9 of this Agreement and set forth in each Merchant Agreement.

"Effective Date" is defined in the first paragraph of this Agreement.

"IC" is defined in Section 2(g) of this Agreement.

"Including" whether capitalized or not, means "including but not limited to."

"Initial Term" is defined in Section 19(a) of this Agreement.

"Marks" is defined in Section 16(a) of this Agreement.

"MasterCard" means MasterCard International, Incorporated.

"Merchant" means each merchant solicited by ISO on behalf of Service Providers and approved by the Service Providers that is a party to a Merchant Agreement.

"Merchant Agreement" means an agreement entered into between Service Providers and a Merchant pertaining to Bank Card Sales by the Merchant.

"Merchant Application" means the form of Merchant Bank Card application and Merchant Agreement in use by Service Providers on the Effective Date, as the same may be modified from time to time by Service Providers in their sole discretion.

"Minimum Fees" shall have the meaning provided in Section 2(a) of Schedule A to this Agreement.

"Nonsolicitation Obligation" is defined in Section 2(h) of this Agreement.

"Other MSP" is defined in Section 2(g) of this Agreement.

"Processing Year 1" means the period commencing on the Effective Date and ending on June 30, 2007.

003

"Processing Year" means each twelve (12) calendar month period commencing on the first day of June and ending on the last day of May.

"Program" means the program of Merchant participation in the Bank Card systems described in the Merchant Agreement.

"Program Standards" means the credit criteria, standards and policies and procedures established by Service Providers to be used by ISO in connection with the solicitation of prospective Merchants and other policies, procedures, fines and penalties established by Service Providers that are designed to promote Merchant satisfaction, to preserve relationships with existing Merchants, to facilitate the growth of the Program, and to ensure the financial safety or soundness of Service Providers and their Program.  Attached as Schedule B is a list of certain categories of merchants who are always unacceptable under the Program.  The Program Standards may be modified by Service Providers from time to time in their sole discretion.

"Rules" means all bylaws, rules, operational regulations, procedures and guidelines promulgated by MasterCard, VISA or any other Bank Card association, as they may from time to time be amended.

"Sales Draft" means a form provided or approved by Service Providers to be executed by a Cardholder as evidence of a purchase of merchandise or services from a Merchant through the use of a Bank Card.

"Sales Transaction" means a sale by a Merchant of merchandise or services through the use of a Bank Card and the face amount thereof when used in this Agreement in reference to payments to the parties.

"Service Providers" is defined in Recital A of this Agreement.

"Total Annual Fees" shall have the meaning provided in Section 2(a) of Schedule A to this Agreement.

"Transaction" means a Sales Transaction, Credit Transaction, or Chargeback.

"VISA" means, individually, or collectively, as appropriate, VISA U.S.A., Inc. or VISA International.

"Year 1 Minimum Fees" shall have the meaning provided in Section 2(a) of Schedule A to this Agreement.

2.  **Obligations of ISO.**

(a)  ISO shall use its best efforts to solicit prospective Merchants to execute Merchant Agreements with Service Providers and shall promote Service Providers' Program as its preferred offering.  "Preferred Offering" means that ISO will utilize Service Providers' Program unless (i) Service Providers decline to execute a Merchant Agreement with any prospective merchant or (ii) Service Providers are unable to provide a prospective merchant with the specific Bank Card processing services required by such merchant.  In furtherance of

004

ISO's solicitation of Merchants, ISO will (i) communicate to Merchants the existence and availability of the Program, provided that the nature and content of such communication shall be in the reasonable discretion of Service Providers; (ii) distribute promotional materials approved by Service Providers regarding the Program to its Merchants; and (iii) perform other reasonable services which ISO and Service Providers deem desirable to promote and market the Program.

(b) ISO shall instruct existing and potential Merchants to furnish Service Providers with such financial information as Service Providers may from time to time request. ISO will use its best efforts to call to Service Providers' attention any information that it reasonably considers relevant to a determination of any existing or potential Merchant=s creditworthiness, and ISO shall follow the Program Standards in soliciting prospective Merchants.

(c) ISO shall obtain such information and take such action as Service Providers may from time to time reasonably require in connection with their processing of prospective Merchants, including:

(i) Fully complete and submit to Service Providers' a Merchant Application for each prospective Merchant;

(ii) Take all necessary action to verify that each prospective Merchant conducts or intends to conduct a bona fide business operation, including inspecting the Merchant's premises to determine whether Merchant has the proper facilities, equipment, inventory and license or permit, if necessary, to conduct the business;

(iii) Submit a written inspection report to Service Providers in such form as Service Providers may from time to time designate; and

(iv) Obtain and submit to Service Providers, as appropriate, any information required by Service Providers, including, as reasonably required by Service Providers, a fully completed Merchant Agreement, financial statements, Bank Card statements and corporate resolutions for each prospective Merchant.

ISO warrants that as of the date of submission to Service Providers the inspection report and all other information provided to Service Providers by ISO shall to ISO's knowledge be correct, complete and not misleading. Notwithstanding the foregoing, Service Providers acknowledge and agree that ISO is not obligated to verify any financial information and makes no warranties regarding the accuracy of any financial information.

(d) ISO will use best efforts to cause each Merchant to fully pay and perform its obligations under the Merchant Agreement and to assist Service Providers in collecting any amounts owed by a Merchant from time to time.

(e) All fees and charges for completing and submitting a Merchant Application to Service Providers must be (i) clearly and conspicuously disclosed to each prospective Merchant in writing in the Merchant Application by ISO in advance of submission of the Merchant Application for consideration by Service Providers and (ii) charged and collected



005

by ISO or Service Providers in accordance with all applicable laws, regulations, and the Rules. If a Merchant or prospective Merchant is entitled to a refund of any such fee or charge, ISO shall refund such fee or charge in full no later than thirty (30) days from the date on which the Merchant or prospective Merchant is entitled to such refund or immediately upon demand by Service Providers or such Merchant for a refund, whichever is earlier.

(f) The sale, lease and/or rental of point-of-sale terminals and other equipment shall be solely pursuant to separate written agreements between ISO (or its designee) and the Merchants.

(g) Except as expressly set forth herein, ISO shall not subcontract, assign, license or in any other manner extend or transfer to any third party any right or obligation ISO has with respect to Service Providers' Program. If ISO desires to use the services of any other independent sales organization/member service provider ("Other MSP"), such Other MSP must be (i) reviewed and approved by Service Providers, in their sole discretion, (ii) contracted with Service Providers upon mutually agreeable terms, and (iii) registered with VISA and MasterCard by Service Providers in accordance with the Rules. If ISO desires to use the services of an individual independent contractor who represents himself or herself as working for ISO using ISO's legal/business name ("IC"), then ISO shall enter into a written agreement with each such IC that (i) requires the IC to comply with all applicable terms of this Agreement and all applicable Rules, laws and regulations, and (ii) prohibits the making of any representation or creating any liability on behalf of Service Providers.

(h) During the term of this Agreement, ISO covenants and agrees that it will not, directly or indirectly, on behalf of itself or any other person or entity, perform Bank Card processing services for any of the Merchants developed by ISO pursuant to this Agreement, or contact or solicit any such Merchant for the purpose of providing Bank Card processing services (the "Nonsolicitation Obligation").

3. **Obligations of Service Providers.** In addition to its other obligations stated elsewhere in this Agreement, Service Providers shall be responsible for all processing and accounting functions relating to the clearing and settlement of Transactions, including (a) Merchant processing and settlement; (b) Merchant credit research (other than matters to be performed by ISO pursuant to Section 2(e) of this Agreement); (c) Merchant customer activation and credit approval; (d) Merchant security and recovery; (e) Merchant customer services; (f) Merchant Chargeback and retrieval services; (g) all other Back Office Services; (h) final classification of Merchants (e.g., high, medium or low risk) pursuant to the Program Standards in the sole discretion of Service Providers; and (i) negotiation and termination of Merchant Agreements. Service Providers may contract with other persons to perform these functions on behalf of Service Providers. All debits and credits covered by this Agreement shall be subject to audit and final checking by Service Providers, and prompt adjustment shall be made for any inaccuracies discovered.

4. **Credit Risk.**

(a) Service Providers shall be under no obligation to enter into any Merchant Agreement with any Merchant solicited by ISO that does not, in the sole discretion of Service Providers, meet the Program Standards. Furthermore, in the event Service Providers enter



006

into a prospective Merchant Agreement with a Merchant, Service Providers may terminate such Merchant Agreement(s) in accordance with the terms thereof.

(b) Service Providers will perform credit reviews on prospective Merchants and ISO understands that Service Providers will not accept those Merchants who do not meet the Program Standards or other credit criteria set forth by Service Providers. Service Providers will assume the risks associated with the Bank Card processing relationship for those Merchants with a valid Merchant Agreement approved by Service Providers, except as otherwise provided herein. If at any time during the Term of this Agreement ISO is interested in assuming credit risk for those Merchants boarded by ISO, FDMS agrees to enter into good faith negotiations with ISO accordingly.

(c) ISO shall be liable to Service Providers for all losses associated with Merchant relationships with Service Providers where the Merchant Application submitted by ISO contains significant inaccuracies or omissions (including signature by an unauthorized individual), and provided that ISO had actual knowledge of the inaccuracies or omissions at the time the Merchant Application was submitted to Service Providers.

(d) No assignee for the benefit of creditors, successor in interest, custodian, receiver, trustee in bankruptcy, debtor in possession, sheriff or any other officer of a court, or other person charged with taking custody of a party's assets or business, shall have any right to continue or to assume or to assign this Agreement.

## 5. **Confidentiality.**

(a) Service Providers and ISO agree that they will not divulge or disclose to third parties, without the written consent of the other, any Confidential Information. No party will obtain any proprietary rights to any Confidential Information of another party.

(b) Notwithstanding anything herein to the contrary, Service Providers shall not be prohibited from disclosing Confidential Information to the extent that it is related to Merchant Applications, Merchant Agreements, Merchant accounts and records and other information regarding the Merchant Program, but excluding any other information regarding the business of ISO, to the extent that such disclosure by Service Providers is for a bona fide business purpose.

(c) Notwithstanding anything herein to the contrary, ISO agrees that ISO's Confidential Information may be made available to VISA, MasterCard or to supervisory or regulatory authorities of ISO upon the written request of any of the foregoing.

(d) If a party breaches this Section 5, the non-breaching party will suffer irreparable harm and the total amount of monetary damages for any injury to such party will be impossible to calculate and therefore an inadequate remedy. Accordingly, the non-breaching party may (i) seek temporary and permanent injunctive relief against the breaching party or (ii) exercise any



other rights and seek any other remedies to which the non-breaching party may be entitled to at law, in equity and under this Agreement for any violation of this Section 5. The provisions of this Section 5 shall survive the expiration or termination of this Agreement.

6. **Compliance with Laws; Rules.**   ISO shall comply with all applicable laws and regulations. In addition, this Agreement is made subject to the Rules. ISO acknowledges that it has received and understands the Rules and agrees to be bound by all applicable Rules, including the Rules pertaining to member service providers and independent sales organizations. ISO agrees to indemnify and hold harmless MasterCard and VISA and their respective members for any failure by ISO to comply with the Rules, and to allow MasterCard and VISA to directly enforce the Rules. The Rules shall control to the extent of any inconsistency with the terms and conditions of this Agreement. This Agreement shall be automatically amended to reflect any change in any applicable Rule.

7. **Other Services.**   Unless otherwise agreed to in writing by Service Providers on a case-by-case basis, ISO shall not have the right to participate in or be entitled to any fees associated with any financial products or services provided to Merchants by Service Providers that are not related to Bank Cards, Bank Card Sales, or Bank Card processing.

8. **Merchant Agreements.**

(a)   ISO shall only use the form of Merchant Agreement and Merchant Application that has been designated and approved by Service Providers. Service Providers may from time to time amend the Merchant Agreement in their sole discretion. Service Providers will provide ISO with a copy of all applicable revisions. There may not be any separate or other agreement between ISO and any Merchant in any way relating to the Merchant's participation in the Program. For the avoidance of doubt, the parties acknowledge and agree that nothing herein shall prohibit ISO from entering into a separate agreement with a Merchant with respect to (i) services unrelated to the Program and (ii) the sale, lease and/or rental of point-of-sale terminals and other equipment if such equipment is not being provided by the Service Providers.

(b)   Service Providers shall, in their sole discretion, make the final decision as to whether or not a prospective Merchant meets the Program Standards.

(c)   All Merchant Applications, Merchant Agreements and Merchant accounts and records shall be and remain the exclusive property of Service Providers. ISO acknowledges and agrees that all Merchant Applications, Merchant Agreements and Merchant accounts and records are owned by Service Providers and may not be transferred, assigned, sold or exchanged by ISO.

9. **Discount Fees, Other Merchant Fees.**   The Discount Fee and other fees charged to the Merchant under the Merchant Agreement including Merchant Application fees, statement fees, service fees, minimum fees, chargeback fees, authorization fees, and transaction fees shall be recommended by ISO, but in all cases will be subject to final approval by Service Providers in their sole discretion, which approval shall not be unreasonably withheld.



10. **Fees.**

(a) During the term of this Agreement and for such longer period of time after termination as may be provided in Section 19, Service Providers agree to pay ISO, on a monthly basis by the 20th day of each month for the previous month, the amount specified in Schedule A for all Merchants. Service Providers shall advise ISO in writing, on a monthly basis, of the amount to which ISO is entitled under this Agreement and may credit ISO's Designated Account for that amount. ISO shall repay Service Providers the amount of any previously paid fee attributable to any refund or Chargeback within ten (10) days of notice thereof. In addition, Service Providers may setoff against any payments to be made to ISO any sums that are due and owing to Service Providers from ISO.

(b) For each Processing Year after Processing Year 1, Service Providers may increase any of the fees, costs and charges set forth in Schedule A and designated with an asterisk (*) by an amount not to exceed the percentage increase in the Consumer Price Index ("CPI"), during the period described below. For purposes of this paragraph, the CPI shall be the index compiled by the United States Department of Labor's Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers ("CPI-U") having a base of 100 in 1982-1984, using that portion of the index which appears under the caption "Other Goods and Services." The percentage increase in the CPI shall be calculated as of ninety (90) days in advance of the effective date of such increase, by comparing the CPI using a twelve (12) month period ending as of such date of calculation and expressing the increase in the CPI through the twelve (12) month period as a percentage.

(c) Service Providers may from time to time pass through to ISO increases in the non-controllable fees, costs and charges set forth in Schedule A of the Agreement, including Interchange Fees and VISA and MasterCard dues and assessments, to reflect any increases in such fees, costs and charges to Service Providers, upon ten (10) days prior written notice to ISO.

(d) In the event of any fee increases to ISO, Service Providers shall provide reasonable assistance to ISO in passing such fee increases through to Merchants under the Merchant Agreements.

(e) Except as expressly permitted under this Agreement (including Schedule A) or as agreed upon in writing by Service Providers, ISO shall not be entitled to any fees or charges that Service Providers may receive from any Merchant.

11. **ISO's Future Residuals.** At any time during the Term, ISO may sell ISO's right to receive future residual payments relating to Merchants developed by ISO pursuant to this Agreement ("ISO's Future Residuals"), subject to the following terms and conditions. ISO hereby grants to Service Providers a right of first refusal to purchase ISO's Future Residuals. If ISO receives a bona fide offer from a willing and able buyer to purchase ISO's Future Residuals (an "Offer"), ISO shall notify Service Providers of the amount and terms of such Offer. Service Providers shall have the first right to purchase ISO's Future Residuals for an amount and on terms equal to the Offer, and ISO



sl all not sell or in any way transfer any rights to ISO's Future Residuals without first presenting Service Providers with the opportunity to match any such Offer. Service Providers shall have fifteen (15) days to notify ISO of their decision whether or not to exercise their right to purchase ISO's Future Residuals.

12. **Establishment of Accounts; Appointment of Agent.**

(a) ISO will establish and maintain a Designated Account with Bank during the term of this Agreement and may for this purpose designate an existing account with Bank. ISO agrees to maintain sufficient funds in the Designated Account to cover costs and charges payable by ISO, including those estimated by Service Providers as likely to arise, during the term of this Agreement and for a period of one hundred eighty (180) days thereafter.

(b) ISO authorizes Service Providers to make any payment owed to ISO or collect any charge owed by ISO and accruing from time to time pursuant to this Agreement by making the appropriate credit or debit to the Designated Account. Service Providers shall notify ISO if at any time there are insufficient funds in the Designated Account to cover any amount that is due and owing to Service Providers. ISO shall immediately pay such amount to Service Providers.

13. **American Express and Discover Authorization and Capture Services.**

(a) At ISO's request, Service Providers shall provide authorization for Merchant's Discover and American Express ("Amex") Transactions to ISO. Such services shall include authorization only or authorization and capture. ISO agrees and understands that Service Providers will provide Discover and Amex authorization services only if Merchant has entered into a separate Merchant Agreement with Discover or Amex, as applicable, pursuant to which Merchant may accept the Discover Card or Amex Card.

(b) ISO agrees and understands that Service Providers shall provide Discover or Amex authorization (and capture) services only and that Service Providers shall in no respect be responsible for the funding of such Transactions. Funding shall be the sole responsibility of Discover or Amex.

(c) [Intentionally Omitted].

14. **Diners Club/Carte Blanche and JCB Non-Licensing and/or Licensing Services.**

(a) At ISO's request, Service Providers shall provide authorization, data capture and/or settlement services for Merchants' Diner's Club/Carte Blanche ("Diners") and/or JCB Transactions.

(b) ISO agrees and understands that should Service Providers provide authorization and capture services only, Service Providers shall in no respect be responsible for the funding of such Transactions. Funding shall be the sole responsibility of Diners and/or JCB.

(c) ISO agrees and understands that fees of whatever type or nature assessed by Service Providers or Diners and/or JCB for Diners and/or JCB authorization, capture and/or settlement services are subject to change on thirty (30) days' prior written notice.



## 15. Audits; Books and Records; Financial Statements.

(a)  During the term of this Agreement and for a period of two (2) years thereafter, ISO shall retain and allow representatives of Service Providers, MasterCard or VISA to, during normal business hours, inspect ISO's place of business to conduct financial and procedural audits and make copies of ISO's books, accounts, records and files pertaining to ISO's performance of services hereunder.  ISO shall make available records containing Merchant records as may be requested from time to time by Service Providers, MasterCard, VISA, their designees or any regulatory agent as soon as possible but no later than seven (7) business days from the date of the request.

(b)  ISO shall provide Service Providers with financial statements on an annual basis within six (6) months of the close of ISO's fiscal year and on a more frequent basis if so requested by Service Providers. Financial statements shall be audited or, if audited financial statements are not available, prepared in accordance with generally accepted accounting principles.  Service Providers shall maintain all financial statements provided by ISO in confidence and shall not use or disclose any statement except as contemplated by this Agreement or required under the Rules.

(c)  ISO shall have the reciprocal right on an annual basis to request copies of Service Providers' relevant books, accounts, records and files for the sole purpose of verifying payments to be received by the ISO from Service Providers under this Agreement.  ISO shall bear all costs related to such audit.

## 16. Promotional Materials; Marks.

(a)  Upon request by ISO, Service Providers will provide ISO and Merchants, at Service Providers' then-current charges, with promotional materials indicating the participation of ISO and Merchants in the Program, and supplies, including Sales Drafts, credit vouchers and other forms.  Upon termination of this Agreement, ISO and Merchants shall immediately discontinue and shall no longer use any promotional materials identifying Service Providers, or containing any trade name, trademark, service mark, or logotype associated with Bank Cards ("Marks"), except to the extent such use may be authorized under a separate agreement.

(b)  ISO acknowledges and agrees that MasterCard and VISA are the owners of their respective Marks and may at any time and without notice prohibit ISO from using the Marks for any reason.  ISO agrees that it shall not contest the ownership of any Mark.

(c)  ISO shall not use any Mark on its own behalf and shall not suggest, imply or in any manner create an impression that it is a member of MasterCard or VISA, that it is other than a member service provider or independent sales organization of Service Providers, or that MasterCard or VISA in any way endorse ISO or the services provided by ISO.  ISO shall not state or infer in any correspondence, supplies, materials and/or solicitations directed to any Merchant or prospective Merchant that the Bank Cards or merchant materials of any other member of MasterCard or VISA are being replaced, are invalid, or should be destroyed. All Program materials including Merchant Applications, Merchant Agreements, Merchant



statements, websites and promotional materials (i) must be approved by Service Providers before use; (ii) must clearly and conspicuously disclose Service Providers' name and location by city and state; (iii) may not represent Service Providers as having all aspects of the Program; and (iv) may not state or imply that ISO is participating in any activity precluded by the Rules. ISO shall have no authority to permit use of any of the Marks by any of its agents. All promotional materials used by ISO shall clearly disclose that the Merchant Agreement is between Service Providers and the Merchant. All proposed promotional materials shall be submitted to Service Providers for review at least ten (10) days prior to use.

(d) ISO shall not under any circumstances use the Marks on any marketing materials, including business cards and letterhead on stationery.

(e) Nothing contained herein shall prohibit or limit ISO's use of the Marks to the extent such use is authorized under a separate agreement between ISO and a third party.

## 17. **Indemnity.**

(a) ISO agrees to indemnify, defend, and hold harmless Service Providers, MasterCard and VISA and their respective affiliates, officers, directors, employees and permitted assigns from and against any loss, liability, damage, penalty or expense (including attorney's fees and cost of defense) suffered or incurred as a result of (i) any breach of its obligations under this Agreement, (ii) any warranty or representation made by ISO to Service Providers being false or misleading, (iii) any representation or warranty made by ISO to any third person other than as specifically authorized by this Agreement or the Program Standards, (iv) any failure by ISO to fully comply with the Rules or any rules, regulations, order and requirements of any regulatory authority, (v) any fraud by ISO or any IC or (vi) any act of any IC.

(b) Service Providers agree to indemnify, defend and hold harmless ISO and its affiliates, officers, directors and employees from and against any loss, liability, damage, penalty or expense (including attorney's fees and costs of defense) suffered or incurred as a result of (i) any breach of their obligations under this Agreement, or (ii) any failure by Service Providers to comply fully with the Rules or any rules, regulations, orders and requirements of any regulatory authority.

18. **Reimbursement.** ISO shall reimburse Service Providers through setoff or upon demand for all fines and penalties imposed by MasterCard, VISA or any other regulatory authority as a result of any action or inaction by ISO or any IC.

## 19. **Renewal and Termination.**

(a) The initial term of this Agreement shall commence on the Effective Date and continue for four (4) Processing Years through June 30, 2010 (the "Initial Term"). Thereafter, this Agreement will be automatically renewed for successive terms of two (2) Processing Years each unless either party provides written notice to the other at least six (6) months prior to the expiration of the then-current term the Initial Term and all renewal terms shall be collectively referred to herein as the "Term".

(b) Service Providers shall have the right to immediately terminate this Agreement by



012

written notice upon the occurrence of any of the following:

        (i)     Material breach of this Agreement by ISO which is not cured by ISO within thirty (30) days of receipt of written notice from Service Providers;

        (ii)    Repeated breach of any Rule by ISO, or breach of any material Rule by ISO which is not cured by ISO within thirty (30) days of receipt of written notice from Service Providers;

        (iii)   Fraudulent activity by ISO, or any action by ISO deemed to be injurious to Cardholders, MasterCard or VISA;

        (iv)   Termination of Bank's status as a licensed full processing bank or the insolvency of Bank;

        (v)    Deregistration of ISO by MasterCard or VISA;

        (vi)   Cessation by Service Providers of Bank Card operations;

        (vii)  Insolvency or bankruptcy of ISO which is not dismissed within sixty (60) days; or

        (viii)  If at any time and in good faith, Service Providers reasonably believe that there has been a material adverse change in ISO's financial condition or there is any material impairment in the prospect of performance by ISO of any of its obligations under this Agreement.



(c)  ISO shall have the right to immediately terminate this Agreement by written notice upon the occurrence of any of the following:

(i)    Material breach of this Agreement by Service Providers which is not cured by Service Providers within thirty (30) days of receipt of written notice from ISO; or

(ii)    Insolvency or bankruptcy of either of Service Providers which is not dismissed within sixty (60) days.

(d)  Upon the nonrenewal or earlier termination of this Agreement for any reason:

(i)    ISO will promptly discontinue its promotion and recommendation of Service Provider's Program; and

(ii)    Service Providers will be responsible for all servicing of Merchants and rendering all services under the Merchant Agreements (including setting Merchant pricing).

(iii)    Service Providers' obligation to make residual payments to ISO under Section 10 will continue after the effective date of nonrenewal or termination of this Agreement until such time as the total amount of any residual paid to ISO under Section 10 in any calendar month is less than $2,000, after which time such obligation will cease and Service Providers will own all Merchant Agreements developed by ISO under this Agreement free and clear; provided, however, that Service Providers' obligation to make residual payments to ISO under Section 10 will cease upon the effective date of termination if Service Providers terminate this Agreement pursuant to Section 19(b)(i), 19(b)(ii), 19(b)(iii) or 19(b)(v), but only to the extent necessary to satisfy any financial damages incurred by Service Providers as a result of such breach.  After such damages have been recouped by Service Providers, residual payments under this Agreement shall resume.

(iv)    ISO shall continue to comply with the Nonsolicitation Obligation after the effective date of nonrenewal or termination of this Agreement until such time as Service Providers cease making residual payments to ISO under Section 10; provided, however, that if Service Providers terminate this Agreement pursuant to Section 19(b)(i), 19(b)(ii), 19(b)(iii) or 19(b)(v), then ISO's obligation to comply with the Nonsolicitation Obligation will continue for thirty-six (36) months after the effective date of nonrenewal or termination of this Agreement.

20. **Limitation of Liability.**



(a) Service Providers' cumulative liability for any loss or damage, direct or indirect, for any cause whatsoever (including those arising out of or related to this Agreement) with respect to claims (whether third party claims, indemnity claims or otherwise) relating to events in any one Processing Year shall not under any circumstances exceed the amount of the fees paid to Service Providers pursuant to this Agreement during the immediately preceding Processing Year or, in the case of Processing Year 1, the Year 1 Minimum Processing Fee.

(b) Neither party shall be liable for (i) any punitive or exemplary damages of any kind; or (ii) any special, indirect, consequential or incidental damages of any kind (including lost profits) even if such party has been advised of the possibility of such damages.

21. **Relationship of the Parties.** Except for the purpose of ISO's solicitation of Merchants on behalf of Service Providers in accordance with the terms and conditions of this Agreement, this Agreement does not create a relation of principal and agent nor, except as otherwise expressly provided in this Agreement, is either party to be considered to be the agent or legal representative of the other. ISO is not authorized to make any warranty or representation on behalf of Service Providers except as specifically authorized by this Agreement. It is expressly understood that ISO and Service Providers are in all other respects independent parties to a contract. ISO agrees that, except as otherwise expressly provided in this Agreement, it will not represent to any person that it is the agent of Service Providers, nor will it fail to correct any misunderstanding as to status.

22. **Sales Locations.** Schedule C contains the identity and location of each of ISO's sales locations, and ISO represents and warrants that it does not have any sales locations other than those listed on Schedule C. ISO shall provide Service Providers with prior written notice of any change in the identity or location of any of its sales locations.

23. **Registration and Reporting.** Service Providers shall register ISO with MasterCard and VISA as a member service provider and independent sales organization. ISO shall provide Service Providers with all documentation and execute such documents as may be necessary for such registrations and any renewals thereof, and shall allow Service Providers to review all such documentation as necessary during the term of this Agreement. ISO shall reimburse Service Providers for all fees paid by Service Providers for such registrations and renewals. ISO agrees to comply with all renewals and reporting requirements applicable to member service providers and independent sales organizations. ISO agrees to provide Service Providers with prior written notice of any proposed change of ownership of ISO.

24. **Training.** ISO shall adequately train all of its employees and IC's and use reasonable efforts to cause its employees to perform in accordance with this Agreement, the Rules and any training guidelines that may be provided by Service Providers, MasterCard and/or VISA. Upon request by Service Providers, ISO shall certify in writing that each of its employees and IC's has successfully completed training. As reasonably requested, ISO shall provide copies of all training materials to Service Providers for its approval prior to use. ISO must modify its training materials from time to time as reasonably requested by Service Providers.



015

25. **Amendments.** Except as otherwise contemplated in Sections 6 and 10(b), no provision of this Agreement may be amended, modified, or waived except by a written agreement signed by Service Providers and ISO.

26. **Employees.** ISO will provide Service Providers with a list of the names of all of its employees and IC's and such additional information as Service Providers may reasonably request from time to time regarding any employee or IC. ISO will provide Service Providers with a current employee and IC list on a quarterly basis. ISO will conduct appropriate background checks (including credit and criminal background checks) on all employees and IC's.

27. **Waiver.** No term or provision of this Agreement shall be deemed waived and no breach excused, unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. Any consent by any party to, or waiver of, a breach by the other party, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any different or subsequent breach.

28. **Assignment.** Except as expressly provided in this Agreement, ISO shall not assign, subcontract, license, franchise, or in any manner attempt to transfer or extend to any third party any right or obligation under this Agreement, by operation of law or otherwise, without the prior written consent of Service Providers, which may be granted or withheld at the sole discretion of Service Providers. For purposes of this Agreement, any transfer of ownership or voting control of ISO shall be considered an assignment or transfer hereof.

29. **Notices.** All notices and other communication required or permitted under this Agreement shall be in writing and shall be deemed delivered when given by personal delivery, telefax (confirmed by a mailed copy) or first-class mail, postage prepaid, addressed as follows:

(a) If to Service Providers, notice should be sent to both:

Bancorp South Bank
2778 West Jackson
3rd Floor
Tupelo, MS 38801
Attn: Senior Vice President

First Data Merchant Services
Corporation
10825 S. Old Mill Road
Omaha, Nebraska 68154
Attn: Senior Vice President

with a copy to FDMS General
Counsel at:
12500 E. Belford Ave.
Suite MI-2-A
Englewood, Colorado 80112

(b) If to ISO:

Bank Transactions, Inc.
10855 Sorrento Valley Road
Suite 201
San Diego, CA 92121



016

or to such other address as either party may by like notice designate to the other parties.

30. **Cooperation.** Service Providers and ISO will each timely furnish to the other any and all information and materials that the other may, from time to time, reasonably request in connection with all matters contemplated by this Agreement. Each party also shall take the action as the other may, from time to time, reasonably request in order that the purposes of this Agreement will be fully accomplished and that all matters contemplated hereby will comply with all applicable laws, regulations and Rules.

31. **Severability.** The invalidity of any paragraph or subparagraph hereof shall not affect the validity of any other paragraph or subparagraph hereof.

32. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and such counterparts shall together constitute one and the same instrument.

33. **Entire Agreement, Binding Effect, Governing Law, Exclusive Jurisdiction, and Venue.** This Agreement, including any schedules, exhibits or attachments, embodies the entire understanding and agreement of the parties with respect to the subject matter hereof and replaces any marketing agreement or similar agreement previously entered into between the parties. This Agreement will not become legally binding and may not be enforced by any party until and unless approved by the Credit Department of FDMS and/or Bank. This Agreement shall be binding upon and shall inure only to the benefit of the parties hereto and their respective successors and assigns. Nothing in this Agreement, express or implied, is intended to confer or shall be deemed to confer upon any persons or entities not parties to this Agreement, any rights or remedies under or by reason of this Agreement. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to its conflict of law principles.

In consideration of the foregoing, the parties hereby execute the Agreement.

BANCORP SOUTH BANK

By: _Katee Cane_

Title: _SVP_

FIRST DATA MERCHANT SERVICES CORPORATION

By: _[signature]_

Title: _Vice President_

017

ISO

By: _____

Title: _____Pre sident_____

## SCHEDULE A

1. **Amount Payable to ISO.**  Service Providers agree to pay ISO with respect to Merchants an amount equal to the sum of all Discount Fees and any other fees collected by Service Providers under this Agreement for the preceding month less the sum of the following amounts:

      a.      Interchange Fees, including Service Providers' surcharge for non-qualified Transactions;

      b.      MasterCard and VISA dues and assessments;

      c.      Additional Services, as set forth below:

| Item Number | Item | Definition | |
|---|---|---|---|
| 5707 7217 | Acquirer and Issuer Chargeback | Each return of a Ticket and receipt of the amount thereof from an Acquirer or Issuer to an Issuer or Acquirer as provided for in the then current MasterCard and VISA rules and regulations. Chargebacks will be forwarded by FDMS to Customer for resolution via the On-Line Direct Sell Chargeback System. Includes the following bundled elements 5820, 5756, 5757 and 5708. | ██████ |
| 2806 303 | Address Verification - Acquiring | Each electronic request for an Address Verification by a Merchant of Customer. | ███████ |
| 3519 * | Address Verification - Voice | Each voice inquiry request received by FDMS from a Merchant requesting a confirmation of the address of a Cardholder. | ███████ |
| 3505 3506 | ARU Authorization | Each audio response unit (ARU) authorization service provided to a Merchant of Customer by the use of a touch-tone telephone. Customer shall pay FDMS for each instance during which FDMS has electronic contact with a Merchant of Customer and receives the Merchant number. In addition, if an audio response unit authorization inquiry results in a voice inquiry, Merchant request for assistance or a security action, Customer will pay FDMS for the audio response unit authorization and the appropriate voice and/or security action charge as provided in this Agreement. | ██████ |
| 5758 * | Backoffice Services – Service Calls | Client Service Call: Each instance in which a Merchant calls the FDMS service center with an inquiry request or for other information concerning its Merchant account, or each instance in which the FDMS service center returns a call to a Merchant, Bank or its applicable Affiliates in response to an inquiry request that required further research. Fee includes cost of toll-free telephone expenses, labor and other miscellaneous expenses associated with the customer service function. | ██████ ██ ██ ██ |

| 5717<br>5706<br>304 | Batch<br>Header/Summary | Each closed batch of Merchant Tickets of a Merchant of Customer captured by means of Electronic Ticket Capture (ETC or ETC-Online Debit), entered remotely from Customer's terminal(s), or sent via tape and forwarded to FDR for processing and reporting. | |
| Manual Item | Client Workstation | This element identifies the charge for the ability to view the Merchant Online System. | |
| 335 | Debit Gateway – Authorization | The approval and/or decline of a debit transaction presented at the Merchant's point-of-sale terminal via a debit gateway and FDMS' computers. Includes 336 as a bundled element. | |
| N/A | Discount | Fee calculated by applying a fixed percentage to the dollar amount of the gross bankcard sales dollar volume. | |
| 7118 | eMerchant Workstation User | Recurring monthly fee billed to each user who has a digital certificate and has access to the eMerchantView$^{SM}$ workstation product | |
| 3514<br>3518 | External Authorization Processing/Debit Summary Process | The fee associated with the point-of-sale authorization of a transaction or a debit transaction to an account of Customer by a third party where notice of such authorization or debit transaction is delivered to FDMS via a transmission medium from the third party. | |

| 5700 * | Merchant Account on File | Each account of a Merchant of Customer that remains on Customer's masterfile at FDMS on the last processing day of the calendar month as defined on the MM-101 Merchant Profitability report or an equivalent. Includes the following bundled elements: 5702, 5465, 5701, 5712, and 7103. | |
| 5714<br>5715<br>5704 | Merchant Ticket: | Each transaction of a Merchant of Customer that is either captured by means of an electronic process (ETC or ETC-Online Debit), entered remotely from Customer's terminal(s), or sent via tape and forwarded to FDMS for processing and reporting. | |
| 3507<br>305<br>3508<br>1102<br>317<br>318 | Non-Dial Authorizations | Each non-dial authorization inquiry received in FDMS protocol via a computer to computer (CPU-to-CPU), CRT terminals, Batch or Internet, or leased line point-of-sale terminals that are on the premises of Customer or Customer's Merchant, where FDMS captures the identification number of Customer's Merchant. Includes the following bundled elements 306 and 398. | |
| 7607 * | PlastiCard Merchant Plates/Plastics | Each plastic card or metal plate for which FDMS has mechanically raised personalized characters in accordance with Customer's Product Control File settings and Merchant masterfile. | |

| 3502<br>3503<br>3504<br>300<br>3521<br>1101<br>319 | Dial Authorization | Each Dial-up point-of-sale terminal attempted inquiry serviced by FDMS for Merchants of Customer by the use of a dial-up point-of-sale terminal. Per attempt fee for each authorization request received by FDMS from a certified Internet-enabled POS device via an Internet Protocol Network (IPN) transaction. Internet connectivity not included. Customer shall pay FDMS for each instance during which a batch is closed and/or FDMS had electronic contact with a Merchant of Customer and receives the Merchant number, including batch closing.   Includes the following bundled elements 301 and 398.<div align="right">Total Monthly Volume (+):<br>0 – 250,000<br>250,001 – 500,000<br>500,001 – 1,000,000<br>1,000,001 – 2,000,000<br>Over 2,000,000</div> | ▉▉▉▉▉<br>▉▉▉▉<br>▉▉▉▉<br>▉▉▉▉<br>▉▉▉▉<br>▉▉▉ |
| N/A | Downgrade Surcharge | Fee calculated by applying a fixed percentage to the dollar amount of the downgraded bankcard sales dollar volume. | ▉▉▉▉<br>▉▉▉▉▉▉<br>▉▉▉▉▉▉ |
| N/A | Welcome Kits | Package sent to ISO for distribution to new merchants. | ▉▉▉▉▉ |
| N/A | New Accounts | Fee charged for each new Merchant Account boarded on the FDMS system. | ▉▉▉▊ |
| 5736<br>5741<br>2314 | Wireless Setup/Activation Fee | Per Terminal set-up/activation fee to access the APRIVA, Velocita or US Wireless network. | ▉▊ ▉▉▉▉<br>▉▉ |
| 5737<br>5742<br>5860 | Wireless Monthly Access Fee | Per terminal per month fee to access to the APRIVA, Velocita or US Wireless network. | ▉▉▉▉▉<br>▉▉▉ |
| 3501 * | Voice Authorization Inquiry | Each Merchant authorization request received by FDMS through voice inquiries from Merchants of Customer, including collect calls, or via telegrams and telexes from countries outside of the United States. Includes the following bundled elements 227, 3509 and 7903. | ▉▉▉▉▉ |

| 5723 349 | Service Calls – Help Desk | Each instance in which a Merchant calls the FDMS service center with an inquiry request or for other information concerning its Merchant account, or each instance in which the FDMS service center returns a call to a Merchant, Bank or its applicable Affiliates in response to an inquiry request that required further research. Fee includes cost of toll-free telephone expenses, labor and other miscellaneous expenses associated with the customer service function. | ███████ |
|---|---|---|---|
| n/a | **YourPay® DIRECT INTERNET PAYMENT GATEWAY** | On-line service that allows merchants to submit authorization and data capture transactions directly from their web sites to FDMS. FDMS will provide a standard, secured Internet connection for routing and settlement of transactions. | n/a |
| 0750 | YourPay.com Set-Up Fee | YourPay.com is an Internet website product that provides merchants the ability to process card transactions using a standard web browser. A one time set-up fee to obtain a store ID and user ID to access the YourPay.com website. | ███████ |
| 0751 | YourPay.com Monthly Fee | Fee charged per store ID per month to access the YourPay.com website. There is a 3 month minimum fee requirement. | ███████ |
| 0752 | YourPay Authorization Fee | Per item fee for each authorization inquiry originated by a YourPay merchant account. This includes all authorization inquiries from YourPay.com, YourPay Connect, and YourPay API accounts. | ███████ |
| 0753 | YourPay AVS Fee | Per item fee for each Address Verification Service (AVS) request originated by a YourPay merchant account. This includes all AVS requests from YourPay.com, YourPay Connect, and YourPay API accounts. | ███████ |
| 0754 | YourPay Capture Fee | Per item fee for the capture of each ticket (clearing record) originated by a YourPay merchant account that is sent to the FDMS System for processing. This includes all captured tickets (clearing records) from YourPay.com, YourPay Connect, and YourPay API accounts. | ███████ |
| 0755 | YourPay Monthly Inactive Account Fee | Monthly inactive account fee for each inactive YourPay merchant account. This includes all inactive accounts for YourPay.com, YourPay Connect, and YourPay API. | ███████ |
| 0756 | YourPay Connect Set-up Fee | YourPay Connect allows a merchant to enable any website to accept and process card transactions. A one time set-up fee for establishing a YourPay Connect account. | ███████ |
| 0757 | YourPay Connect Monthly Account Fee | The monthly maintenance fee for each YourPay Connect account. | ███████ |
| 0758 | YourPay API Set-up Fee | YourPay API allows a merchant to create a customized website solution to accept and process card transactions. A one time set-up fee for establishing a YourPay API account. | ███████ |

Schedule A, Page 4



022

| 0759 | YourPay API Monthly Account Fee | The monthly maintenance fee for each YourPay API account. | ███████ |
|------|------|------|------|

- (a.) Monthly Account on File Fee includes services such as statementing, miscellaneous account maintenance. Postage is a pass-through.
- (+) Gateway fee is in addition to the appropriate monthly dial authorization rate.
- Pricing excludes passthroughs such as postage, debit gateway fees, surcharges, datalines and client specific setup fees.

- (**) ISO shall pay Service Providers for each volume-sensitive service ("VS Service") at the rate indicated by the estimated monthly volume. The fees charged for each item of VS Service during each subsequent calendar month shall be based upon the previous calendar month's actual volumes. If, during any Processing Year, ISO shall have paid Service Providers more or less than the amount owed to Service Providers based upon the above calculations, then Service Providers shall issue a credit to ISO for any amounts due ISO or invoice ISO for any amounts due Service Providers, as appropriate.

**Additional Services**. For any services performed by FDMS at ISO's direction which are neither set forth in this Schedule nor covered by a separate agreement, ISO shall pay FDMS for such services at FDMS's then current standard rates.

**Equipment Lease Program**. Upon request by ISO, Service Providers can provide an equipment-leasing program to ISO at FDMS preferred pricing.

**TASQ Deployment and Terminal Purchase Program**. Upon request by ISO, the Service Providers, through FDMS' affiliation with TASQ, can provide a terminal purchase and deployment program to ISO at FDMS preferred pricing.

**MAE Applications**. Notwithstanding anything contained in this Agreement to the contrary, if ISO submits any Merchant applications via the Service Providers' MAE application, ISO shall not be entitled to receive any fees or other amounts related to any Merchant whose paper application and all other necessary documents are not received by the Service Providers within fifteen (15) days of submission of the MAE application.

**Welcome Kits**. ISO shall be responsible, at its expense, for the creation and delivery of merchant welcome kits.

## 2. Minimum Fees; Liquidated Damages.

(a) In Processing Year 1, ISO will require and shall pay Service Providers for services sufficient to generate aggregate fees at least equal to ███████



██████ (the "Year 1 Minimum Fees"). In each Processing Year after Processing Year 1, ISO will require and shall pay Service Providers for services sufficient to generate aggregate fees at least equal to ████████████ of the fees paid during the immediately preceding Processing Year, but in no event less than ██████ (the "Minimum Fees"). Service Providers shall calculate the total fees paid by ISO in respect of services performed during each Processing Year (the "Total Annual Fees") within ninety (90) days after the end of each Processing Year and will, after ten (10) days written notice to ISO, draw upon the Designated Account pursuant to Section 12 of this Agreement for the amount, if any, by which the Year 1 Minimum Fees or Minimum Fees, as applicable, for the Processing Year exceed the Total Annual Fees for the Processing Year. For the avoidance of doubt and based on economic assumptions material to each party underlying this transaction, ISO and Service Providers expressly agree that ISO shall pay Service Providers fees each Processing Year in an amount at least equal to the Year 1 Minimum Fees or Minimum Fees, as applicable, until this Agreement expires or is terminated.

(b) The parties agree that the fees and prices for services under this Agreement were determined by mutual agreement based upon certain assumed volumes of processing activity and the length of the Initial Term of this Agreement. ISO acknowledges that without the certainty of revenue from the Year 1 Minimum Fees and the Minimum Fees, Service Providers would have been unwilling to provide services at the prices set forth in this Agreement. The parties agree it would be difficult or impossible to ascertain Service Providers' actual damages in the event of a termination of this Agreement due to a default by ISO before the expiration of the Initial Term. The parties further agree that a reasonable estimation of the actual damages that Service Providers would suffer if this Agreement were terminated early due to a default by ISO is an amount equal to the sum of: (i) the Year 1 Minimum Fees or Minimum Fees, as applicable, for the Processing Year in which the termination occurs (after crediting ISO for any fees paid during such Processing Year); plus (ii) the sum of the present values of a payment in each full Processing Year (other than the year of termination) which remains during the Initial Term of this Agreement in an amount equal to thirty-five percent (35%) of the Year 1 Minimum Fees or Minimum Fees, as applicable, for the Processing Year in which termination occurs (the "Liquidated Damages"). In determining the present values of each amount, an interest rate equal to the three (3) month Treasury Bill Rate, as quoted by The Wall Street Journal for the date on which termination occurs, or, if not available on the date of termination, as soon thereafter as the next edition of The Wall Street Journal is published, will be assumed, and the payments shall be assumed to be made on the first day of each Processing Year. The parties acknowledge and agree, after taking into account the terms of this Agreement and all relevant circumstances as of the date hereof, that the Liquidated Damages payable under this Section represent a reasonable and genuine estimate of the actual damages that Service Providers would suffer in the event of early termination of this Agreement and does not constitute a penalty. Notwithstanding the foregoing, nothing in this Agreement shall limit



Service Providers' right to recover from ISO (i) any amounts for which ISO is liable under this Agreement other than for fees, or (ii) any payment under any provision for indemnification under this Agreement.  Nothing in this Agreement shall limit the right of any party to this Agreement to seek injunctive relief, to the extent available, in respect of breaches of this Agreement.

025

## SCHEDULE B

## UNACCEPTABLE BUSINESS

The following unacceptable industries are in part due to Bank Card Rules prohibition, illegal or likely to be deemed illegal, fraud or high potential for excessive chargebacks, or where experience has demonstrated high losses or high chargebacks.

- All Sexually Oriented or Pornographic merchants including:
  - Adult Book Stores/Video stores
  - Adult Telephone Conversations or video text
  - Companion/Escort Services/Dating Services
  - Massage Parlors
  - Topless bars/clubs
  - Modeling agencies
  - Miscellaneous entertainment (not elsewhere classified)
- Aggregators (third party payment processors)
- Audio/video text
- Airlines
- Cruise Lines
- Any illegal products/services or any service or product providing peripheral support of illegal activities
- Auction Houses
- Bail Bondsmen
- Cellular Phone/Beepers (Services, not equipment)
- Chain Letters
- Charities (other than well known)
- Check Cashing
- Collection agencies or firms involved in recovering/collecting past due receivables
- Credit Repair
- Credit Card Protection or Identity Theft Services
- Currency Exchanges
- Drug Paraphernalia
- Extended Warranty Companies
- Flea Markets (with no lease and phone availability) *(Virtual terminal/Wireless considered High Risk)*
- Fortune Tellers
- Merchants offering free gifts, prizes, sweepstakes or contests as an inducement to purchase a product/service
- Get Rich Quick Schemes



- Health Membership Clubs (Extended Memberships)
- Import/Export (Non Mag Stripe or MO/TO)
- Investment Programs/ Opportunities
- Non-face to face sale of prescription  drugs (non-institutional)
- Non-face to face sale of tobacco products
- Lotteries, Gambling, internet Gambling, contests or sweepstakes
- Sports forecasting or odds making
- Mortgage Reduction Services
- Taxi/Limousines (singletons) *Virtual terminal/Wireless considered High Risk*
- Pseudo-pharmaceuticals (anti-aging pills, sex nutrients, etc.)
- Prepaid Cards/quasi cash
- Real Estate Seminars
- Shippers/forwarding Brokers
- Timeshare
- Travel Agents/Tour Operators/Travel Clubs
- Merchants engaged in Door to Door Sales
- Pyramid or multi-level marketing distribution
- Third party order fulfillment
- Merchants engaged in Outbound Telemarketing
- Infomercial merchants or other inbound telemarketers engaged in upsell
- Merchants offering rebates or special incentives

## SCHEDULE C

## SALES LOCATIONS

Schedule C, Page 1

028

# SCHEDULE C

## SALES LOCATIONS

1) Bank Transactions, Inc.
10855 Sorrento Valley Rd. Ste 201
San Diego, CA 92121

## FIRST AMENDMENT TO MARKETING AGREEMENT

This First Amendment to Marketing Agreement (this "Amendment") is made and entered in to as of this July 1, 2006 ("Execution Date") between First Data Merchant Services Corporation, a F orida corporation ("FDMS"), BancorpSouth Bank ("Bank"), and Bank Transactions, Inc., a California c rporation ("ISO").

## RECITALS

A.     FDMS, Bank and ISO have entered into that certain Marketing Agreement dated as of July 1, 2 )06 as amended (the "Agreement").

B.  ISO and FDMS now desire to amend the Marketing Agreement as set forth herein.

## AGREEMENT

In consideration of the foregoing, FDMS, Bank and ISO hereby agree as follows:

1.     **Effective Date.**  The terms of this Amendment will be effective as of the Execution Date ("Effective Date").

2.     **Definitions.** Capitalized terms used but not otherwise defined in this Amendment will have t e meanings set forth in the Agreement. The following definitions apply to the terms set forth below:

(a)     "Buypass Transaction" means each instance during which Concord (as defined b low) or FDMS has electronic contact with a point of sale device of a Merchant of ISO for the purpose of p ocessing a transaction, credit or refund.

(b)     "Card or Electronic Payment Association" means (i) Visa, MasterCard and any c her association or crd issuer having proprietary rights to and clearing and oversight responsibilities with r spect to any credit or debit card used to effect Transactions and includes any debit card network utilized t ) authorize and settle any debit card used to effect Transactions and (ii) NACHA and any other a sociation or entity having oversight responsibilities with respect to electronic payments.

(c)     "CISP" means Visa's Cardholder Information Security Program, as may be a nended from time to time.

(d)     "Concord" shall mean Concord EFS, Inc. and any entity which, directly or i directly, owns or controls, or is owned or controlled by, or is under common ownership or common c ntrol with, Concord EFS, Inc.

(e)     "Concord Services" include Buypass services, ClientLine Services, PINless Debit ransaction services and EFSnet Web Payment Services, as each is defined in this Amendment.

(f)     "Concord System" means the computer equipment, computer software, and

1

related equipment and documentation used at any time and from time to time to provide the Concord Services and includes the Buypass (Atlanta) platform.

(g) "Concord System Specifications" shall mean the specifications, manuals, technical and operating data and operating standards adopted, amended or supplemented and published from time to time by Concord with respect to the Concord System.

(h) "Data Security Requirements" means the Payment Card Industry Data Security Standard developed by MasterCard and Visa, CISP, SDP and other similar requirements that apply to entities that transmit, process or store Cardholder, Transaction Card or bank account information, as may be promulgated or amended by a Card or Electronic Payment Association or any Requirements of Law.

(i) "Network" means any debit card network utilized to authorize and settle any debit card used to effect Transactions and includes STAR, NYCE and Pulse debit card networks and such additional debit card networks that FDMS or Concord may add in their sole discretion.

(j) "SDP" means the MasterCard Site Data Protection Program, as may be amended from time to time.

(k) "Transaction" means the purchase by a Cardholder of goods or services from a Merchant by use of a Transaction Card.

3. **Buypass Services**. Through Concord, FDMS shall make available to ISO and certain of its Merchants as agreed upon by the parties data processing services on the Buypass platform. In exchange for such services, ISO will pay FDMS the fees set forth in this Amendment, including Schedule 1, in the manner set forth in this Amendment. Buypass Transaction detail is only available through ClientLine Services.

4. **ClientLine Services**. Through Concord, FDMS shall make available to ISO, and ISO shall access, ClientLine℠ Services in the manner described and in accordance with the terms and conditions set forth below. Concord has developed a product that allows ISO to access certain databases of Buypass Transaction information maintained by Concord and communicate certain instructions to Concord using an Internet connection to access a Concord internal web page ("ClientLine℠ Services"). The specific features and functions available through ClientLine® Services are detailed in ClientLine® Services documentation that will be provided to ISO by Concord, as may be promulgated, amended or supplemented by Concord from time to time (the "Documentation"). As referenced herein, such features and functions include, among other things, (i) access to information regarding Buypass Transactions, (ii) access to other proprietary information of Concord ("Concord Proprietary Information"), (iii) the ability to communicate certain instructions to Concord as specifically provided in the Documentation ("Communications Interface"), (iv) access to and creation of Buypass Transaction related reports, and (v) generation of Buypass Transaction related statements. ISO acknowledges and agrees that certain features and functionality of the ClientLine Services are not currently available to ISO or its Merchants.

(a) Equipment. ISO shall be solely responsible, at its expense, for the acquisition, repair and maintenance of all equipment and software necessary for it to utilize ClientLine℠ Services (the "Equipment"), including without limitation a personal computer, modem, and telecommunications and web browser software. All such Equipment must comply with Concord specifications and requirements set forth in the Documentation. Concord has the exclusive right to alter the specifications or requirements for the Equipment

2



031

a any time. Concord shall provide notice to ISO of any change in Equipment specifications or requirements. ISO shall be responsible for conforming its Equipment to the revised specifications or requirements. ISO acknowledges that for ClientLine® Services to function properly, and to enable ISO to fully use ClientLine® Services, ISO must maintain the Equipment and keep it in good working order and repair, including by timely installing software upgrades or modifications. Concord has implemented security systems consisting of encryption and "firewall" technologies that are understood in the industry to provide adequate security for the transmission of information over the Internet. In addition, until the ClientLine® Services are terminated as set forth in this Amendment, ISO shall maintain security systems sufficient to protect Concord's Proprietary Information, ISO's databases and all other confidential information contained therein or accessed by ISO via ClientLine® Services and shall ensure that all Cardholder and Buypass Transaction data is protected by ISO behind firewalls or on servers inaccessible to third parties.

(b) License. Until ClientLine® Services are terminated as set forth in this Amendment, FDMS grants to ISO (i) a nonexclusive right to use ClientLine® Services in accordance with the Documentation and the terms, conditions and limitations contained in this Section, and (ii) a limited, nonexclusive right and sublicense to access and use the Concord Proprietary Information and Communications Interface for the purposes contemplated by and subject to the terms, conditions and limitations contained in this Section.

(c) License Limitations.

(1) Concord Proprietary Information and the Communications Interface available through ClientLine® Services are provided hereunder for the sole use of ISO and its officers, employees or agents authorized to use ClientLine® Services sublicensed hereunder. If, in utilizing ClientLine® Services, ISO receives any confidential information of any third party, including any Transaction-related information of any third party other than ISO or its Merchants, or any non-public personal financial information of any consumer, or any Concord Proprietary Information to which it is not entitled, ISO shall notify Concord immediately and shall not use, copy or disclose such information to any third party.

(2) ISO acknowledges and agrees that all Concord Proprietary Information accessed or obtained from its use of ClientLine® Services constitutes valuable and unique property of Concord. ISO further acknowledges and agrees that the fees charged to ISO for use of ClientLine® Services reflect the use by ISO of the Concord Proprietary Information contemplated by this Section, as well as the time, effort and expense incurred by Concord to compile, edit, and maintain the Concord Proprietary Information, and to develop and maintain the hardware and software necessary to provide the Concord Proprietary Information to ISO through ClientLine® Services. ISO warrants that, under no circumstance will it share with any third party any non-public personal financial information of any cardholder and agrees that ISO does and shall not, under any circumstances, own or otherwise obtain any right, title or interest in the ISO databases, including any and all Buypass Transaction and cardholder information contained therein. All right, title and interest in and to ClientLine® Services, including without limitation all copyrights or renewals thereof, heretofore or hereafter secured therein, are and shall remain exclusively owned by Concord.

(d) Fees. In exchange for the ClientLine® Services, ISO shall pay FDMS the ClientLine® Services fees set forth in this Amendment, including Schedule 1, in the manner set forth in this Amendment.

(e) Support Services. Concord or its designated provider shall provide support services to assist ISO with procedural questions relating to ClientLine® Services through the use of a toll-free telephone number. Neither Concord nor FDMS warrant such services or assume any liability for loss, damage or



njury resulting therefrom.

(f)     Changes and Improvements. Concord reserves the right to: (i) alter the content or format of ClientLine® Services; (ii) add, alter or delete any data or other information from ClientLine® Services; and (iii) add, alter or delete any feature, procedure, technique or documentation with respect to ClientLine® Services or use of ClientLine® Services by ISO. A list of the information available through ClientLine® Services, as well as significant changes in ClientLine® Services affecting ISOs generally, shall be published from time to time by Concord by notice to ISO, at Concord's discretion.

(g)     Protection and Security of ClientLine® Services. ISO must complete the Security Access Request Form set forth in Schedule 2, as such form may be amended or supplemented by Concord from time to time, and submit such form to Concord. Upon Concord's approval of such form, Concord will issue ISO an identification code and password so it may access the ClientLine® Services ("Access Codes"). Access Codes are the property of Concord and ISO shall not disclose the Access Codes to anyone except upon direction from an authorized employee of Concord or FDMS. ISO acknowledges and agrees that ISO solely is responsible for ensuring that (i) Access Codes are distributed only to ISO's designated officers, employees and agents who are authorized by ISO to utilize ClientLine® Services, (ii) ISO's officers, employees and agents protect the confidentiality of the Access Codes and of information obtained through use of the Access Codes, (iii) ISO's officers, employees and agents use the Access Codes and ClientLine® Services only for their intended purposes, and (iv) Concord is immediately notified of the termination of any of ISO's officer's, employee's or agent's authority to utilize an Access Code. ISO shall instruct each of its officers, employees and agents to utilize the degree of care in protecting the secrecy of the Access Codes and the Concord Proprietary Information that ISO uses to protect its most sensitive commercial information, but in no event less than a commercially reasonable degree of care, and ISO shall take such additional steps as may be necessary to monitor and enforce the confidential treatment of Access Codes and the Concord Proprietary Information. ISO shall immediately notify Concord in writing upon the occurrence of a breach of its security obligations set forth in this Section.

(h)     Communications Interface. ISO may be permitted, from time to time, to provide information or instructions to Concord regarding the services provided under the Agreement and the records and databases maintained thereunder, including additions, deletions and modifications thereto, through the Communications Interface in accordance with the Documentation. ISO warrants and represents to Concord and FDMS that all information transmitted to Concord through the Communications Interface is accurate and complete and Concord and FDMS shall be entitled to rely upon any and all such information or instructions received under a ISO Access Code as a duly authorized direction of ISO, unless Concord has received a notice of revocation of authority for such Access Code in accordance with the procedures and advance notice requirements set forth in the Documentation. Further, Concord and FDMS shall have no liability whatsoever arising out of any such instructions communicated to Concord or FDMS via the Communications Interface, including without limitation any and all errors or omissions made by ISO with respect to such instructions, regardless of whether the Equipment or software utilized to communicate such instructions are provided by Concord or FDMS.

(i)     Confidentiality. Concord and FDMS acknowledge that, ISO, in its use of ClientLine® Services, may disclose to Concord and FDMS certain non-public personal financial information relating to Cardholders. Accordingly, ISO agrees to hold and use any and all such Cardholder information in confidence, and not to disclose, reveal, copy, sell, transfer, assign or distribute any part or parts of it, in any form, to any person or entity, or permit any of its employees, agents, or representatives to do so, except as

4



expressly permitted or required by law. ISO warrants and represents to Concord and FDMS that, pursuant to an agreement between ISO and each Merchant whose Buypass Transaction information is contained in the ISO databases and obtained via ClientLine® Services pursuant to this Section, ISO has been duly authorized to obtain such Buypass Transaction information. Further, in the event any Merchant revokes the aforementioned authorization, ISO shall no longer obtain the Buypass Transaction information of the applicable Merchant.

(j)  Indemnification. In addition to its indemnification obligations under the Agreement and as otherwise stated in this Amendment, ISO shall, jointly and severally, indemnify, defend and hold harmless each of Concord and FDMS and each of their respective directors, officers, employees, agents, successors and assigns from and against any and all claims, demands, damages, costs, expenses (including reasonable attorneys' fees), losses and liabilities arising out of all claims and actions brought or made by any third party (including Merchants) relating in any way to (1) the misuse of an Access Code, or (2) the wrongful disclosure or use of information obtained through ISO or any of its employees or agents or the Equipment under their control.

5.  **PINless Debit Transactions Services**.  Through its Affiliate, Concord, FDMS shall make available to ISO and its Merchants, and ISO and its Merchants shall access, PINless debit Transaction services in the manner described and in accordance with the terms and conditions set forth below. ISO desires to access the Networks for the purposes of processing certain Buypass Transactions on behalf of its Merchants without receiving PIN validation ("Pinless Debit Transactions," also known as "Debit Bill Payment Transactions") and FDMS and Concord desire to provide Pinless Debit Transaction services as may be permitted by the Network rules. ISO acknowledges that under no circumstances will FDMS or Concord have any liability for Pinless Debit Transactions services and any associated fees, penalties or charges should payment of any Pinless Debit Transaction be rejected for any reason. Prior to and during FDMS' and Concord's provision of the Pinless Debit Transaction services contemplated hereunder, ISO and its Merchants and Indirect Processors (as such term is defined in Debit Network rules) shall be subject to and shall comply with the requirements of the Networks, including without limitation, execution and completion of certain documentation and agreements as required by the Networks; at any time that ISO or any of its Merchants or Indirect Processors are not in compliance with such requirements, FDMS or Concord may terminate Pinless Debit Transaction services with respect to ISO or such Merchant or Indirect Processor. FDMS or Concord may delete any Network upon prior written notice to ISO and in accordance with Network rules. All Pinless Debit Transactions processed hereunder shall be billed at the rates set forth in this Amendment, including Schedule 1, plus any applicable Transaction and Third Party Fees, in the manner set forth in this Amendment.

6.  **EFSnet Web Payment Services**. Through its Affiliate, Concord, FDMS shall make available to ISO and its Merchants, and ISO and its Merchants shall access, the Internet gateway interface ("EFSnet") for use with certain Concord-certified point of sale equipment ("Equipment") for the purposes of processing, via the Internet, certain e-commerce payment transactions and other electronic payment transactions initiated at the point of sale (the "EFSnet Web Payment Services") in the manner described and in accordance with the terms and conditions set forth below. In exchange for such services, ISO will pay FDMS the fees set forth in this Amendment in the manner set forth in the Agreement.

(a)  General ISO Requirements. In order to access the EFSnet Web Payment Services, ISO shall:

(1)  Successfully complete testing of the integration of ISO's system with the EFSnet system and the integration of the system of each of the following that will access the EFSnet system through

5



034

ISO: Merchants and third party processors (collectively the "ISO Parties"). ISO must receive written certification from Concord of the completion of each test with respect to ISO Parties;

(2)     Until the EFSnet Web Payment Services are terminated as set forth in this Amendment, ensure that ISO and ISO Parties are in compliance with the EFSnet Specifications (as defined in Section 5 below) and the EFSnet interface specifications located at www.concordefsnet.com, as promulgated, supplemented or amended from time to time;

(3)     Obtain and maintain, and cause ISO Parties to obtain and maintain, at their sole cost and expense, an Internet connection;

(4)     Obtain, or cause ISO Parties to obtain, an authorization of each Buypass Transaction processed hereunder by ISO Parties, in accordance with the terms of the Agreement, including this Amendment.

(5)     Regardless of whether the Transaction Card is or is not present at the point of sale, cause ISO Parties to follow and comply with the policies and procedures established by FDMS and Concord and provided to ISO from time to time for the acceptance of such Cards.

(6)     Cause its ISO Parties to maintain the confidentiality and security of the store ID and store key issued to such ISO Party by ISO, and notify FDMS and Concord immediately of any disclosure or unauthorized use of the store ID or store key of which the ISO or a ISO Party becomes aware.

(7)     Cooperate with FDMS, Concord and Networks and provide such information as is requested by FDMS, Concord and Networks to fulfill any Network requirements.

(b)     EFSnet Specifications Compliance. ISO shall review and comply with, and shall cause ISO Parties to review and comply with the EFSnet Interface Specification, the EFSnet Resource Guide located at www.concordefsnet.com, and the EFSnet transaction processing information located at http://www.concordefsnet.com/Support/FaqFraudRisk.asp., as each may be amended or supplemented by Concord or FDMS from time to time (collectively, the "EFSnet Specifications).

(c)     Card Not Present Transactions Via the Internet. With respect to Internet Transactions originated through EFSnet, unless otherwise directed by Concord or FDMS:

(1)     ISO shall cause Merchants to complete the sales draft without the Cardholder's signature or an imprint but with the Cardholder's name, billing address, card number, expiration date of the Card, a description of the merchandise or service and the date and amount of all charges, including taxes.

(2)     ISO shall cause Merchants to obtain information to perform address verification services and obtain and provide other information as Concord may reasonably require.

(3)     ISO shall cause each Merchant, which engages in Internet Transactions to complete and deliver to Concord in the manner instructed by FDMS or Concord an EFSnet Web Payment Services profile, as promulgated, amended or supplemented by Concord or FDMS from time to time and delivered to ISO.

(4)     ISO agrees and acknowledges that Merchants may authorize but shall not settle sales



prior to delivery of the product or service. All Internet Transactions will be settled into a depository institution in the United States.

(5)     ISO shall cause Merchants' web sites to contain all of the following information: (i) complete description of the goods or services offered; (i) returned merchandise and refund policy; (iii) customer service contact, including electronic mail address and/or telephone number; (iv) transaction currency (U.S. dollars only); (v) export or legal restrictions if known.

(6)     ISO shall cause ISO Parties to process Internet Transactions only (i) if the Transactions have been encrypted by Concord or by a third party vendor acceptable to Concord and (ii) Cardholder data is protected by the ISO Party behind firewalls or on servers inaccessible to third parties. Encryption is not a guarantee of payment to Merchants.

(7)     If applicable based upon the manner in which a Merchant's account is set-up, ISO agrees and acknowledges that Internet Transactions initiated by ISO Parties are authorized and settled through separate bank identification numbers or Interbank Card Association (collectively "BIN/ICA") numbers and interchanges and ISO acknowledges that Concord and FDMS will be unable to combine deposits of Internet Transactions and non-Internet Transactions.

(d)     Chargebacks. ISO agrees and acknowledges that Internet Transactions are subject to a higher incidence of chargebacks and, as with other Transactions, receiving an authorization and following procedures and complying with applicable requirements will not relieve ISO or ISO Parties of liability for chargebacks nor for any liability associated with the fraudulent use of Data obtained off of ISO's or a ISO Party's website or Transaction processing system.

(e)     Fees. All Buypass Transactions initiated via the EFSnet Gateway shall be billed at the Buypass Transaction rates set forth in this Amendment, including Schedule 1, plus any applicable Transaction fees and Third Party Fees.

(f)     Indemnity. In addition to its indemnification obligations under the Agreement and as otherwise stated in this Amendment, ISO shall indemnify and hold FDMS and Concord and each of their officers, directors, employees, shareholders and subsidiaries, from any and all loss, cost, expense, claim, damage and liability (including attorneys' fees and costs) paid or incurred by any one or more of them, arising from, caused by, or attributable to, any of the following, unless due to the gross negligence or willful misconduct of FDMS or Concord, including Concord:

(1)     Any action FDMS or Concord takes in accordance with or in reliance upon information or instructions provided by ISO or ISO Parties, including instructions regarding the routing of Transactions;

(2)     ISO's or ISO Parties' transmission FDMS or Concord of any inaccurate information; or

(3)     Unauthorized access to FDMS' or Concord's systems utilized to process, route and authorize Buypass Transactions from a point within ISO's or a ISO Party's control.

(g)     Grant of License. FDMS hereby grants to ISO a non-exclusive, non-assignable sublicense to the software loaded onto such Equipment specifically for the purpose of providing the EFSnet Web Payment

7



036

Services until the EFSnet Web Payment Services are terminated as set forth in this Amendment. Notwithstanding the foregoing, it is FDMS' and Concord's understanding that the licensor of such software has implemented security systems consisting of encryption and "firewall" technologies which are understood in the industry to provide adequate security for the transmission of information over the Internet. FDMS and Concord do not guarantee that such security is secure or impregnable, and shall not be responsible in the event of the infiltration of ISO's security systems. ISO further acknowledges and agrees that Concord and FDMS are not responsible for the security of the Cardholder data or information stored on ISO's or ISO Parties' web sites. If ISO or an ISO Party stores Cardholder account numbers, expiration dates, and other personal Cardholder data in a database, ISO shall, and shall cause the ISO Party to, follow policies, procedures, rules and regulations of Card or Electronic Payment Associations on securing such data. ISO agrees to indemnify, defend and hold FDMS and Concord harmless from every action, claim, loss, damage, and liability whatsoever ("Losses"), including attorneys' fees and other costs of defense, whether or not litigation is commenced, that relates to or results from its use or inability to use the software, or a ISO Party's use or inability to use the software, and all other products and services related to EFSNet Transactions processed hereunder, except to the extent FDMS would be otherwise liable for such Losses as set forth in the Agreement.

7.  **Payment of Fees for Concord Services.**

(a)  Notwithstanding anything in the Agreement to the contrary, FDMS shall invoice the ISO for any fees and charges incurred by ISO and its Merchants as set forth in this Amendment, including any Schedules, for services provided pursuant to this Amendment and shall deduct such fees and charges via ACH from a bank account of ISO or other similar arrangement agreed upon by FDMS and ISO. Fees for services provided pursuant to this Amendment (excluding any Third Party Fees (as defined in Section 7(c) of this Amendment, Special Fees or similar fees or interest payments) shall be included in Processing Fees as appropriate for the purposes of calculating Minimum Processing Fees and the Growth Incentive Rebate under the Agreement. FDMS may increase the fees set forth in this Amendment pursuant to the terms of this Amendment or the Agreement.

(b)  In addition to the specified fees and charges, ISO will pay any taxes or excises however designated, now or hereafter imposed, levied or based upon the fees paid to Concord or FDMS, except for taxes on income.

(c)  ISO will pay all Third Party Fees, as such may be adjusted or amended from time to time. ISO shall at all times be responsible for payment of all fees and charges of any Transaction Card issuer, Network, telecommunications provider, equipment manufacturer or vendor, processor, third party service provider, federal, state or local governmental authority in connection with the services provided under this Amendment (each a "Third Party"), including without limitation, any switch fee, issuer reimbursement fee, adjustment fee, interchange fee, assessment fee, access fee or other pass through fee (collectively, "Third Party Fees"). Concord and FDMS shall be entitled, without prior notice to the ISO, to pass through to the ISO any increases in communications costs or telephone tariffs subsequent to the Effective Date that affect the services provided by Concord. Should Concord or FDMS incur an increase in Third Party Fees, Concord and FDMS shall be entitled to increase Third Party Fees to ISO and such increases shall become effective on the date Concord or FDMS notifies ISO of such increases in writing.

(d)  ISO shall complete and return to FDMS the Authorization for Electronic Debit of ISO Account, attached as Schedule 4. FDMS shall ACH all fees and charges from ISO's designated account(s) within 10 days after FDMS' issuance of an invoice to ISO for such fees and charges. Any payments that are



037

d:linquent shall bear interest at the rate of 10% per annum or the highest rate allowed by law, whichever is lower.

(e)     ISO shall adhere to FDMS and Concord's Merchant Debit Card Adjustment Processing Procedures set forth in Schedule 3.

8.     **Concord System Specifications; Concord Proprietary Information; Confidentiality.**

(a)     FDMS, through Concord or other third parties, shall provide the Concord Services identified in this Amendment in accordance with the Concord System Specifications and the applicable Card or Electronic Payment Association operating rules and regulations.  FDMS or Concord may at any time and from time to time, without prior notice to the ISO, upgrade, change, or alter the Concord System and its capabilities.

(b) ISO acknowledges and agrees that all product and system developments, enhancements, improvements and modifications provided under this Amendment by FDMS or Concord that may be utilized for the benefit ISO or its Merchants shall remain the sole and exclusive property of FDMS or Concord as applicable.  Neither ISO nor its Merchants shall obtain any proprietary rights in any proprietary or confidential information which has been or at any time after the date of this Amendment is disclosed, directly or indirectly, to ISO or any of its Merchants by FDMS or Concord including any data, information, functionality or reporting capability related to the Concord Services or information that is a trade secret or competitively sensitive material, user manuals, screen displays and formats, computer software, methodologies, systems, products, system architecture and documentation, software performance results, flow charts, and other specifications (whether or not electronically stored), data and data formats, in each case, whether owned, licensed, sublicensed or provided by FDMS or Concord, including Concord (collectively, "Concord's Proprietary Information") whether any of the materials are developed or purchased specifically for performance of this Amendment or otherwise.  Concord's Proprietary Information shall be considered FDMS' Proprietary Information under the Agreement.

(c) Concord's Proprietary Information is confidential and is and shall remain the sole property of Concord.  ISO agrees that it will not disclose to any third party all or any part of the Concord Proprietary Information, including without limitation, any non-public personal financial information of consumers, and such agreement of non-disclosure shall be binding upon all officers, employees and agents of ISO.  ISO agrees that it will take any necessary action by instruction, agreement or otherwise with its officers, employees, and agents permitted access to the Concord Proprietary Information to satisfy its confidentiality obligations under this Section.  ISO shall, and shall cause its affiliates to, promptly return to FDMS or Concord or destroy all Concord Proprietary Information, including without limitation, manuals, forms, programs, files, screens, graphics, images and specifications, relating to any Concord Service that is terminated, or all of Concord's Proprietary Information in the event the Agreement expires or is terminated.  ISO acknowledges and agrees that in addition to any other remedies FDMS or Concord may have at law or in equity, FDMS or Concord will be entitled to a restraining order, injunction or other similar remedy and to enforce specifically the terms and provisions contained in this paragraph.  ISO hereby acknowledges that money damages alone would be an inadequate remedy for the injuries and damages that would be suffered and incurred by FDMS and Concord as a result of any breach by ISO of the provisions of this Section.

9

9.     **Compliance with Data Security Requirements.**

(a)     ISO represents and warrants that it, each of its Merchants, and each of its and its Merchants' agents and third party service providers is, and during the Term will remain, in compliance with all applicable material Data Security Requirements, at the expense of ISO or such Merchants, agents or third party service providers. ISO acknowledges that compliance with Data Security Requirements by it, its Merchants, or its or its Merchants' agents or third party service providers may not prevent a breach of or intrusion into the Concord System, FDMS system or the computer system of ISO, one of ISO's Merchants, or one of ISO's or its Merchants' agents or third party service providers. ISO further acknowledges that (1) compliance with Data Security Requirements is not a replacement for the information security program of ISO, its Merchants, or its or its Merchants' agents or third party service providers, and (2) it is the sole and exclusive responsibility of ISO to maintain, update and validate its security posture on an ongoing basis and to monitor the security posture of its Merchants and its and its Merchants' agents and third party service providers.

(b)     Without liability, FDMS has the right to withhold Services, in whole or in part, and immediately suspend connectivity to the FDMS System, including the Concord System, with respect to ISO, any of ISO's Merchants, or any of ISO's or its Merchants' agents or third party service providers if ISO, such Merchant, or such agent or third party service provider, as applicable, is not in compliance with all applicable material Data Security Requirements and Concord System Specifications until ISO, such Merchant, or such agent and third party service provider, as applicable, is in compliance with all applicable Data Security Requirements. In the event FDMS withholds Services or suspends connectivity pursuant to this Section, FDMS will give prompt notice of such to ISO. In addition, FDMS or Concord shall have the right, at any time in its sole discretion without prior notice, to suspend access to ClientLine® Services by Bank for security reasons or for emergency maintenance of the equipment used to provide ClientLine® Services and, upon reasonable notice to Bank, in order to conduct routine maintenance upon such equipment.

(c)     In addition to the indemnification obligations set forth in the Agreement, ISO shall indemnify and hold FDMS and Concord harmless from and against any and all liabilities, claims, suits, damages, losses, costs and expenses, including any fines, penalties and reasonable attorneys fees, to the extent that the liability, claim, suit, damage, loss and expense is caused by, relates to or arises out of (1) failure to comply with applicable Data Security Requirements by it, its Merchants, or its or its Merchants' agents or third party service providers, (2) any security breach in or intrusion into the computer system of it, any of its Merchants, or any of its or its Merchants' agents or third party service providers, or (3) the unauthorized use or disclosure or actual loss or theft of any information or records containing Cardholder or Transaction Card data or any bank account information of a payee or payor that is generated or stored by, or on behalf of, ISO, any of its Merchants, or its or its Merchants' agents or third party service providers.

(d)     As promptly as possible after it first obtains knowledge thereof, ISO shall

(i) notify FDMS of (A) any security breach or data compromise of ISO's computer system or the computer system of any of its Merchants or its or its Merchants' agents or third party service providers or (B) any suspected or actual unauthorized use or disclosure or loss or theft of any information or records containing Cardholder or Transaction Card data or any bank account information of a payee or payor that is generated or stored by, or on behalf of, ISO, any of its Merchants, or any of ISO's or its Merchants' agents or third party service providers, and

(ii) (A) cooperate with, and shall cause its Merchants and its or its Merchants' agents or third party service providers to cooperate with FDMS and Concord to determine the nature and extent of any such



039

security breach, data compromise, suspected or actual unauthorized use or disclosure or loss or theft, including the identification of any account numbers known or believed to be compromised; (B) provide and cause its Merchants and its or its Merchants' agents or third party service providers to provide information requested by FDMS with respect to accounts known or believed to be compromised; (C) cooperate and cause its Merchants and its or its Merchants' agents or third party service providers to cooperate with the efforts of FDMS and Concord directly or through third parties, to assess the vulnerability of the compromised data and ISO's or its Merchants and its or its Merchants' agents or third party service providers data security systems; (D) repair any vulnerabilities in any security systems so identified.

10.    **Disclaimer of Warranties.**

IN ADDITION TO THE DISCLAIMER SET FORTH IN ARTICLE 7 OF THE AGREEMENT, NEITHER FDMS NOR CONCORD WARRANT THAT CONCORD SERVICES OR THE INFORMATION OBTAINED THEREFROM WILL BE ERROR FREE. NEITHER FDMS NOR CONCORD SHALL HAVE ANY LIABILITY OF ANY KIND TO ISO OR ANY OF ITS MERCHANTS WITH RESPECT TO USE OF CONCORD SERVICES OR ANY INFORMATION OBTAINED THEREFROM. FURTHER, ALTHOUGH FDMS OR CONCORD MAY SUGGEST CERTAIN EQUIPMENT AND EQUIPMENT SUPPLIERS TO ISO FROM TIME TO TIME, NEITHER FDMS NOR CONCORD MAKE ANY WARRANTY WHATSOEVER WITH RESPECT TO EQUIPMENT OBTAINED BY ISO OR ITS MERCHANTS FROM THIRD PARTIES AND SHALL HAVE NO LIABILITY WITH RESPECT THERETO.

11.    **Limitation of Liability.** The cumulative liability of FDMS and Concord under this Amendment is subject to the provisions set forth in Article 6 of the Agreement.

12.    **Amendments.** If the functionality or scope of the Concord System, Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services changes, or if FDMS determines revisions to this Amendment are reasonably necessary to protect FDMS' Proprietary Information or to accurately reflect the manner in which such services are delivered to ISO or its Merchants, FDMS may amend this Amendment by providing ISO with prior written notice of such amendment; provided, however, that any such amendment that includes fee adjustments or additional fees (other than with respect to Third Party Fees) will be effective only if made in a writing signed by authorized officers of both parties.

13.    **Termination.**

(a)    Notwithstanding anything in this Amendment or the Agreement to the contrary, FDMS' obligation to provide the Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services to ISO will terminate automatically without penalty to FDMS or Concord upon the earlier of (i) the termination or expiration of the Agreement or (ii) the occurrence of any event causing FDMS or Concord to cease providing the Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services, respectively, to ISO. In addition, either party shall have the right to terminate any of the Concord Services at any time upon ninety (90) days' prior written notice to the other party.

(b)    Upon termination of the Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services, ISO shall not be permitted to use the respective service and all rights, licenses and sublicenses granted with respect to such service shall be terminated. Termination of Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services



040

for any reason shall not affect FDMS' or Concord's entitlement to any sums due under this Amendment, the Agreement or any additional remedies provided by law or equity.

14.     **Force Majeure**. FDMS or Concord shall be excused from performance of the Concord Services if such performance is prevented or delayed by acts or events beyond its reasonable control, including, but not limited to, severe weather and storms, earthquakes or other natural occurrences, strikes or labor unrest, riots or other civil disturbances, power or equipment failures not caused by its own negligence, nuclear or other civil or military emergencies, or acts of legislative, judicial, executive or administrative authorities at the federal, state, or local level. Each of FDMS and Concord shall not be liable for any claims, demands, damages, costs, expenses, losses or liabilities arising out of or resulting from any such event or act. Prevention or delay of the performance of FDMS or Concord under this Amendment shall not constitute an event of default or a breach of this Amendment or the Agreement.

15.     **Third Party Beneficiary.** Concord is a third party beneficiary under the Agreement and this Amendment.

16.     **Interpretation.** This Amendment constitutes the entire agreement between the parties regarding the subject matter of this Amendment and supersedes all prior and contemporaneous agreements and understandings regarding such subject matter.  In the event of a conflict between this Amendment and the Agreement as it relates to the subject matter hereof, the terms of this Amendment will control.  Otherwise, all terms and conditions of the Agreement will remain in full force and effect and likewise apply to this Amendment.

[Signature Page Follows.]

12

041

The parties have executed this Amendment as of the date first above written.

FIRST DATA MERCHANT SERVICES CORPORATION,
a Florida corporation

By: _____

Name: _Martin Suess_

Title: _Vice President_

BANK TRANSACTIONS, INC.,
a ___Nevada___ corporation

By: _____

Name: _Adam Friedman_

Title: _President_

BANCORPSOUTH BANK

By: _Kathi Carter_

Name: _KATHI CARTER_

Title: _SVP_

13

042

## ACER PAYMENT
### Proposed Fees for Buypass Front-End Services

**Non-Tiered Pricing (Note 1)**

| Service | Platform | Driver | Rate |
|---|---|---|---|
| File Residency | Buypass | Per account per month | ██████ |
| Debit Adjustments | Buypass | Per adjustment | ██████ |
| Activation by Client | Buypass | | ███████ |
| Downline Load – Full Table Partial | Buypass | Per telephone download | ██████ ██████ |
| Help Desk Support | Buypass | Per Merchant Per Month | ██████ |
| ACH Fee | Buypass | Per ACH transaction | █████ |
| Custom Development & Programming | Buypass | Per hour | ██████ |
| Satellite and dedicated telecom installation and usage | Buypass | | █████████ |
| Client Line Set Up & Monthly Change | Buypass | | ████████ ████████ |

| | Base Rate per Buypass Transaction (Based on Transactions Processed Each Calendar Month) | | |
|---|---|---|---|
| Service | Buypass Transactions 1-250,000 | Buypass Transactions 250,001-500,000 | Buypass Transactions 500,001 and above |
| Buypass Platform Front End Services | ██████ (notes 2-6) | ██████ (notes 2-6) | ██████ (notes 2-6) |

### NOTES:

(1) This addendum is coterminous with FDR agreement.

(2) Buypass Transaction means each instance during with Concord has electronic contact with a point of sale device of Merchant or Client including authorizations, declines, purchases, reversals, returns, totals and table loads..

(3) Base rate assumes each Buypass Transaction utilizes dial, or Datawire. Each Buypass Transaction utilizing EFSnet, a leased line or VSAT will be billed at the applicable base rate less ████████ ██████ Each Buypass Transaction that is a fleet card transaction will be at the applicable base rate plus ██████ .

(4) All dedicated telecommunications, postage and credit card assessments will be passed through to the Client.

(5) Buypass Transactions will be applied to the Total Monthly Volume amounts set forth on Schedule A to the Agreement for item number 3502 – Dial Authorization.

**ACER PAYMENT**
**Proposed Fees for Buypass Front-End Services**

Non-Tiered Pricing (Note 1)

| Service | Platform | Driver | Rate |
|---|---|---|---|
| File Residency | Buypass | Per account per month | ██ |
| Debit Adjustments | Buypass | Per adjustment | ██ |
| Activation by Client | Buypass | | ███ |
| Downline Load – Full Table Partial | Buypass | Per telephone download | ███ ██ ██ |
| Help Desk Support | Buypass | Per Merchant Per Month | ██ |
| ACH Fee | Buypass | Per ACH transaction | ██ |
| Custom Development & Programming | Buypass | Per hour | ███ |
| Satellite and dedicated telecom installation and usage | Buypass | | █████ |
| Client Line Set Up & Monthly Change | Buypass | | █████ |

| Service | Base Rate per Buypass Transaction (Based on Transactions Processed Each Calendar Month) | | |
|---|---|---|---|
| | Buypass Transactions 1-250,000 | Buypass Transactions 250,001-500,000 | Buypass Transactions 500,001 and above |
| Buypass Platform Front End Services | ████ (notes 2-6) | ████ (notes 2-6) | ████ (notes 2-6) |

**NOTES:**

(1) This addendum is coterminous with FDR agreement.

(2) Buypass Transaction means each instance during with Concord has electronic contact with a point of sale device of Merchant or Client including authorizations, declines, purchases, reversals, returns, totals and table loads..

(3) Base rate assumes each Buypass Transaction utilizes dial, EFSnet Gateway or Datawire. Each Buypass Transaction utilizing a leased line or VSAT will be billed at the applicable base rate less ████████ ████. Each Buypass Transaction that is a fleet card transaction will be at the applicable base rate plus ████.

(4) All dedicated telecommunications, postage and credit card assessments will be passed through to the Client.

(5) Subject to separate addendum and terms on behalf of First Financial Bank.

14

044

## SECOND AMENDMENT TO MARKETING AGREEMENT

This Second Amendment to Marketing Agreement (this "Amendment") is made and entered into as of this _3_ day of November , 2006 between Bank Transactions, Inc., a Nevada corporation ("ISO"), First Data Merchant Services Corporation, a Florida corporation ("FDMS") and BancorpSouth Bank ("BANK").

### RECITALS

A.     ISO, FDMS and BANK have previously entered into a Marketing Agreement dated as of July 1, 2006, as amended (the "Marketing Agreement").

B.     ISO, FDMS and BANK now desire to amend the Marketing Agreement as set forth herein.

### AGREEMENT

In consideration of the foregoing, ISO, FDMS and BANK hereby agree as follows:

1.     This Amendment will be effective as of November 3rd , 2006.

2.     The following definitions of Section 1 of the Marketing Agreement are hereby replaced in their entirety as follows:

"Processing Year 1" means the period commencing on the Effective Date and ending on October 31, 2007.

"Processing Year" means each twelve (12) calendar month period commencing on the first day of September and ending on the last day of October, except for Processing Year 1.

3.     Section 19(a) of the Marketing Agreement is hereby deleted in its entirety and replaced with the following:

(a) The initial term of this Agreement commenced on July 1, 2006 (the "Effective Date") and shall continue for four (4) Processing Years through October 31, 2010 (the "Initial Term"). Thereafter, this Agreement will be automatically renewed for successive terms of two (2) Processing Years each unless either party provides written notice to the other at least six (6) months prior to the expiration of the then-current term.

045

4.  The following items set forth in Section 1(c) of <u>Schedule A</u> to the Marketing Agreement are hereby deleted and replaced in their entirety with the following:

| Item Number | Item | Definition | Price per Item |
|---|---|---|---|
| N/A | Discount | Fee calculated by applying a fixed percentage to the dollar amount of the gross bankcard sales dollar volume. | 4 basis points (0.04%) on the gross bankcard sales dollar volume |
| N/A | Downgrade Surcharge | Fee calculated by applying a fixed percentage to the dollar amount of the downgraded bankcard sales dollar volume. | 0.0 basis points (0.00%) on the downgraded bankcard sales dollar volume |

5.  Capitalized terms used but not otherwise defined in this Amendment will have the meanings set forth in the Marketing Agreement.

6.  In the event of a conflict between this Amendment and the Marketing Agreement as it relates to the subject matter hereof, the terms of this Amendment will control. Otherwise, all terms and conditions of the Marketing Agreement will remain in full force and effect and likewise apply to this Amendment.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

BANK TRANSACTIONS, INC.,
a Nevada corporation

By: _____

Name: _Adam Friedman_____

Title: _President_____

Date: _11/3/06_____

FIRST DATA MERCHANT SERVICES
CORPORATION, a Florida corporation

By: _____

Name: _Martin Sass_____

Title: _Vice President_____

Date: _11-13-06_____

BANCORPSOUTH BANK

By: _Kathi Carter_____

Name: _KATHI CARTER_____

Title: _SVP_____

Date: _11-14-06_____

# EXHIBIT B

**MAJOR MERCHANT AMENDMENT TO MARKETING AGREEMENT**

This Major Merchant Amendment to Marketing Agreement (this "**Amendment**") is made and entered into as of this _____ day of _____, 2008 between Bank Transactions, Inc., a Nevada corporation ("**ISO**" or "**Customer**"), First Data Merchant Services Corporation, a Florida corporation ("**FDMS**") and BancorpSouth Bank ("**BANK**").

## RECITALS

A.      ISO, FDMS and BANK have previously entered into a Marketing Agreement dated as of July 1, 2006, as amended (the "**Agreement**").

B.      ISO, FDMS and BANK now desire to amend the Agreement as set forth herein.  FDMS and Bank are together the "**Service Providers**".

## AGREEMENT

In consideration of the foregoing, ISO, FDMS and BANK hereby agree as follows:

1.      This Amendment will be effective as of _____, 2008.

2.      Section 1 (c) of Schedule A to the Agreement is  hereby amended and restated in its entirety as follows:

c.  Additional Services fees, as set forth below in Schedule A; provided, however, that for each merchant boarded under System 1392 / PRIN 7600 pursuant to the terms set forth in Schedule A-1 (each, a "**Rev Share Merchant**"), the foregoing will not apply, and Service Providers will pay ISO in accordance with Schedule A-1."

3.      The Agreement is hereby amended by the addition of Schedule A-1 as set forth in Exhibit I to the Agreement.

4.      FDMS may terminate this Amendment upon thirty (30) days prior written notice for any reason, and upon written notice if the only Merchants receiving processing services under the Agreement are set up as Rev Share Merchants.

5.      Capitalized terms used but not otherwise defined in this Amendment will have the meanings set forth in the Agreement.

6.      This Amendment, constitutes the entire agreement between the parties regarding the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings.  In the event of a conflict between this Amendment and the Agreement as it relates to the subject matter hereof, the terms of this Amendment shall control.  Otherwise, all terms and conditions of the Agreement shall likewise apply to this Amendment.

The parties have executed this Amendment as of the date first above written.

Bank Transactions, Inc.,                         First Data Merchant Services Corporation,
a Nevada corporation                            a Florida corporation


By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

048

BancorpSouth Bank


By: _____
Name: _____
Title: _____

# EXHIBIT I

## SCHEDULE A-1

**1.  Amount Payable to ISO for Rev Share Merchants.**  Service Providers will pay ISO seventy percent (70%) of Profit derived from each Rev Share Merchant, subject to the terms of the Agreement and this Schedule A-1.  For purposes of Schedule A-1, "**Profit**" means all amounts collected from each Rev Share Merchant less applicable: (i) Interchange Fees, including Service Providers' surcharge for non-qualified Transactions, (ii) association dues, assessments and other association fees, (iii) debit network fees, (iv) debit gateway fees, (v) pass through fees, and (vi) Additional Services fees as set forth in this Schedule A-1, and if not covered in Schedule A-1, as set forth in Schedule A.  ISO has sole responsibility for each Rev Share Loss. A "**Rev Share Loss**" occurs when Profit for any individual Rev Share Merchant is less than zero. Each Rev Share Loss will be offset against any payments to be made to ISO by Service Providers under this Agreement.

ISO's ability to board merchants as Rev Share Merchants under the designated System / PRIN for Rev Share Merchants shall be at the sole discretion of Service Providers. Only Merchants, Merchant Chains or Franchise Chains that are classified as "Regular" Merchants under FDMS's credit policy and that are reasonably expected to generate at least 20,000 transactions during a particular calendar month (all card types, including sales and returns) within ninety days after set up as a Rev Share Merchant may be set up as Rev Share Merchants.  Service Providers shall have no obligation to make any payment to ISO for services provided to any Merchant set up as a Rev Share Merchant that fails to meet the foregoing requirement ("**Non-conforming Merchant**") until ISO brings such Non-conforming Merchant into conformity with this requirement. At ISO's sole expense, ISO may, and at FDMS's direction will, move such Non-conforming Merchants to a different System/PRIN governed by the pricing set forth in Schedule A of the Agreement. For purposes of this Schedule A-1, "**Merchant Chain**" means multiple Merchant locations owned by same legal entity, and "**Franchise Chain**" means multiple Merchants that are not owned by the same legal entity, but hold the right or license granted by a franchisor to market the franchisor's products or services.

Terms set forth in Schedule A for Additional Services, Equipment Lease Program, TASQ Deployment and Terminal Purchase Program, MAE Applications, Welcome Kits and similar services or programs shall apply to Rev Share Merchants.

All references in the Agreement to Schedule A shall include this Schedule A-1 (except for such references in this Schedule A-1).

050

| Item Number | Item | Definition | Price Per Item |
|---|---|---|---|
| **Billable Items** | | | |
| 5700 | Merchant Account on File | Each account of a Merchant of Customer that remains on Customer's masterfile at FDMS on the last processing day of the calendar month as defined on the MM-101 Merchant Profitability report or an equivalent. Includes the following bundled elements 5702, 5465, 5701, 5712, 0349, 5723, 5941, 5942 ,7103 and Buypass File Residency Fee. | ■■■■■■■<br>■■■■■■ |
| 5707<br>7217<br>Buypass | Acquirer and Issuer Chargeback and Debit Adjustment | Each return of a Ticket and receipt of the amount thereof from an Acquirer or Issuer to an Issuer or Acquirer as provided for in the then current MasterCard and VISA rules and regulations. Chargebacks will be forwarded by FDMS to Customer for resolution via the On-Line Direct Sell Chargeback System.  Includes the following bundled elements 5727, 5820, 5756, 5757, 5758 and 5708. | |
| 335 | Debit Gateway – Authorization | The approval and/or decline of a debit transaction presented at the Merchant's point-of-sale terminal via a debit gateway and FDMS' computers.  Includes 336 as a bundled element. | ■■■■■■ ■ |
| N/A | Discount | Fee calculated by applying a fixed percentage to the dollar amount of the gross bankcard sales dollar volume.   The percentage applied is based on the average sales volume per bankcard ticket for the month for the Rev Share Merchant SYS/PRIN:<br><br>Rev Share Merchant ■■■■■■<br><br>■■■■■■<br>■■■■■ | <br><br><br><br><br>■■■■■■■<br>■■■■■■■<br>■■■■■■■<br>■■■■■ |
| 3536<br>3518 | External Authorization Processing/Debit Summary Process | The fee associated with the point-of-sale authorization of a transaction or a debit transaction to an account of Customer by a third party where notice of such authorization or debit transaction is delivered to FDMS via a transmission medium from the third party. | ■■■■<br>■■■■■<br>■■■ |
| 5714<br>5715<br>5704<br>5717<br>5706<br>0304<br>Buypass | Merchant Ticket/ Batch Header/Summary: | Each transaction and or closed batch of transactions of a Merchant of Customer that is either captured by means of an electronic process (ETC or ETC-Online Debit), entered remotely from Customer's terminal(s), or sent via tape and forwarded to FDMS for processing and reporting. | ■■■■■ |
| 3507<br>305<br>3508<br>1102<br>317<br>318<br>Buypass– Direct Connect | Non-Dial Authorizations | Each non-dial authorization inquiry received in FDMS protocol via a computer to computer (CPU-to-CPU), CRT terminals, Batch or Internet. or leased line point-of-sale terminals that are on the premises of Customer or Customer's Merchant, where FDMS captures the identification number of Customer's Merchant.  Includes the following bundled elements 306 and 398. | ■■■■■■ |

4

| 3521<br>Buypass-Datawire | IP (Datawire) Authorizations (POS-Authorization DDOV-ISDN) | Per attempt fee for each authorization request received by FDMS from a certified Internet-enabled POS device via an Internet Protocol Network (IPN) transaction.  Internet connectivity not included. | ■■■■■ |
| 3502<br>3503<br>3504<br>300<br>1101<br>319<br>Buypass | Dial Authorization | Each Dial-up point-of-sale terminal attempted inquiry serviced by FDMS for Merchants of Customer by the use of a dial-up point-of-sale terminal.  Per attempt fee for each authorization request received by FDMS from a certified Internet-enabled POS device via an Internet Protocol Network (IPN) transaction.  Internet connectivity not included. Customer shall pay FDMS for each instance during which a batch is closed and/or FDMS had electronic contact with a Merchant of Customer and receives the Merchant number, including batch closing.  Includes the following bundled elements 301 and 398. | ■■■■■ |
| N/A | New Accounts | Fee charged for each new Merchant Account boarded on the FDMS system.  Includes the risk underwriting of one entity per Merchant relationship boarded.<br><br>Per each additional entity underwritten for a Merchant relationship such as each franchisee  in a Franchise Chain. | ■■■■■ |
| **Zero-Priced & Bundled Items** | | | |
| 2806<br>303 | Address Verification – Acquiring | Each electronic request for an Address Verification by a Merchant of Customer. | ■■■■■ |
| Manual Item | Client Workstation | This element identifies the charge for the ability to view the Merchant Online System. | ■■■■■ |
| 7118 | eMerchant Workstation User | Recurring monthly fee billed to each user who has a digital certificate and has access to the eMerchantView$^{SM}$ workstation product | |
| N/A | Downgrade Surcharge | Fee calculated by applying a fixed percentage to the dollar amount of the downgraded bankcard sales dollar volume. | ■■■■■ |
| 5723†<br>349†<br>5941†<br>5942†<br>Buypass† | Service Calls – Help Desk | Each instance in which a Merchant calls the FDMS service center with an inquiry request or for other information concerning its Merchant account, or each instance in which the FDMS service center returns a call to a Merchant, Bank or its applicable Affiliates in response to an inquiry request that required further research.  Fee includes cost of toll-free telephone expenses, labor and other miscellaneous expenses associated with the customer service function. | ■■■■■ |
| Buypass | | Buypass ClientLine Services Buyer Monthly Fee | ■■■■■ |

- † - Items marked with a cross are considered non-billable or bundled so long as the volume is minimal and incidental to the provision of standard dial or non-dial authorization and transaction processing.  In the event that the volume under any of these elements becomes significant, FDMS reserves the right to charge for these services at the then-standard rates.
- (+) Gateway fee is in addition to the appropriate monthly dial authorization rate.
- (*) For the first calendar month of the Rev Share Merchant program, ISO shall pay Service Providers the Discount basis points rate indicated by the estimated monthly calculated Average Ticket Size.  For each

5

subsequent calendar month of the term, ISO shall pay Service Providers the Discount basis points rate indicated by the previous calendar month's actual Average Ticket Size excluding any volume on the "Buypass" platform.  Notwithstanding the foregoing, FDMS may, in its sole discretion, consider volume on the Buypass platform when adjusting the monthly Discount basis points rate.  Within 90 days after the end of each Processing Year, FDMS shall determine aggregate Average Ticket Size on all FDMS platforms (including all volume on the Buypass platform) and the Discount basis points rate based on this aggregate Average Ticket Size.  If, during any such Processing Year, ISO shall have paid Service Providers more or less than the amount owed to Service Providers based upon the above calculations, then Service Providers shall issue a credit to ISO for any amounts due ISO or invoice ISO for any amounts due Service Providers, as appropriate.

- Pricing excludes pass through fees and charges such as postage, debit gateway fees, surcharges, datalines, and client specific setup fees not specifically addressed Schedule A or Schedule A-1.  ISO is responsible for all pass through fees.  Postage will be passed through at First Class rates.

- Volumes included in the Rev Share Merchant System/PRIN will not apply toward any volume-sensitive pricing grids or fee based calculations (other than minimum fee calculations) contained elsewhere in this Agreement.

- For any services performed by FDMS at ISO's direction which are not set forth in this Schedule A-1 or Schedule A or covered by a separate agreement, ISO shall pay FDMS for such services at FDMS's then current standard rates.

- Each Buypass Transaction that is a fleet card transaction will be billed at the applicable base rate plus $0.010. ISO will be invoiced separately for Buypass Transaction and other Buypass fees and, upon request from FDMS, agrees to provide FDMS or its designee with written authorization to debit ISO's designated bank account for such fees.

# EXHIBIT C

**PCI Compliance Service Program**
**Page 7 | P a g e**

*Election to Implement and Manage ISO PCI Compliance Service Program*

**Please submit your completed form (which includes this entire letter) via email to**
**pci.2@firstdata.com or fax to (402) 916-8241 no later than July 1, 2009.**

Bank Transactions "ISO" acknowledges that PCI DSS compliance is required for all entities that process, transmit and store cardholder as mandated by the payment brands (including MasterCard, Visa, Discover Network, American Express and JCB International), including all merchants. ISO further acknowledges that it does not wish to participate in the FDMS PCI Compliance Service Program; and, consequently, the Merchant Portfolio and ISO will not be eligible to receive the services and benefits provided by the FDMS PCI Compliance Service Program. ISO understands and agrees that failure to participate in FDMS PCI Compliance Program or implement and manage ISO's own PCI compliance program that complies with then-current FDMS ISO Managed PCI Compliance Program Requirements (see following page)will prevent FDMS and its sponsor bank from fully complying with payment brand PCI DSS reporting requirements.

ISO represents, warrants, covenants and agrees that it has implemented and manages, or by August 1, 2009 will implement and manage, a PCI compliance program that complies with the then-current FDMS ISO Managed PCI Compliance Program Requirements (see following page). In connection with the foregoing, ISO acknowledges and agrees that ISO is responsible for: (1) establishing its own relationship with an ASV to facilitate ISO's PCI compliance program for the Merchant Portfolio; (2) providing reports to FDMS regarding the PCI DSS compliance status of each merchant in the Merchant Portfolio within the time-frames designated by FDMS in the then-current FDMS ISO Managed PCI Compliance Program Requirements; and, (3) providing additional documentation of merchant PCI DSS compliance upon request by FDMS.

ISO acknowledges and agrees that: (1) FDMS will pass through to ISO any fines assessed by payment card brands arising from ISO's failure to comply with the then current FDMS ISO Managed PCI Compliance Program Requirements with respect to the Merchant Portfolio; and, (2) FDMS reserves all rights under the merchant agreements and ISO Agreement to take measures, in its discretion, to mitigate risk and/or losses, up to and including termination of any merchant agreement and/or ISO Agreement (in accordance with their respective terms). In addition, if ISO fails to establish and maintain a PCI compliance program by August 1, 2009 that complies with the then-current FDMS ISO Managed PCI Compliance Program Requirements, FDMS may implement Option 1(a)($79.00) of the First Data Merchant Services PCI Compliance Program (as described in this letter) with respect to each merchant in the Merchant Portfolio.

I, Adam Friedman, on behalf of Bank Transactions ("ISO") have read, understood and acknowledge the information in this letter concerning PCI DSS reporting requirements and ISO's responsibilities and obligations if it elects to implement and maintain its own PCI compliance program to meet these reporting requirements. ISO hereby notifies FDMS and its sponsor bank that, as of the date set forth below, ISO elects to implement and maintain a PCI compliance program for the Merchant Portfolio that complies with FDMS' then-current ISO Managed PCI Compliance Program Requirements. In the event of a conflict between this letter agreement and the ISO Agreement, the terms of this letter agreement will control. Otherwise, all terms and conditions of the ISO Agreement will remain in full force and effect and likewise apply to this letter agreement.

Bank Transactions    Wells Fargo    8/21/09
Company/Title        ISO Bank/Agent ID        Date

Adam Friedman
Print Name                                    Signature

055

**PCI Compliance Service Program**
**Page** 8 **| P a g e**

**First Data Merchant Services Corporation (FDMS)**
**ISO Managed PCI Compliance Program Requirements (as of June 1, 2009):**

To comply with the payment brand rules regarding PCI DSS reporting and safeguard against merchant losses, FDMS and its sponsor banks require that PCI DSS compliance is validated and reported to the payment brands for each merchant receiving processing services under our bank sponsorship agreements, including the Merchant Portfolio. This may be accomplished through ISO's participation in the FDMS Managed PCI Compliance Program, or ISO's implementation (by August 1, 2009) and maintenance of a PCI compliance program for the Merchant Portfolio that complies with the requirements set forth below. These requirements are subject to change on 60 days prior written notice from FDMS and the sponsor bank, or as necessary to comply with payment brand PCI DSS requirements.

FDMS reserves the right to review and approve or disapprove ISO's PCI compliance program based on these requirements. If ISO fails to establish (by August 1, 2009) and maintain a PCI compliance program that complies with these requirements, then FDMS may implement the FDMS PCI Compliance Program with respect to the Merchant Portfolio.

**Retail ISO Managed PCI Compliance Program Requirements**
- ISO managed PCI compliance programs must use an Approved Scanning Vendors (ASVs) recognized by the PCI Security Standards Council to conduct any required network scans. Visit www.pcisecuritystandards.org for a listing of ASVs.

- ISO managed PCI compliance programs must require that each merchant in the Merchant Portfolio complete a Self-Assessment Questionnaire (SAQ) using the latest versions (current version is 1.2) of the SAQ that are recognized and approved by the PCI Security Standards Council.

- ISO managed PCI compliance programs must ensure that merchants complete the appropriate version (e.g., currently, A, B, C or D) of the SAQ in accordance with PCI Security Council's guidelines.

- ISO managed PCI compliance programs must ensure that the SAQs are completed in full (including remediation plan if applicable) and signed by an authorized representative of the merchant.

- ISO must provide the required compliance reporting (as indicated below) on or before the due dates. PCI DSS compliance reports received after the due date are considered not received. Incomplete PCI DSS compliance reports are considered not received.

- ISO must be able to provide merchant PCI DSS compliance documentation upon request by FDMS.

**PCI Compliance Service Program**
Page 9 | P a g e

- ISO must submit a PCI program plan document that identifies a timeline of events and milestones to be achieved by the ISO manage PCI compliance program

**Retail ISO Managed Compliance Reporting Requirements**

To obtain a copy of the current reporting templates please email your request to pci.2@firstdata.com.
- Visa - Monthly reports. Due date is the 25th of every month.
- MasterCard - Quarterly reports. Due dates are: March 25, June 25, September 25, and December 25.
- Discover Network – Semi-annual reports due. Due dates are:  June 25 and December 25

On or before the applicable due date, submit your completed reports on the current reporting template to the pci.2@firstdata.com inbox. **PCI reports received after the due date and incomplete PCI reports are considered not received.  Note:** Completed reports will contain sensitive merchant data and therefore must be transmitted in an encrypted manner.

## Adam Friedman

| | |
|---|---|
| **From:** | Kerolos, Mike [Mike.Kerolos@firstdata.com] |
| **Sent:** | Wednesday, August 12, 2009 2:11 PM |
| **To:** | Adam Friedman |
| **Cc:** | Nicholson, Erik R |
| **Subject:** | RE: PCI Questions |

Hello Adam,

Please see the answers below:

**Thanks for all your help. Below are the questions I have in regards to the ISO managed PCI compliance program:**

**Could you please calrify the meaning of the questions in blue?**

**Also, you mentioned First Data will be sending out letters to inform merchants of the PCI compliance needed, and the fees associated with the First Data PCI compliance program. We are not going to participate in this program, please do not send these letter to Bank Transaction's merchants.**

**First Data will not send the PCI letters to merchants in your portfolio provided that you meet the PCI requirement outlined in First Data letter to you.**

**Once these are clarified, we will send back the PCI letter/ agreement.**

**We also need another extension to find our ASV vendor. May we have until the end of the month?**

**We can approve a second extension until 08/26/09**

**From what I understand according to the Retail ISO Managed PCI Compliance Program Requirements , the ASV only needs to perform the scan, but does not need to send out the letters, Yes or complete the remediation? They should provide to the merchant a report to help in the remediation effort**

**So we could send the letters and walk the merchant through the SAQs (of our ASV) Yes-you can send the SAQ after an interview with the merchant is completed to help determine the actual processing environment and the appropriate SAQ that needs to be completed. and then allow the ASV to perform the scans when needed.  And then the reporting could be done by Bank Transactions as well?  Yes- the reporting could be done by Bank Transactions**

### Retail ISO Managed PCI Compliance Program Requirements

- ISO managed PCI compliance programs must use an Approved Scanning Vendors (ASVs) recognized by the PCI Security Standards Council to conduct any required network scans. Visit www.pcisecuritystandards.org for a listing of ASVs.

**From what I understand according to the Retail ISO Managed PCI Compliance Program Requirements , the ASV only needs to perform the scan, but does not need to send out the letters, or complete the remediation?  So we could send the letters and walk the merchant through the SAQs (of our ASV) and then allow the ASV to perform the scans when needed. And then the reporting could be done by Bank Transactions as well?**

This was answered above

- ISO managed PCI compliance programs must require that each merchant in the Merchant Portfolio complete a Self-Assessment Questionnaire (SAQ) using the latest versions (current version is 1.2) of the SAQ that are recognized and approved by the PCI Security Standards Council.

My understanding is the word "each" means "all" merchants must complete the SAQ...100%?  First Data's understanding is simply that:  each merchant must be "sent" a SAQ according to Mike K.

First Data goal is to ensure compliance with the association and First Data understand that no ISO can achieve 100% of their merchant's compliance.

First Data

Therefore we Request that you require from 100% of your merchants to complete the SAQ. It will be unrealistic to except that 100% of your merchants will complete it.

- ISO managed PCI compliance programs must ensure that merchants complete the appropriate version (e.g., currently, A, B, C or D) of the SAQ in accordance with PCI Security Council's guidelines.

- ISO managed PCI compliance programs must ensure that the SAQs are completed in full (including remediation plan if applicable) and signed by an authorized representative of the merchant.

Also, this sentence to me means "all" merchants must sign off on the SAQs?  First Data's understanding is different....

First Data Request that you require from 100% of your merchants to complete the SAQ in full (including remediation plan if applicable) and signed by an authorized representative of the merchant.. It will be unrealistic to except that 100% of your merchants will complete it in full.

- ISO must provide the required compliance reporting (as indicated below) on or before the due dates. PCI DSS compliance reports received after the due date are considered not received. Incomplete PCI DSS compliance reports are considered not received.

- ISO must be able to provide merchant PCI DSS compliance documentation upon request by FDMS.

- ISO must submit a PCI program plan document that identifies a Tim line of events and milestones to be achieved by the ISO manage PCI compliance program

**Retail ISO Managed Compliance Reporting Requirements**

To obtain a copy of the current reporting templates please email your request to pci.2@firstdata.com.

- Visa - Monthly reports. Due date is the 25th of every month.

- MasterCard - Quarterly reports. Due dates are: March 25, June 25, September 25, and December 25.

- Discover Network – Semi-annual reports due. Due dates are: June 25 and December 25

On or before the applicable due date, submit your completed reports on the current reporting template to the pci.2@firstdata.com inbox. **PCI reports received after the due date and incomplete PCI reports are considered not received. Note:** Completed reports will contain sensitive merchant data and therefore must be transmitted in an encrypted manner.

My Further questions are:

What type of enforcement should be chosen to force merchant's to comply? A monthly fee? If so how much? Should a hold back of funds be done instead? I would rather not charge anything to a merchant...if possible. If an ISO decide to opt out of the First Data PCI program and manage their own PCI program it will be up to them to decide on the effective enforcement that help ensure merchants compliance with the

Associations mandates.
If we meet the requirement described in the FD letter/ agreement and clarified here, then we will not be subject to the fines as described in the FD letter/ agreement correct?
If an ISO meet the requirements outlined in First Data PCI letter then they should not expect to have fines (as outlined in the letter) passed on to them.

Thanks

**Mike Kerolos**
Compliance Manager

**First Data**
805.552.2681 Direct
402.916.6667 Fax
Mike.Kerolos@FirstData.com
www.FirstData.com

**From:** Adam Friedman [mailto:adam@banktransactions.com]
**Sent:** Tuesday, August 11, 2009 8:08 PM
**To:** Kerolos, Mike
**Cc:** Nicholson, Erik R
**Subject:** PCI Questions
**Importance:** High

     **Mike,**

     **Thanks for all your help. Below are the questions I have in regards to the ISO managed PCI compliance program:**

     **Could you please calrify the meaning of the questions in blue?**

     **Also, you mentioned First Data will be sending out letters to inform merchants of the PCI compliance needed, and the fees associated with the First Data PCI compliance program. We are not going to participate in this program, please do not send these letter to Bank Transaction's merchants.**

     **Once these are clarified, we will send back the PCI letter/ agreement.**

     **We also need another extension to find our ASV vendor. May we have until the end of the month?**

**From what I understand according to the Retail ISO Managed PCI Compliance Program Requirements , the ASV only needs to perform the scan, but does not need to send out the letters, or complete the remediation?  So we could send the letters and walk the merchant through the SAQs (of our ASV) and then allow the ASV to perform the scans when needed. And then the reporting could be done by Bank Transactions as well?**

**Retail ISO Managed PCI Compliance Program Requirements**

- ISO managed PCI compliance programs must use an Approved Scanning Vendors (ASVs) recognized by the PCI Security Standards Council to conduct any required network scans. Visit www.pcisecuritystandards.org for a listing of ASVs.

**From what I understand according to the Retail ISO Managed PCI Compliance Program Requirements , the ASV only needs to perform the scan, but does not need to send out the letters, or complete the remediation?  So we could send the letters and walk the merchant through the SAQs (of our ASV) and then allow the ASV to perform the scans when needed. And then the reporting could be done by Bank Transactions as well?**

- ISO managed PCI compliance programs must require that each merchant in the Merchant Portfolio complete a Self-Assessment Questionnaire (SAQ) using the latest versions (current version is 1.2) of the SAQ that are recognized and approved by the PCI Security Standards Council.

My understanding is the word "each" means "all" merchants must complete the SAQ...100%?  First Data's understanding is simply that:  each merchant must be "sent" a SAQ according to Mike K.

- ISO managed PCI compliance programs must ensure that merchants complete the appropriate version (e.g., currently, A, B, C or D) of the SAQ in accordance with PCI Security Council's guidelines.

- ISO managed PCI compliance programs must ensure that the SAQs are completed in full (including remediation plan if applicable) and signed by an authorized representative of the merchant.

Also, this sentence to me means "all" merchants must sign off on the SAQs?  First Data's understanding is different....

- ISO must provide the required compliance reporting (as indicated below) on or before the due dates. PCI DSS compliance reports received after the due date are considered not received. Incomplete PCI DSS compliance reports are considered not received.

- ISO must be able to provide merchant PCI DSS compliance documentation upon request by

FDMS.

- ISO must submit a PCI program plan document that identifies a Tim line of events and milestones to be achieved by the ISO manage PCI compliance program

**Retail ISO Managed Compliance Reporting Requirements**

To obtain a copy of the current reporting templates please email your request to pci.2@firstdata.com.

- Visa - Monthly reports. Due date is the 25th of every month.

- MasterCard - Quarterly reports. Due dates are: March 25, June 25, September 25, and December 25.

- Discover Network – Semi-annual reports due. Due dates are: June 25 and December 25

On or before the applicable due date, submit your completed reports on the current reporting template to the pci.2@firstdata.com inbox. **PCI reports received after the due date and incomplete PCI reports are considered not received. Note:** Completed reports will contain sensitive merchant data and therefore must be transmitted in an encrypted manner.

My Further questions are:

What type of enforcement should be chosen to force merchant's to comply? A monthly fee? If so how much? Should a hold back of funds be done instead? I would rather not charge anything to a merchant...if possible.

If we meet the requirement described in the FD letter/ agreement and clarified here, then we will not be subject to the fines as described in the FD letter/ agreement correct?

Regards,

Adam Friedman
Bank Transactions, Inc.
Office: 858.866.4260
Fax: 877.267.4780
adam@banktransactions.net

# EXHIBIT D

# FIRST AMENDMENT TO MARKETING AGREEMENT

This First Amendment to Marketing Agreement (this "Amendment") is made and entered in to as of this July 1, 2006 ("Execution Date") between First Data Merchant Services Corporation, a Florida corporation ("FDMS"), BancorpSouth Bank ("Bank"), and Bank Transactions, Inc., a California corporation ("ISO").

## RECITALS

A.     FDMS, Bank and ISO have entered into that certain Marketing Agreement dated as of July 1, 2006 as amended (the "Agreement").

B.  ISO and FDMS now desire to amend the Marketing Agreement as set forth herein.

## AGREEMENT

In consideration of the foregoing, FDMS, Bank and ISO hereby agree as follows:

1.     **Effective Date**.  The terms of this Amendment will be effective as of the Execution Date ("Effective Date").

2.     **Definitions**. Capitalized terms used but not otherwise defined in this Amendment will have the meanings set forth in the Agreement. The following definitions apply to the terms set forth below:

(a)     "Buypass Transaction" means each instance during which Concord (as defined below) or FDMS has electronic contact with a point of sale device of a Merchant of ISO for the purpose of processing a transaction, credit or refund.

(b)     "Card or Electronic Payment Association" means (i) Visa, MasterCard and any other association or crd issuer having proprietary rights to and clearing and oversight responsibilities with respect to any credit or debit card used to effect Transactions and includes any debit card network utilized to authorize and settle any debit card used to effect Transactions and (ii) NACHA and any other association or entity having oversight responsibilities with respect to electronic payments.

(c)     "CISP" means Visa's Cardholder Information Security Program, as may be amended from time to time.

(d)     "Concord" shall mean Concord EFS, Inc. and any entity which, directly or indirectly, owns or controls, or is owned or controlled by, or is under common ownership or common control with, Concord EFS, Inc.

(e)     "Concord Services" include Buypass services, ClientLine Services, PINless Debit Transaction services and EFSnet Web Payment Services, as each is defined in this Amendment.

(f)     "Concord System" means the computer equipment, computer software, and

1

065

related equipment and documentation used at any time and from time to time to provide the Concord Services and includes the Buypass (Atlanta) platform.

   (g) "Concord System Specifications" shall mean the specifications, manuals, technical and operating data and operating standards adopted, amended or supplemented and published from time to time by Concord with respect to the Concord System.

   (h) "Data Security Requirements" means the Payment Card Industry Data Security Standard developed by MasterCard and Visa, CISP, SDP and other similar requirements that apply to entities that transmit, process or store Cardholder, Transaction Card or bank account information, as may be promulgated or amended by a Card or Electronic Payment Association or any Requirements of Law.

   (i) "Network" means any debit card network utilized to authorize and settle any debit card used to effect Transactions and includes STAR, NYCE and Pulse debit card networks and such additional debit card networks that FDMS or Concord may add in their sole discretion.

   (j) "SDP" means the MasterCard Site Data Protection Program, as may be amended from time to time.

   (k) "Transaction" means the purchase by a Cardholder of goods or services from a Merchant by use of a Transaction Card.

  3. **Buypass Services**. Through Concord, FDMS shall make available to ISO and certain of its Merchants as agreed upon by the parties data processing services on the Buypass platform. In exchange for such services, ISO will pay FDMS the fees set forth in this Amendment, including Schedule 1, in the manner set forth in this Amendment. Buypass Transaction detail is only available through ClientLine Services.

  4. **ClientLine Services**. Through Concord, FDMS shall make available to ISO, and ISO shall access, ClientLine® Services in the manner described and in accordance with the terms and conditions set forth below. Concord has developed a product that allows ISO to access certain databases of Buypass Transaction information maintained by Concord and communicate certain instructions to Concord using an Internet connection to access a Concord internal web page ("ClientLine® Services"). The specific features and functions available through ClientLine® Services are detailed in ClientLine® Services documentation that will be provided to ISO by Concord, as may be promulgated, amended or supplemented by Concord from time to time (the "Documentation"). As referenced herein, such features and functions include, among other things, (i) access to information regarding Buypass Transactions, (ii) access to other proprietary information of Concord ("Concord Proprietary Information"), (iii) the ability to communicate certain instructions to Concord as specifically provided in the Documentation ("Communications Interface"), (iv) access to and creation of Buypass Transaction related reports, and (v) generation of Buypass Transaction related statements. ISO acknowledges and agrees that certain features and functionality of the ClientLine Services are not currently available to ISO or its Merchants.

   (a) Equipment. ISO shall be solely responsible, at its expense, for the acquisition, repair and maintenance of all equipment and software necessary for ito to utilize ClientLine® Services (the "Equipment"), including without limitation a personal computer, modem, and telecommunications and web browser software. All such Equipment must comply with Concord specifications and requirements set forth in the Documentation. Concord has the exclusive right to alter the specifications or requirements for the Equipment



at any time. Concord shall provide notice to ISO of any change in Equipment specifications or requirements. ISO shall be responsible for conforming its Equipment to the revised specifications or requirements. ISO acknowledges that for ClientLine® Services to function properly, and to enable ISO to fully use ClientLine® Services, ISO must maintain the Equipment and keep it in good working order and repair, including by timely installing software upgrades or modifications. Concord has implemented security systems consisting of encryption and "firewall" technologies that are understood in the industry to provide adequate security for the transmission of information over the Internet. In addition, until the ClientLine® Services are terminated as set forth in this Amendment, ISO shall maintain security systems sufficient to protect Concord's Proprietary Information, ISO's databases and all other confidential information contained therein or accessed by ISO via ClientLine® Services and shall ensure that all Cardholder and Buypass Transaction data is protected by ISO behind firewalls or on servers inaccessible to third parties.

(b)     License.  Until ClientLine® Services are terminated as set forth in this Amendment, FDMS grants to ISO (i) a nonexclusive right to use ClientLine® Services in accordance with the Documentation and the terms, conditions and limitations contained in this Section, and (ii) a limited, nonexclusive right and sublicense to access and use the Concord Proprietary Information and Communications Interface for the purposes contemplated by and subject to the terms, conditions and limitations contained in this Section.

(c)     License Limitations.

(1)     Concord Proprietary Information and the Communications Interface available through ClientLine® Services are provided hereunder for the sole use of ISO and its officers, employees or agents authorized to use ClientLine® Services sublicensed hereunder. If, in utilizing ClientLine® Services, ISO receives any confidential information of any third party, including any Transaction-related information of any third party other than ISO or its Merchants, or any non-public personal financial information of any consumer, or any Concord Proprietary Information to which it is not entitled, ISO shall notify Concord immediately and shall not use, copy or disclose such information to any third party.

(2)     ISO acknowledges and agrees that all Concord Proprietary Information accessed or obtained from its use of ClientLine® Services constitutes valuable and unique property of Concord. ISO further acknowledges and agrees that the fees charged to ISO for use of ClientLine® Services reflect the use by ISO of the Concord Proprietary Information contemplated by this Section, as well as the time, effort and expense incurred by Concord to compile, edit, and maintain the Concord Proprietary Information, and to develop and maintain the hardware and software necessary to provide the Concord Proprietary Information to ISO through ClientLine® Services.  ISO warrants that, under no circumstance will it share with any third party any non-public personal financial information of any cardholder and agrees that ISO does and shall not, under any circumstances, own or otherwise obtain any right, title or interest in the ISO databases, including any and all Buypass Transaction and cardholder information contained therein. All right, title and interest in and to ClientLine® Services, including without limitation all copyrights or renewals thereof, heretofore or hereafter secured therein, are and shall remain exclusively owned by Concord.

(d)     Fees.  In exchange for the ClientLine® Services, ISO shall pay FDMS the ClientLine® Services fees set forth in this Amendment, including Schedule 1, in the manner set forth in this Amendment.

(e)     Support Services. Concord or its designated provider shall provide support services to assist ISO with procedural questions relating to ClientLine® Services through the use of a toll-free telephone number.  Neither Concord nor FDMS warrant such services or assume any liability for loss, damage or

3



067

njury resulting therefrom.

(f)    Changes and Improvements. Concord reserves the right to: (i) alter the content or format of ClientLine® Services; (ii) add, alter or delete any data or other information from ClientLine® Services; and (iii) add, alter or delete any feature, procedure, technique or documentation with respect to ClientLine® Services or use of ClientLine® Services by ISO. A list of the information available through ClientLine® Services, as well as significant changes in ClientLine® Services affecting ISOs generally, shall be published from time to time by Concord by notice to ISO, at Concord's discretion.

(g)    Protection and Security of ClientLine® Services. ISO must complete the Security Access Request Form set forth in Schedule 2, as such form may be amended or supplemented by Concord from time to time, and submit such form to Concord. Upon Concord's approval of such form, Concord will issue ISO an identification code and password so it may access the ClientLine® Services ("Access Codes"). Access Codes are the property of Concord and ISO shall not disclose the Access Codes to anyone except upon direction from an authorized employee of Concord or FDMS. ISO acknowledges and agrees that ISO solely is responsible for ensuring that (i) Access Codes are distributed only to ISO's designated officers, employees and agents who are authorized by ISO to utilize ClientLine® Services, (ii) ISO's officers, employees and agents protect the confidentiality of the Access Codes and of information obtained through use of the Access Codes, (iii) ISO's officers, employees and agents use the Access Codes and ClientLine® Services only for their intended purposes, and (iv) Concord is immediately notified of the termination of any of ISO's officer's, employee's or agent's authority to utilize an Access Code. ISO shall instruct each of its officers, employees and agents to utilize the degree of care in protecting the secrecy of the Access Codes and the Concord Proprietary Information that ISO uses to protect its most sensitive commercial information, but in no event less than a commercially reasonable degree of care, and ISO shall take such additional steps as may be necessary to monitor and enforce the confidential treatment of Access Codes and the Concord Proprietary Information. ISO shall immediately notify Concord in writing upon the occurrence of a breach of its security obligations set forth in this Section.

(h)    Communications Interface. ISO may be permitted, from time to time, to provide information or instructions to Concord regarding the services provided under the Agreement and the records and databases maintained thereunder, including additions, deletions and modifications thereto, through the Communications Interface in accordance with the Documentation. ISO warrants and represents to Concord and FDMS that all information transmitted to Concord through the Communications Interface is accurate and complete and Concord and FDMS shall be entitled to rely upon any and all such information or instructions received under a ISO Access Code as a duly authorized direction of ISO, unless Concord has received a notice of revocation of authority for such Access Code in accordance with the procedures and advance notice requirements set forth in the Documentation. Further, Concord and FDMS shall have no liability whatsoever arising out of any such instructions communicated to Concord or FDMS via the Communications Interface, including without limitation any and all errors or omissions made by ISO with respect to such instructions, regardless of whether the Equipment or software utilized to communicate such instructions are provided by Concord or FDMS.

(i)    Confidentiality. Concord and FDMS acknowledge that, ISO, in its use of ClientLine® Services, may disclose to Concord and FDMS certain non-public personal financial information relating to Cardholders. Accordingly, ISO agrees to hold and use any and all such Cardholder information in confidence, and not to disclose, reveal, copy, sell, transfer, assign or distribute any part or parts of it, in any form, to any person or entity, or permit any of its employees, agents, or representatives to do so, except as

4



expressly permitted or required by law.  ISO warrants and represents to Concord and FDMS that, pursuant to an agreement between ISO and each Merchant whose Buypass Transaction information is contained in the ISO databases and obtained via ClientLine® Services pursuant to this Section, ISO has been duly authorized to obtain such Buypass Transaction information. Further, in the event any Merchant revokes the aforementioned authorization, ISO shall no longer obtain the Buypass Transaction information of the applicable Merchant.

(j)     Indemnification. In addition to its indemnification obligations under the Agreement and as otherwise stated in this Amendment, ISO shall, jointly and severally, indemnify, defend and hold harmless each of Concord and FDMS and each of their respective directors, officers, employees, agents, successors and assigns from and against any and all claims, demands, damages, costs, expenses (including reasonable attorneys' fees), losses and liabilities arising out of all claims and actions brought or made by any third party (including Merchants) relating in any way to (1) the misuse of an Access Code, or (2) the wrongful disclosure or use of information obtained through ISO or any of its employees or agents or the Equipment under their control.

5.     **PINless Debit Transactions Services**.  Through its Affiliate, Concord, FDMS shall make available to ISO and its Merchants, and ISO and its Merchants shall access, PINless debit Transaction services in the manner described and in accordance with the terms and conditions set forth below. ISO desires to access the Networks for the purposes of processing certain Buypass Transactions on behalf of its Merchants without receiving PIN validation ("Pinless Debit Transactions," also known as "Debit Bill Payment Transactions") and FDMS and Concord desire to provide Pinless Debit Transaction services as may be permitted by the Network rules.  ISO acknowledges that under no circumstances will FDMS or Concord have any liability for Pinless Debit Transactions services and any associated fees, penalties or charges should payment of any Pinless Debit Transaction be rejected for any reason.  Prior to and during FDMS' and Concord's provision of the Pinless Debit Transaction services contemplated hereunder, ISO and its Merchants and Indirect Processors (as such term is defined in Debit Network rules) shall be subject to and shall comply with the requirements of the Networks, including without limitation, execution and completion of certain documentation and agreements as required by the Networks; at any time that ISO or any of its Merchants or Indirect Processors are not in compliance with such requirements, FDMS or Concord may terminate Pinless Debit Transaction services with respect to ISO or such Merchant or Indirect Processor. FDMS or Concord may delete any Network upon prior written notice to ISO and in accordance with Network rules. All Pinless Debit Transactions processed hereunder shall be billed at the rates set forth in this Amendment, including Schedule 1, plus any applicable Transaction and Third Party Fees, in the manner set forth in this Amendment.

6.     **EFSnet Web Payment Services**. Through its Affiliate, Concord, FDMS shall make available to ISO and its Merchants, and ISO and its Merchants shall access, the Internet gateway interface ("EFSnet") for use with certain Concord-certified point of sale equipment ("Equipment") for the purposes of processing, via the Internet, certain e-commerce payment transactions and other electronic payment transactions initiated at the point of sale (the "EFSnet Web Payment Services") in the manner described and in accordance with the terms and conditions set forth below. In exchange for such services, ISO will pay FDMS the fees set forth in this Amendment in the manner set forth in the Agreement.

(a)     General ISO Requirements. In order to access the EFSnet Web Payment Services, ISO shall:

(1)     Successfully complete testing of the integration of ISO's system with the EFSnet system and the integration of the system of each of the following that will access the EFSnet system through

5



069

ISO: Merchants and third party processors (collectively the "ISO Parties"). ISO must receive written certification from Concord of the completion of each test with respect to ISO Parties:

(2)     Until the EFSnet Web Payment Services are terminated as set forth in this Amendment, ensure that ISO and ISO Parties are in compliance with the EFSnet Specifications (as defined in Section 5 below) and the EFSnet interface specifications located at www.concordefsnet.com, as promulgated, supplemented or amended from time to time;

(3)     Obtain and maintain, and cause ISO Parties to obtain and maintain, at their sole cost and expense, an Internet connection;

(4)     Obtain, or cause ISO Parties to obtain, an authorization of each Buypass Transaction processed hereunder by ISO Parties, in accordance with the terms of the Agreement, including this Amendment.

(5)     Regardless of whether the Transaction Card is or is not present at the point of sale, cause ISO Parties to follow and comply with the policies and procedures established by FDMS and Concord and provided to ISO from time to time for the acceptance of such Cards.

(6)     Cause its ISO Parties to maintain the confidentiality and security of the store ID and store key issued to such ISO Party by ISO, and notify FDMS and Concord immediately of any disclosure or unauthorized use of the store ID or store key of which the ISO or a ISO Party becomes aware.

(7)     Cooperate with FDMS, Concord and Networks and provide such information as is requested by FDMS, Concord and Networks to fulfill any Network requirements.

(b)     EFSnet Specifications Compliance. ISO shall review and comply with, and shall cause ISO Parties to review and comply with the EFSnet Interface Specification, the EFSnet Resource Guide located at www.concordefsnet.com, and the EFSnet transaction processing information located at http://www.concordefsnet.com/Support/FaqFraudRisk.asp., as each may be amended or supplemented by Concord or FDMS from time to time (collectively, the "EFSnet Specifications).

(c)     Card Not Present Transactions Via the Internet. With respect to Internet Transactions originated through EFSnet, unless otherwise directed by Concord or FDMS:

(1)     ISO shall cause Merchants to complete the sales draft without the Cardholder's signature or an imprint but with the Cardholder's name, billing address, card number, expiration date of the Card, a description of the merchandise or service and the date and amount of all charges, including taxes.

(2)     ISO shall cause Merchants to obtain information to perform address verification services and obtain and provide other information as Concord may reasonably require.

(3)     ISO shall cause each Merchant, which engages in Internet Transactions to complete and deliver to Concord in the manner instructed by FDMS or Concord an EFSnet Web Payment Services profile, as promulgated, amended or supplemented by Concord or FDMS from time to time and delivered to ISO.

(4)     ISO agrees and acknowledges that Merchants may authorize but shall not settle sales

6



prior to delivery of the product or service. All Internet Transactions will be settled into a depository institution in the United States.

(5)     ISO shall cause Merchants' web sites to contain all of the following information: (i) complete description of the goods or services offered; (i) returned merchandise and refund policy; (iii) customer service contact, including electronic mail address and/or telephone number; (iv) transaction currency (U.S. dollars only); (v) export or legal restrictions if known.

(6)     ISO shall cause ISO Parties to process Internet Transactions only (i) if the Transactions have been encrypted by Concord or by a third party vendor acceptable to Concord and (ii) Cardholder data is protected by the ISO Party behind firewalls or on servers inaccessible to third parties. Encryption is not a guarantee of payment to Merchants.

(7)     If applicable based upon the manner in which a Merchant's account is set-up, ISO agrees and acknowledges that Internet Transactions initiated by ISO Parties are authorized and settled through separate bank identification numbers or Interbank Card Association (collectively "BIN/ICA") numbers and interchanges and ISO acknowledges that Concord and FDMS will be unable to combine deposits of Internet Transactions and non-Internet Transactions.

(d)     Chargebacks. ISO agrees and acknowledges that Internet Transactions are subject to a higher incidence of chargebacks and, as with other Transactions, receiving an authorization and following procedures and complying with applicable requirements will not relieve ISO or ISO Parties of liability for chargebacks nor for any liability associated with the fraudulent use of Data obtained off of ISO's or a ISO Party's website or Transaction processing system.

(e)     Fees. All Buypass Transactions initiated via the EFSnet Gateway shall be billed at the Buypass Transaction rates set forth in this Amendment, including Schedule 1, plus any applicable Transaction fees and Third Party Fees.

(f)     Indemnity. In addition to its indemnification obligations under the Agreement and as otherwise stated in this Amendment, ISO shall indemnify and hold FDMS and Concord and each of their officers, directors, employees, shareholders and subsidiaries, from any and all loss, cost, expense, claim, damage and liability (including attorneys' fees and costs) paid or incurred by any one or more of them, arising from, caused by, or attributable to, any of the following, unless due to the gross negligence or willful misconduct of FDMS or Concord, including Concord:

(1)     Any action FDMS or Concord takes in accordance with or in reliance upon information or instructions provided by ISO or ISO Parties, including instructions regarding the routing of Transactions;

(2)     ISO's or ISO Parties' transmission FDMS or Concord of any inaccurate information; or

(3)     Unauthorized access to FDMS' or Concord's systems utilized to process, route and authorize Buypass Transactions from a point within ISO's or a ISO Party's control.

(g)     Grant of License. FDMS hereby grants to ISO a non-exclusive, non-assignable sublicense to the software loaded onto such Equipment specifically for the purpose of providing the EFSnet Web Payment

7


071

Services until the EFSnet Web Payment Services are terminated as set forth in this Amendment. Notwithstanding the foregoing, it is FDMS' and Concord's understanding that the licensor of such software has implemented security systems consisting of encryption and "firewall" technologies which are understood in the industry to provide adequate security for the transmission of information over the Internet. FDMS and Concord do not guarantee that such security is secure or impregnable, and shall not be responsible in the event of the infiltration of ISO's security systems. ISO further acknowledges and agrees that Concord and FDMS are not responsible for the security of the Cardholder data or information stored on ISO's or ISO Parties' web sites. If ISO or an ISO Party stores Cardholder account numbers, expiration dates, and other personal Cardholder data in a database, ISO shall, and shall cause the ISO Party to, follow policies, procedures, rules and regulations of Card or Electronic Payment Associations on securing such data. ISO agrees to indemnify, defend and hold FDMS and Concord harmless from every action, claim, loss, damage, and liability whatsoever ("Losses"), including attorneys' fees and other costs of defense, whether or not litigation is commenced, that relates to or results from its use or inability to use the software, or a ISO Party's use or inability to use the software, and all other products and services related to EFSNet Transactions processed hereunder, except to the extent FDMS would be otherwise liable for such Losses as set forth in the Agreement.

7.  **Payment of Fees for Concord Services.**

(a)  Notwithstanding anything in the Agreement to the contrary, FDMS shall invoice the ISO for any fees and charges incurred by ISO and its Merchants as set forth in this Amendment, including any Schedules, for services provided pursuant to this Amendment and shall deduct such fees and charges via ACH from a bank account of ISO or other similar arrangement agreed upon by FDMS and ISO. Fees for services provided pursuant to this Amendment (excluding any Third Party Fees (as defined in Section 7(c) of this Amendment, Special Fees or similar fees or interest payments) shall be included in Processing Fees as appropriate for the purposes of calculating Minimum Processing Fees and the Growth Incentive Rebate under the Agreement. FDMS may increase the fees set forth in this Amendment pursuant to the terms of this Amendment or the Agreement.

(b)  In addition to the specified fees and charges, ISO will pay any taxes or excises however designated, now or hereafter imposed, levied or based upon the fees paid to Concord or FDMS, except for taxes on income.

(c)  ISO will pay all Third Party Fees, as such may be adjusted or amended from time to time.  ISO shall at all times be responsible for payment of all fees and charges of any Transaction Card issuer, Network, telecommunications provider, equipment manufacturer or vendor, processor, third party service provider, federal, state or local governmental authority in connection with the services provided under this Amendment (each a "Third Party"), including without limitation, any switch fee, issuer reimbursement fee, adjustment fee, interchange fee, assessment fee, access fee or other pass through fee (collectively, "Third Party Fees"). Concord and FDMS shall be entitled, without prior notice to the ISO, to pass through to the ISO any increases in communications costs or telephone tariffs subsequent to the Effective Date that affect the services provided by Concord. Should Concord or FDMS incur an increase in Third Party Fees, Concord and FDMS shall be entitled to increase Third Party Fees to ISO and such increases shall become effective on the date Concord or FDMS notifies ISO of such increases in writing.

(d)  ISO shall complete and return to FDMS the Authorization for Electronic Debit of ISO Account, attached as Schedule 4. FDMS shall ACH all fees and charges from ISO's designated account(s) within 10 days after FDMS' issuance of an invoice to ISO for such fees and charges. Any payments that are



072

delinquent shall bear interest at the rate of 10% per annum or the highest rate allowed by law, whichever is lower.

(e)     ISO shall adhere to FDMS and Concord's Merchant Debit Card Adjustment Processing Procedures set forth in Schedule 3.

8.     **Concord System Specifications; Concord Proprietary Information; Confidentiality.**

(a)     FDMS, through Concord or other third parties, shall provide the Concord Services identified in this Amendment in accordance with the Concord System Specifications and the applicable Card or Electronic Payment Association operating rules and regulations. FDMS or Concord may at any time and from time to time, without prior notice to the ISO, upgrade, change, or alter the Concord System and its capabilities.

(b) ISO acknowledges and agrees that all product and system developments, enhancements, improvements and modifications provided under this Amendment by FDMS or Concord that may be utilized for the benefit ISO or its Merchants shall remain the sole and exclusive property of FDMS or Concord as applicable. Neither ISO nor its Merchants shall obtain any proprietary rights in any proprietary or confidential information which has been or at any time after the date of this Amendment is disclosed, directly or indirectly, to ISO or any of its Merchants by FDMS or Concord including any data, information, functionality or reporting capability related to the Concord Services, or information that is a trade secret or competitively sensitive material, user manuals, screen displays and formats, computer software, methodologies, systems, products, system architecture and documentation, software performance results, flow charts, and other specifications (whether or not electronically stored), data and data formats, in each case, whether owned, licensed, sublicensed or provided by FDMS or Concord, including Concord (collectively, "Concord's Proprietary Information") whether any of the materials are developed or purchased specifically for performance of this Amendment or otherwise. Concord's Proprietary Information shall be considered FDMS' Proprietary Information under the Agreement.

(c) Concord's Proprietary Information is confidential and is and shall remain the sole property of Concord. ISO agrees that it will not disclose to any third party all or any part of the Concord Proprietary Information, including without limitation, any non-public personal financial information of consumers, and such agreement of non-disclosure shall be binding upon all officers, employees and agents of ISO. ISO agrees that it will take any necessary action by instruction, agreement or otherwise with its officers, employees, and agents permitted access to the Concord Proprietary Information to satisfy its confidentiality obligations under this Section. ISO shall, and shall cause its affiliates to, promptly return to FDMS or Concord or destroy all Concord Proprietary Information, including without limitation, manuals, forms, programs, files, screens, graphics, images and specifications, relating to any Concord Service that is terminated, or all of Concord's Proprietary Information in the event the Agreement expires or is terminated. ISO acknowledges and agrees that in addition to any other remedies FDMS or Concord may have at law or in equity, FDMS or Concord will be entitled to a restraining order, injunction or other similar remedy and to enforce specifically the terms and provisions contained in this paragraph. ISO hereby acknowledges that money damages alone would be an inadequate remedy for the injuries and damages that would be suffered and incurred by FDMS and Concord as a result of any breach by ISO of the provisions of this Section.

073

9.   **Compliance with Data Security Requirements.**

(a)     ISO represents and warrants that it, each of its Merchants, and each of its and its Merchants' agents and third party service providers is, and during the Term will remain, in compliance with all applicable material Data Security Requirements, at the expense of ISO or such Merchants, agents or third party service providers. ISO acknowledges that compliance with Data Security Requirements by it, its Merchants, or its or its Merchants' agents or third party service providers may not prevent a breach of or intrusion into the Concord System, FDMS system or the computer system of ISO, one of ISO's Merchants, or one of ISO's or its Merchants' agents or third party service providers. ISO further acknowledges that (1) compliance with Data Security Requirements is not a replacement for the information security program of ISO, its Merchants, or its or its Merchants' agents or third party service providers, and (2) it is the sole and exclusive responsibility of ISO to maintain, update and validate its security posture on an ongoing basis and to monitor the security posture of its Merchants and its and its Merchants' agents and third party service providers.

(b)     Without liability, FDMS has the right to withhold Services, in whole or in part, and immediately suspend connectivity to the FDMS System, including the Concord System, with respect to ISO, any of ISO's Merchants, or any of ISO's or its Merchants' agents or third party service providers if ISO, such Merchant, or such agent or third party service provider, as applicable, is not in compliance with all applicable material Data Security Requirements and Concord System Specifications until ISO, such Merchant, or such agent and third party service provider, as applicable, is in compliance with all applicable Data Security Requirements. In the event FDMS withholds Services or suspends connectivity pursuant to this Section, FDMS will give prompt notice of such to ISO. In addition, FDMS or Concord shall have the right, at any time in its sole discretion without prior notice, to suspend access to ClientLine® Services by Bank for security reasons or for emergency maintenance of the equipment used to provide ClientLine® Services and, upon reasonable notice to Bank, in order to conduct routine maintenance upon such equipment.

(c)     In addition to the indemnification obligations set forth in the Agreement, ISO shall indemnify and hold FDMS and Concord harmless from and against any and all liabilities, claims, suits, damages, losses, costs and expenses, including any fines, penalties and reasonable attorneys fees, to the extent that the liability, claim, suit, damage, loss and expense is caused by, relates to or arises out of (1) failure to comply with applicable Data Security Requirements by it, its Merchants, or its or its Merchants' agents or third party service providers, (2) any security breach in or intrusion into the computer system of it, any of its Merchants, or any of its or its Merchants' agents or third party service providers, or (3) the unauthorized use or disclosure or actual loss or theft of any information or records containing Cardholder or Transaction Card data or any bank account information of a payee or payor that is generated or stored by, or on behalf of, ISO, any of its Merchants, or its or its Merchants' agents or third party service providers.

(d)     As promptly as possible after it first obtains knowledge thereof, ISO shall

(i) notify FDMS of (A) any security breach or data compromise of ISO's computer system or the computer system of any of its Merchants or its or its Merchants' agents or third party service providers or (B) any suspected or actual unauthorized use or disclosure or loss or theft of any information or records containing Cardholder or Transaction Card data or any bank account information of a payee or payor that is generated or stored by, or on behalf of, ISO, any of its Merchants, or any of ISO's or its Merchants' agents or third party service providers, and

(ii) (A) cooperate with, and shall cause its Merchants and its or its Merchants' agents or third party service providers to cooperate with FDMS and Concord to determine the nature and extent of any such



074

security breach, data compromise, suspected or actual unauthorized use or disclosure or loss or theft, including the identification of any account numbers known or believed to be compromised; (B) provide and cause its Merchants and its or its Merchants' agents or third party service providers to provide information requested by FDMS with respect to accounts known or believed to be compromised; (C) cooperate and cause its Merchants and its or its Merchants' agents or third party service providers to cooperate with the efforts of FDMS and Concord directly or through third parties, to assess the vulnerability of the compromised data and ISO's or its Merchants and its or its Merchants' agents or third party service providers data security systems; (D) repair any vulnerabilities in any security systems so identified.

10.     **Disclaimer of Warranties.**

IN ADDITION TO THE DISCLAIMER SET FORTH IN ARTICLE 7 OF THE AGREEMENT, NEITHER FDMS NOR CONCORD WARRANT THAT CONCORD SERVICES OR THE INFORMATION OBTAINED THEREFROM WILL BE ERROR FREE. NEITHER FDMS NOR CONCORD SHALL HAVE ANY LIABILITY OF ANY KIND TO ISO OR ANY OF ITS MERCHANTS WITH RESPECT TO USE OF CONCORD SERVICES OR ANY INFORMATION OBTAINED THEREFROM. FURTHER, ALTHOUGH FDMS OR CONCORD MAY SUGGEST CERTAIN EQUIPMENT AND EQUIPMENT SUPPLIERS TO ISO FROM TIME TO TIME, NEITHER FDMS NOR CONCORD MAKE ANY WARRANTY WHATSOEVER WITH RESPECT TO EQUIPMENT OBTAINED BY ISO OR ITS MERCHANTS FROM THIRD PARTIES AND SHALL HAVE NO LIABILITY WITH RESPECT THERETO.

11.     **Limitation of Liability.** The cumulative liability of FDMS and Concord under this amendment is subject to the provisions set forth in Article 6 of the Agreement.

12.     **Amendments.** If the functionality or scope of the Concord System, Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services changes, or if FDMS determines revisions to this Amendment are reasonably necessary to protect FDMS' Proprietary Information or to accurately reflect the manner in which such services are delivered to ISO or its Merchants, FDMS may amend this Amendment by providing ISO with prior written notice of such amendment; provided, however, that any such amendment that includes fee adjustments or additional fees (other than with respect to Third Party Fees) will be effective only if made in a writing signed by authorized officers of both parties.

13.     **Termination.**

(a)     Notwithstanding anything in this Amendment or the Agreement to the contrary, FDMS' obligation to provide the Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services to ISO will terminate automatically without penalty to FDMS or Concord upon the earlier of (i) the termination or expiration of the Agreement or (ii) the occurrence of any event causing FDMS or Concord to cease providing the Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services, respectively, to ISO. In addition, either party shall have the right to terminate any of the Concord Services at any time upon ninety (90) days' prior written notice to the other party.

(b)     Upon termination of the Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services, ISO shall not be permitted to use the respective service and all rights, licenses and sublicenses granted with respect to such service shall be terminated. Termination of Buypass services, ClientLine Services, Pinless Debit Transaction services or EFSnet Web Payment Services

11



for any reason shall not affect FDMS' or Concord's entitlement to any sums due under this Amendment, the Agreement or any additional remedies provided by law or equity.

14.   **Force Majeure**. FDMS or Concord shall be excused from performance of the Concord Services if such performance is prevented or delayed by acts or events beyond its reasonable control, including, but not limited to, severe weather and storms, earthquakes or other natural occurrences, strikes or labor unrest, riots or other civil disturbances, power or equipment failures not caused by its own negligence, nuclear or other civil or military emergencies, or acts of legislative, judicial, executive or administrative authorities at the federal, state, or local level. Each of FDMS and Concord shall not be liable for any claims, demands, damages, costs, expenses, losses or liabilities arising out of or resulting from any such event or act. Prevention or delay of the performance of FDMS or Concord under this Amendment shall not constitute an event of default or a breach of this Amendment or the Agreement.

15.   **Third Party Beneficiary**. Concord is a third party beneficiary under the Agreement and this Amendment.

16.   **Interpretation**. This Amendment constitutes the entire agreement between the parties regarding the subject matter of this Amendment and supersedes all prior and contemporaneous agreements and understandings regarding such subject matter.  In the event of a conflict between this Amendment and the Agreement as it relates to the subject matter hereof, the terms of this Amendment will control.  Otherwise, all terms and conditions of the Agreement will remain in full force and effect and likewise apply to this Amendment.

[Signature Page Follows.]

12

076

The parties have executed this Amendment as of the date first above written.

FIRST DATA MERCHANT SERVICES CORPORATION,
a Florida corporation

By: _____

Name: _Mark Suss_

Title: _Vice President_


BANK TRANSACTIONS, INC.,
a ___Nevada___ corporation

By: _____

Name: ___Adam Friedman___

Title: ___President___


BANCORPSOUTH BANK

By: ___Kathi Carter___

Name: ___KATHI CARTER___

Title: ___SVP___

## ACER PAYMENT
### Proposed Fees for Buypass Front-End Services

Non-Tiered Pricing  (Note 1)

| Service | Platform | Driver | Rate |
|---------|----------|--------|------|
| File Residency | Buypass | Per account per month | |
| Debit Adjustments | Buypass | Per adjustment | |
| Activation by Client | Buypass | | |
| Downline Load – Full Table Partial | Buypass | Per telephone download | |
| Help Desk Support | Buypass | Per Merchant Per Month | |
| ACH Fee | Buypass | Per ACH transaction | |
| Custom Development & Programming | Buypass | Per hour | |
| Satellite and dedicated telecom installation and usage | Buypass | | |
| Client Line Set Up & Monthly Change | Buypass | | |
| | | | |

| Service | Base Rate per Buypass Transaction (Based on Transactions Processed Each Calendar Month) | | |
|---------|---------------------------------|----------------------------|--------------------------|
| | Buypass Transactions 1-250,000 | Buypass Transactions 250,001-500,000 | Buypass Transactions 500,001 and above |
| Buypass Platform Front End Services | | | |

**NOTES:**

(1)  This addendum is coterminous with FDR agreement.

(2)  Buypass Transaction means each instance during with Concord has electronic contact with a point of sale device of Merchant or Client including authorizations, declines, purchases, reversals, returns, totals and table loads..

(3)  Base rate assumes each Buypass Transaction utilizes dial, or Datawire. Each Buypass Transaction utilizing EFSnet, a leased line or VSAT will be billed at the applicable base rate less $0.005 (one half of one cent).   Each Buypass Transaction that is a fleet card transaction will be at the applicable base rate plus $0.010.

(4)  All dedicated telecommunications, postage and credit card assessments will be passed through to the Client.

(5)  Buypass Transactions will be applied to the Total Monthly Volume amounts set forth on Schedule A to the Agreement for item number 3502 – Dial Authorization.

**ACER PAYMENT**
**Proposed Fees for Buypass Front-End Services**

Non-Tiered Pricing  (Note 1)

| Service | Platform | Driver | Rate |
|---|---|---|---|
| File Residency | Buypass | Per account per month | ███ |
| Debit Adjustments | Buypass | Per adjustment | |
| Activation by Client | Buypass | | |
| Downline Load – Full Table Partial | Buypass | Per telephone download | |
| Help Desk Support | Buypass | Per Merchant Per Month | |
| ACH Fee | Buypass | Per ACH transaction | |
| Custom Development & Programming | Buypass | Per hour | |
| Satellite and dedicated telecom installation and usage | Buypass | | |
| Client Line Set Up & Monthly Change | Buypass | | |
| | | | |
| | | | |

| Service | Base Rate per Buypass Transaction (Based on Transactions Processed Each Calendar Month) | | |
|---|---|---|---|
| | Buypass Transactions 1-250,000 | Buypass Transactions 250,001-500,000 | Buypass Transactions 500,001 and above |
| Buypass Platform Front End Services | ███ | ███ | ███ |

**NOTES:**

(1)  This addendum is coterminous with FDR agreement.

(2)  Buypass Transaction means each instance during with Concord has electronic contact with a point of sale device of Merchant or Client including authorizations, declines, purchases, reversals, returns, totals and table loads..

(3)  Base rate assumes each Buypass Transaction utilizes dial, EFSnet Gateway or Datawire. Each Buypass Transaction utilizing a leased line or VSAT will be billed at the applicable base rate less $0.005 (one half of one cent).  Each Buypass Transaction that is a fleet card transaction will be at the applicable base rate plus $0.010.

(4)  All dedicated telecommunications, postage and credit card assessments will be passed through to the Client.

(5)  Subject to separate addendum and terms on behalf of First Financial Bank.

# EXHIBIT E

From:        "Grimm, Marcy J" <Marcy.Grimm@firstdata.com>
Subject:     RE: Data wire Fee
Date:        Fri, March 11, 2011 3:31 pm
To:          "Adam Friedman" <adam@banktransactions.com>
Cc:          "Sass, Marty A" <marty.sass@firstdata.com>

---

Adam,


We have had conversations on most every item below.  The CAAP is
something new that I will certainly have to look into, because I am not
familiar with the program and if it's still in place today.


The first thing that needs to be addressed is the fact that this
contract expires March 31, 2011.  I am quite certain, we will not be
able to reach agreement on all the items below and have legal prepare
and execute  a new agreement in this short of time.   I will schedule a
call next week to review the items below.


The current agreement must be extended or we just agree to a 1 year
renewal as the current contract.


Marcy Grimm

Regional Business Director, First Data Merchant Services

(O) 402.222.8257| (F) 402.916.7096|

(M) 402.670.5485|  marcy.grimm@firstdata.com
<mailto:imarcy.grimm@firstdata.com>  |  www.firstdata.com
<http://www.firstdata.com/>




From: Adam Friedman [mailto:adam@banktransactions.com]
Sent: Friday, March 11, 2011 2:12 PM
To: Grimm, Marcy J
Cc: Sass, Marty A
Subject: RE: Data wire Fee
Importance: High

Adam,

Sorry for the delay in getting back to you guys....

I am thinking of entering into an agreement with FD.   I don't want to enter into another agreement extension if possible.  Hopefully we can get this done fast...Who are the decision makers?  I'd like to know the process?

There are several key points I wanted to be changed in FD's agreement with us:

1)  Language about "Preferred Offering"  -  This term makes it where we are suppose to send all our business to FD 1st, and if they don't take it or whatnot, then we can send somewhere else.  I would like this removed because we will be under new minimums which are at 10% growth rate every year.

2)  Pricing Issues -

About 2 years ago Erick Nicholson and I met and discussed our transactions fees.  In particular, our transactions fees for datawire were the same cost as our dial up transactions.  I was under the impression our datawire cost would be the same as our CPU 2 CPU cost.  But, FD let me know different.  Also, we had transactions tiers, and once reaching these transaction tiers, I asked Nicholson to have our rates lowered according to those tiers.  Unfortunately, Nicholson let me know that those tiers only applied to dial up transactions and our IP and CPU 2 CPU transactions don't count toward the new tiers.

In any case, because of all this, Erick agreed to lower my datawire cost to my CPU to CPU cost.  The difference was $.02

(I actually think if you read my pricing schedule, the Datawire costs would be included  in the CPU to CPU pricing category).

All in all I estimate there was approximately 75,000 to 100,000 transactions per month at $.02 per month which we were over charged.

3) Additionally, FD charges us a customer service fee of $6 per call of a merchant who needs help with there terminals. This is just annoying and pricing gouging for something which they should be doing as part of their duties in general.


4)  Other Agreements

We received an agreement about a year ago from Erick Nicholson which I should have signed.  It is what FD calls a CAAP program.  The deal essentially allowed us to have $0 costs, and any fees collected by FD trans fees etc. we would collect.  So if some one was priced at pass-thru + $.06, we would make $.02.


We would like to enact this deal as it seems the industry has not stopped becoming more and more competitive.


(I can send you the terms and conditions of the CAAP).


6)  First Data wants a 3 year commitment - I see no reason except they simply want to lock me in to an agreement in their favor.  I would rather have a 2 year agreement.


7)  Marcy Grimm mentioned they were going to come up with language and a bench mark for us to take our existing retail portfolio and have it transferred over to a wholesale deal.  I would like to see the terms and conditions of this agreement.


8)  We also want to eliminate the $.02 foreign auth fee, only if FD cannot provide the authorization service due to not having the ability to do so, certifications etc.


9)  Buypass decline issue - About 2 years ago we completed an analysis of our buypass accounts, and the buypass bill we receive is about 10% greater than what is passed on to the merchant - When we brought this up to First Data, they told us everyone knew about this and we were no action which was going to take place.  Our average our Buypass bill is approximately  $30,000 per month.


What I suggest we do is net the over charges over the course of the next 2 years.  Essentially, if you reduce our auth fee by $.02 across the board and reduce our statement fee to $1, this would suffice for the

inefficiencies and past overcharges.


10)  Technical Needs -  Account Updater, Dynamic Descriptors, Gateway
for PIN Less, On-Line Application, set up leased line or circuit into FD
for aggregating dial transactions, etc. etc.


Let me know your thoughts.


Regards,


Adam Friedman

Bank Transactions, Inc.

Office: 858.866.4260

Fax: 877.267.4780

adam@banktransactions.com


Would like a tier on auth fees which goes higher?  Like 1, 2 , 3 Million

transactions per month?


Would NOT like any type of customer service fee call at all.


Would like statement fee at $3.00


Would like agreement 2 years.


Would like non-preferred language for FD.


Would like ability to transfer these accounts to a wholesale deal in the future.


Access to other front ends/ gateways/ software for pin less debit.


Would like to have other back ends available at no extra cost for settlement.  Like Vital or Paymentech.  (Only if FD could not meet same product offering).


_____

From: Grimm, Marcy J [mailto:Marcy.Grimm@firstdata.com]
Sent: Monday, March 07, 2011 7:10 AM
To: Adam Friedman
Cc: Sass, Marty A
Subject: RE: Data wire Fee

Adam,


We need to discuss the direction of this relationship and the terms of the contract.  Since our agreement was terminated in 2010, and extended the 2 times now by 30-60 days, we need to make a serious decision on what we are doing with the contract.   I propose we extend the agreement 1 year until we work through the pricing   We cannot continue to do the 30-60 days.  This agreement is set to expire March 31, 2011


Please let me know if you would like me to  draft the 1 year extension.

We then need to look at the entire renewal proposal (which has long expired ) and identify what areas of concern you have and the volume you are willing to commit for the next term.


Thank you!


Marcy Grimm

Regional Business Director, First Data Merchant Services

(O) 402.222.8257| (F) 402.916.7096|

(M) 402.670.5485|  marcy.grimm@firstdata.com
<mailto:imarcy.grimm@firstdata.com>   |  www.firstdata.com
<http://www.firstdata.com/>




From: Adam Friedman [mailto:adam@banktransactions.com]
Sent: Friday, March 04, 2011 4:51 PM
To: Grimm, Marcy J
Subject: FW: Data wire Fee
Importance: High


Did you get this?


This was Erick's response to the rate reduction we were suppose to have received but never did...


Our datawire cost was...and is the same as our dial auth cost.


All in all this was a significant amount we paid every month.


Probably $2000 per month we were over billed.


Please see below...

Regards,

Adam Friedman

Bank Transactions, Inc.

Office: 858.866.4260

Fax: 877.267.4780

adam@banktransactions.com

_____

From: Adam Friedman [mailto:adam@banktransactions.com]
Sent: Thursday, February 03, 2011 9:10 PM
To: 'Adam Friedman'
Subject: FW: Data wire Fee
Importance: High

_____

From: Adam Friedman [mailto:adam@banktransactions.com]
Sent: Wednesday, August 05, 2009 4:05 PM
To: 'Nicholson, Erik R'
Subject: RE: Data wire Fee

No addendum needed?  About the split fund?

Regards,

Adam Friedman

Bank Transactions, Inc.

Office: 858.866.4260

Fax: 877.267.4780

adam@banktransactions.net

_____

From: Nicholson, Erik R [mailto:Erik.Nicholson@firstdata.com]
Sent: Wednesday, August 05, 2009 3:30 PM
To: Adam Friedman
Subject: RE: Data wire Fee

Adam-


July 1


Erik Nicholson
Regional Business Director

First Data
O (805) 552-2586

F (402) 916-6576

M (805) 448-7964

www.firstdata.com <http://www.firstdata.com/>


From: Adam Friedman [mailto:adam@banktransactions.com]
Sent: Wednesday, August 05, 2009 3:04 PM
To: Nicholson, Erik R
Subject: Data wire Fee


Erik,


You mentioned you were going to make our Data wire fee the same as CPU?
We need to know when...


Regards,


Adam Friedman

Bank Transactions, Inc.

Office: 858.866.4260

Fax: 877.267.4780

adam@banktransactions.net


_____

The information in this message may be proprietary and/or confidential,
and protected from disclosure. If the reader of this message is not the
intended recipient, or an employee or agent responsible for delivering
this message to the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please
notify First Data immediately by replying to this message and deleting
it from your computer.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.392 / Virus Database: 270.13.35/2269 - Release Date:
08/05/09 05:57:00


_____

The information in this message may be proprietary and/or confidential,
and protected from disclosure. If the reader of this message is not the
intended recipient, or an employee or agent responsible for delivering
this message to the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please
notify First Data immediately by replying to this message and deleting
it from your computer.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.449 / Virus Database: 271.1.1/3457 - Release Date: 03/06/11
19:34:00


_____

From: Grimm, Marcy J [mailto:Marcy.Grimm@firstdata.com]
Sent: Monday, March 07, 2011 7:10 AM
To: Adam Friedman
Cc: Sass, Marty A
Subject: RE: Data wire Fee

Adam,


We need to discuss the direction of this relationship and the terms of

the contract.  Since our agreement was terminated in 2010, and extended
the 2 times now by 30-60 days, we need to make a serious decision on
what we are doing with the contract.   I propose we extend the agreement
1 year until we work through the pricing   We cannot continue to do the
30-60 days.  This agreement is set to expire March 31, 2011


Please let me know if you would like me to  draft the 1 year extension.
We then need to look at the entire renewal proposal (which has long
expired ) and identify what areas of concern you have and the volume you
are willing to commit for the next term.


Thank you!


Marcy Grimm

Regional Business Director, First Data Merchant Services

(O) 402.222.8257| (F) 402.916.7096|

(M) 402.670.5485|  marcy.grimm@firstdata.com
<mailto:imarcy.grimm@firstdata.com>   |  www.firstdata.com
<http://www.firstdata.com/>




From: Adam Friedman [mailto:adam@banktransactions.com]
Sent: Friday, March 04, 2011 4:51 PM
To: Grimm, Marcy J
Subject: FW: Data wire Fee
Importance: High


Did you get this?


This was Erick's response to the rate reduction we were suppose to have
received but never did...


Our datawire cost was...and is the same as our dial auth cost.


All in all this was a significant amount we paid every month.

Probably $2000 per month we were over billed.


Please see below...


Regards,


Adam Friedman

Bank Transactions, Inc.

Office: 858.866.4260

Fax: 877.267.4780

adam@banktransactions.com



_____

From: Adam Friedman [mailto:adam@banktransactions.com]
Sent: Thursday, February 03, 2011 9:10 PM
To: 'Adam Friedman'
Subject: FW: Data wire Fee
Importance: High



_____

From: Adam Friedman [mailto:adam@banktransactions.com]
Sent: Wednesday, August 05, 2009 4:05 PM
To: 'Nicholson, Erik R'
Subject: RE: Data wire Fee

No addendum needed?  About the split fund?


Regards,


Adam Friedman

Bank Transactions, Inc.

Office: 858.866.4260

Fax: 877.267.4780

adam@banktransactions.net


_____

From: Nicholson, Erik R [mailto:Erik.Nicholson@firstdata.com]
Sent: Wednesday, August 05, 2009 3:30 PM
To: Adam Friedman
Subject: RE: Data wire Fee

Adam-


July 1


Erik Nicholson
Regional Business Director

First Data
O (805) 552-2586

F (402) 916-6576

M (805) 448-7964

www.firstdata.com <http://www.firstdata.com/>


From: Adam Friedman [mailto:adam@banktransactions.com]
Sent: Wednesday, August 05, 2009 3:04 PM
To: Nicholson, Erik R
Subject: Data wire Fee


Erik,


You mentioned you were going to make our Data wire fee the same as CPU?
We need to know when...

Regards,


Adam Friedman

Bank Transactions, Inc.

Office: 858.866.4260

Fax: 877.267.4780

adam@banktransactions.net


_____

The information in this message may be proprietary and/or confidential,
and protected from disclosure. If the reader of this message is not the
intended recipient, or an employee or agent responsible for delivering
this message to the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please
notify First Data immediately by replying to this message and deleting
it from your computer.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.392 / Virus Database: 270.13.35/2269 - Release Date:
08/05/09 05:57:00


_____

The information in this message may be proprietary and/or confidential,
and protected from disclosure. If the reader of this message is not the
intended recipient, or an employee or agent responsible for delivering
this message to the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please
notify First Data immediately by replying to this message and deleting
it from your computer.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.449 / Virus Database: 271.1.1/3457 - Release Date: 03/06/11
19:34:00


-------------------------------------------
The information in this message may be proprietary and/or
confidential, and protected from disclosure.  If the reader of this

message is not the intended recipient, or an employee or agent
responsible for delivering this message to the intended recipient,
you are hereby notified that any dissemination, distribution or
copying of this communication is strictly prohibited. If you have
received this communication in error, please notify First Data
immediately by replying to this message and deleting it from your
computer.

**Attachments:**

| **untitled-[1.2].html** | |
|---|---|
| Size: | 56 k |
| Type: | text/html |

| **image001.png** | |
|---|---|
| Size: | 7.8 k |
| Type: | image/png |
| Info: | image001.png |

# EXHIBIT F

# July 2011 Regulatory Product Fee/ TIN/TFN Blank or Invalid Fee Request Form

| Date: **8/26/2011** | Client Contact Email: **service@banktransactions.com** |
|---|---|
| Client Name: **Bank Transactions** | Service Center Ticket: |
| Client Contact Name: **Bianca Romano or Adam Friedman** | System/Prin: **8740/7800** **5642/7800** **1392/7600** |
| Client Contact Phone Number: **858-866-4260** | |

**This process will include all merchants on file as of the month-end you indicate _OR_ the date the merchant was opened. Please choose _one_ option below.**

| | |
|---|---|
| Month-end file to utilize | **July 2011** |
| Date Open to utilize | |

**Risk/Agent Levels impacted (if you want all risk/agent levels impacted, please indicate TOT-9900):**

| Agents Impacted | **8740/7800/TOT-9900** **5642/7800/ TOT-9900** **1392/7800/ TOT-9900** |
|---|---|

You will need to complete a form for each Risk/Agent Level that is priced differently. For example, if you want Risk/Agent Level 0100 and 0200 to have the same rate increase and 0300 and 0400 to have a different rate increase, you will need to complete two separate forms.

**Please complete the below**

| **Account Fee 3 Flag** **_Circle One Below_** | |
|---|---|
| 1 - Charge fixed fee monthly | 2 - Charge fixed fee monthly, only to active merchants |

| **Regulatory Product Fee** | ■■■■ |
|---|---|
| **TIN/TFN Blank or Invalid Fee** | ■■■■ |

Client Signature _____  _under Protest_

CE/AM _____

FDMS Manager Signature _____

# EXHIBIT G

## AMEX ONE POINT AMENDMENT TO MARKETING AGREEMENT

This AMEX One Point Amendment to Marketing Agreement by and between First Data Merchant Services Corporation, a Florida corporation ("**FDMS**"), Wells Fargo Bank, N.A. ("**Bank**") and Bank Transactions, Inc., a Nevada corporation ("**Customer**"), (this "**Amendment**") is made and entered into this __3__ day of __Sept__ _____, 2009.

### RECITALS

A.      Customer, Bank (as assignee of BancorpSouth Bank) and FDMS have previously entered into a Marketing Agreement dated July 1, 2006, as amended (the "**Agreement**").

B.      American Express Travel Related Services Company, Inc. ("**American Express**") has designed a program to increase acceptance of Amex Cards among small merchants by offering an integrated service and competitive pricing through third party service agents, which program is known as the Establishment Sales and Servicing Program (the "**One Point Program**").

C.      FDMS and American Express have entered into an agreement that includes the terms and conditions pursuant to which FDMS and certain of its Indirect Sales Channels may solicit Target Merchants for participation in the One Point Program ("**FDMS Amex Agreement**").

D.      Customer desires to market and promote the One Point Program to Merchants pursuant to the terms and conditions of this Amendment.

E.      Customer, Bank and FDMS now desire to amend the Agreement as set forth herein.

### AGREEMENT

FDMS, Bank and Customer hereby agree as follows:

1.      Effective Date; Definition of Amendment. The terms of this Amendment are effective as of __Sept__ _____, 2009. This Amendment consists of (i) these terms, (ii) the Schedules attached to these terms, and (iii) the American Express One Point Operating Regulations made available to Customer by FDMS or American Express (as they may be amended or updated from time to time) that are applicable to a Service Agent or Indirect Sales Channel and relate to Customer's obligations under this Amendment ("**Amex Operating Regulations**").

2.      Amendments to Marketing Agreement. Customer acknowledges and agrees that each provision of the Agreement that references both VISA and MasterCard shall be deemed to also include any other Bank Card association with respect to which Merchants submit Transactions for processing under this Agreement ("**Other Bank Card Association**"), such that Customer's obligations with respect to Other Bank Card Associations under the Agreement shall be the same as Customer's obligations with respect to VISA and MasterCard; the rights of Other Bank Card Associations under the Agreement shall be the same as those identified for VISA and MasterCard; and, any definitions, terms or descriptions referencing both VISA and MasterCard shall be deemed to also include or apply to Other Bank Card Associations; provided, however, that the foregoing shall not apply to terms or conditions applicable to registration of Customer with VISA and MasterCard.

3.      One Point Program - Rights and Obligations of Customer.

a.      Pursuant to its authorization under the FDMS Amex Agreement, FDMS authorizes Customer to act as American Express's agent during the term of this Amendment in accordance with the terms and conditions of this Amendment, for the sole purpose (a) providing solicitation services by recruiting Target Merchants and causing Target Merchants that elect to participate

600/100 ☑       £89585Z819  XVA ZT:9T 6002/80/60

in the One Point Program to execute Card Acceptance Agreements directly with American Express; and (b) providing the transactional support services contemplated by this Amendment on behalf of American Express (collectively, the "**Amex Services**"). Customer acknowledges that such authorization is non-transferable without the prior written consent of FDMS. The product and the benefit of all services provided by Customer with respect to the One Point Program shall be deemed to be tendered to American Express at its location in New York. Customer agrees to act as an agent of American Express and perform the Amex Services in accordance with the terms and conditions of this Amendment. Customer will provide all resources necessary to fulfill its obligations under this Amendment, including personnel, financial, and technology resources, and shall assume all costs associated with such resources.

      b.    Customer acknowledges that American Express is the owner of all proprietary rights in and to the Amex Operating Regulations, and that the information revealed in such Amex Operating Regulations is Confidential Information of American Express. Customer shall not disclose the contents of the Amex Operating Regulations to any person except as necessary to enable it to perform the Amex Services in accordance with this Amendment, nor shall Customer copy or reproduce the Amex Operating Regulations in whole or in part except for such purpose. For purposes of this Amendment, Confidential Information shall include any information that would otherwise be considered confidential by a reasonable person in the payment card industry.

      c.    Customer shall provide the Amex Services with at least the same level of accuracy, timeliness, detail, and reliability that it provides for services similar to the Amex Services for Other Payment Products, subject to differences in treatment that are necessary because of inherent differences between features related to processing by merchants of Amex Cards versus Other Payment Products. Similarly, Customer's support of Amex Cards at One Point Program Merchants (e.g., placement and ongoing maintenance of decals and other point of sale advertising and promotion materials) shall be no less favorable to American Express than Customer's support for Other Payment Products is to other card networks.

      d.    In performing the Amex Services, Customer shall not misrepresent to Target Merchants or One Point Program Merchants American Express's speed of payment or Discount, nor shall Customer knowingly discourage Target Merchants from accepting the Amex Card. Customer agrees to price Amex Services in accordance with Amex Operating Regulations and the terms of this Amendment.

      e.    Customer shall provide the Amex Services: (a) with promptness and diligence in a workmanlike manner, in accordance with the practices and high professional standards used in well-managed operations performing services similar to the Amex Services; (b) in accordance with other express requirements provided in the Amex Operating Regulations; and (c) using adequate numbers of qualified individuals with suitable training, education, experience, and skill to perform the Amex Services. Customer represents and warrants that (i) it shall perform all Amex Services in a manner, and at a level of quality and timeliness, that is substantially similar to its performance of similar services for Other Payment Products; and (ii) the Amex Operating Regulations have been made available to Customer by FDMS.

      f.    Customer acknowledges and agrees that Customer may charge One Point Program Merchants additional servicing fees under a Merchant Application and Merchant Agreement related to Amex Card acceptance (e.g., fees for electronic authorizations, manual voice authorizations, processing fees, statement fees) (collectively, "**Direct Program Merchant Fees**"), provided such Direct Program Merchant Fees (i) are directly related to processing and merchant servicing functions provided to the One Point Program Merchants and (ii) do not have the effect of discriminating against Amex Cards as compared to any Other Payment Product.

      g.    For each failure by Customer to meet any Performance Standards applicable to Customer that may be set forth in the Amex Operating Regulations, Customer shall promptly: (a)

2

investigate, assemble, and preserve pertinent information with respect to, and report on the causes of, the problem, including performing a root cause analysis of the problem; (b) advise FDMS, as and to the extent requested by FDMS, of the status of remedial efforts being undertaken with respect to such problem; (c) minimize the impact of and correct the problem and use commercially reasonable efforts to begin meeting the Performance Standard; and (d) implement preventive measures designed to prevent recurrence of the problem.

h.       Customer recognizes that its failure to comply with this Amendment may have a material adverse impact on American Express's business and operations and that the damage from this failure is not susceptible of precise determination. Accordingly, if Customer fails to meet certain Performance Standards, then in addition to any non-monetary remedies available to FDMS under this Amendment, at law or in equity, FDMS may elect in lieu of pursuing other monetary remedies to pass through to Customer the corresponding Non-Compliance Fees (or reasonable allocation of such fees if applicable to more than one Customer) provided in the Amex Operating Regulations as liquidated damages and as its sole and exclusive monetary remedy for such failure of Customer.

i.       Customer must cooperate in the registration process provided in the Amex Operating Regulations. Customer must complete initial and periodic training as required by FDMS or American Express with respect to the One Point Program and Customer's obligations under this Amendment.

j.       Except as set forth in this Amendment, Customer shall serve as the sole "first line" customer interface with One Point Program Merchants for purposes of sales (including solicitations, customer service and relationship management in connection with the Amex Services).

k.       At FDMS' request, Customer shall notify One Point Program Merchants that American Express will be communicating with them in the manner contemplated by Section 5(c) below.

l.       Schedule 1 provides certain terms governing Customer's use of American Express trademarks. Customer shall comply with such terms (and terms relating to promotional materials under the Agreement) in performing the Amex Services. American Express retains all right, title and interest in and to American Express Materials. FDMS grants to Customer a nonexclusive, nontransferable sublicense during the term of this Amendment to use American Express Materials only to the extent necessary for performing the Amex Services as permitted under this Amendment for the benefit of American Express and the One Point Program Merchants. Customer shall cease all use of American Express Materials upon termination of this Amendment and completion of Transition Assistance (as defined below). Any materials developed under this Amendment that are: (i) derivative works of American Express Materials (e.g., modifications and upgrades); or (ii) wholly new materials developed by American Express that are not derivative works of Customer Materials shall be considered American Express Materials, in each case excluding any Customer materials or Confidential Information incorporated therein. As between American Express and Customer, American Express shall own all patent, copyright, trademark, trade secret, transferable moral and other intellectual property rights in such developed American Express Materials. American Express Materials means any American Express software, Amex Operating Regulations, business plans, procedures, and other materials containing technical or operational procedures provided by American Express or FDMS under this Amendment.

m.       One Point Program Merchants that have a valid Card Acceptance Agreement as of the effective date of termination of this Amendment and (a) American Express determines are no longer eligible to participate in the One Point Program; (b) elect to cease accepting Amex Cards; or (c) elect to transition to another service agent participating in the One Point Program or to a different American Express Card Service program shall be deemed "**Transition Merchants**." Upon termination of this Amendment, or in connection with the transition of one or more Transition Merchants to another American Express Card service or service agent, Customer shall provide the reasonable assistance

3

100

requested by American Express to allow the Amex Services to continue without interruption or adverse effect to American Express or the Transition Merchants and to facilitate the orderly transfer of the Amex Services to American Express or its designee (including other service agents) (**"Transition Assistance"**).

n.     In addition to its obligations under the Agreement, Customer shall, at its expense and FDMS' request, indemnify, defend and hold harmless Service Providers and American Express, American Express Affiliates, and their respective officers, directors, employees, agents, representatives, successors and permitted assigns, from and against any Losses arising out of or in connection with: (a) the inaccuracy or untruthfulness of any representation or warranty made by Customer in connection with the One Point Program ; (b) any claim from a third party (other than a One Point Program Merchant) arising out of a failure by Customer to comply with its obligations under this Amendment, including failures to comply with applicable law; (c) any claim of infringement or misappropriation of any trade secret, copyright or other proprietary rights (other than patent rights) based upon performance of the Amex Services by Customer, except to the extent such infringement or misappropriation is caused by systems, software, materials, or other resources provided by American Express; (d) any claim or action by any Other MSP, IC or employee of Customer that American Express is liable to such person as the employer or joint employer of such person, including and any claim for employee benefits as a result thereof; (e) any claim brought by a Target Merchant or One Point Program Merchant arising out of a failure of Customer to perform or comply with respect to Other Payment Products or Amex Cards under a Merchant Application and Merchant Agreement or under any other contractual relationship between the One Point Program Merchant and Customer.

4.     One Point Program - Rights and Obligations of FDMS.

a.     FDMS shall register Customer with American Express in accordance with the Amex Operating Regulations. Customer shall provide FDMS with all documentation and execute such documents as may be necessary for such registrations and any renewals thereof, and shall allow Service Providers to review all such documentation as necessary during the term of this Agreement. Customer shall reimburse Service Providers for all fees paid by Service Providers for such registrations and renewals. Customer agrees to comply with all renewals and reporting requirements applicable to member service providers and independent sales organizations. Customer agrees to provide Service Providers with prior written notice of any proposed change of ownership of Customer.

b.     FDMS shall pay Customer the Amex Residuals set forth in Schedule 2 for Customer's performance of the Amex Services.

c.     The following billing element is hereby added to the end of the pricing schedule set forth in Section 1 (c) of Schedule A of the Agreement; this billing element will not be included in any calculations used to determine whether Customer has met any minimum fee obligations or any rebates or other discounts:

5855    Amex OnePoint Compensation Percent  This element identifies the residual percentage compensated for the monthly Charge Volume submitted by each New Program Merchant.

5.     One Point Program - Rights and Obligations of American Express.

a.     American Express shall act as the Acquirer in: (i) establishing the Discount and any other fees and assessments payable by One Point Program Merchants; (ii) entering into Card Acceptance Agreements directly with Target Merchants that elect to participate in the One Point Program; and (iii) providing settlement, clearing, and related functions required to support Customer's performance of the Services.

b.     American Express has all of the rights set forth in this Amendment.

4

c.     American Express may communicate directly with One Point Program Merchants regarding One-Point-Program related matters (at its own expense unless otherwise agreed by the parties), including for One Point Program Merchant inspections. American Express may communicate directly with One Point Program Merchants (at its own expense unless otherwise agreed by the parties) for any other purpose not related to the One Point Program, including for (i) marketing American Express products and services or (ii) conducting programs designed to enhance the value of the American Express Network.

6.     ESA Program. During the term of this Amendment, the American Express's external sales agent program (ESA) for American Express's standard Amex Card acceptance program including any related commissions typically paid by FDMS to Customer in connection with ESA (the "**ESA Program**"), shall be suspended as it applies to Target Merchants and One Point Program Merchants. 100% of the Target Merchants solicited by Customer that agree to accept Amex Cards during the term of this Amendment must be signed to a Card Acceptance Agreement under the Amex One Point Program, and not under the ESA Program.

7.     Term and Termination.

(a)     This Amendment will terminate upon the earlier of (a) termination or expiration of the Agreement or the FDMS Amex Agreement (in which case, FDMS agrees to give Customer notice as is commercially reasonable under the circumstances) or (b) any time that American Express requires FDMS to cease using Customer to perform services in connection with the One Point Program.

(b)     Following the expiration or termination of this Amendment, (a) Customer shall (i) cease soliciting Target Merchants and signing up new One Point Program Merchants for acceptance of the Amex Cards under this Amendment, and (ii) provide the Transition Assistance requested by American Express; and (b) in FDMS sole discretion and upon written notice by FDMS to Customer, the rights and duties of FDMS under any applicable ESA Agreement then in effect shall resume with respect to Target Merchants.

(c)     Within 30 days following the termination or expiration of this Amendment, Customer shall return to FDMS, or certify to FDMS the destruction of, all documents, manuals, lists, and other documents and data of any type containing confidential or proprietary information of American Express, including the Amex Operating Regulations, and all copies thereof.

8.     Definitions. Capitalized terms used and not defined in this Amendment have the meaning set forth in the Amex Operating Regulations. Capitalized terms used but not otherwise defined in this Amendment or the Amex Operating Regulations will have the meanings set forth in the Agreement. The term "**Program**" as defined in the Amex Operating Regulations has the same meaning as "**One Point Program**" under this Amendment. The term "**Card**" as defined in the Amex Operating Regulations has the same meaning as "**Amex Card**" under this Amendment.

9.     Entire Agreement. This Amendment, together with all exhibits attached hereto, constitutes the entire agreement between the parties regarding the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings. In the event of a conflict between this Amendment and the Agreement as it relates to the subject matter hereof, the terms of this Amendment shall control. Otherwise, all terms and conditions of the Agreement shall likewise apply to this Amendment.

5

102

IN WITNESS WHEREOF, the parties have executed this Amendment as of the dates set forth
below.

Bank Transactions, Inc.,
a Nevada corporation

By: _____
Name: Adam Friedman
Title: President
Date: 9/3/09

First Data Merchant Services Corporation,
a Florida corporation

By: _____
Name: _____
Title: _____
Date: _____

Wells Fargo Bank, N.A.

By: _____
Name: _____
Title: _____
Date: _____

6

图 006/009

## SCHEDULE 1
## TERMS GOVERNING USE OF AMERICAN EXPRESS LICENSED MARKS

The terms in this Schedule 1 ("**Amex License**") govern Customer's use of the trade names, trademarks and service marks (hereinafter called the "**Amex Licensed Marks**") and any corresponding registrations and applications thereof listed on Exhibit A to this Schedule 1 in connection with the One Point Program. References to American Express in this Schedule 1 refer to American Express's Affiliate, American Express Marketing & Development Corp.

### 1.    GRANT OF AMEX LICENSE

For purposes of and to facilitate the receipt of Amex Services, American Express grants to Customer a nonexclusive, nontransferable license, free of the payment of royalties upon such license, to use the Amex Licensed Marks, in the United States only, in its name and in connection with the goods and services covered by the Amex Licensed Marks and any corresponding registrations referred to in Exhibit A to Schedule 1; and Customer accepts the Amex License subject to American Express's right to add to or delete from Exhibit A to Schedule 1 upon thirty (30) days written notice, as well as the following terms and conditions.

### 2.    OWNERSHIP OF MARKS

Customer acknowledges that American Express is the owner of the Amex Licensed Marks, and agrees that it shall do nothing inconsistent with such ownership and that all use of the Amex Licensed Marks by Customer shall inure to the benefit of and be on behalf of American Express, and agrees to assist American Express in recording this Amex License with appropriate government authorities. Customer agrees that nothing in this Amex License shall give Customer any right, title or interest in the Amex Licensed Marks other than the right to use the Amex Licensed Marks in accordance with the Amex License and Customer agrees that it shall not attack the title of American Express to the Amex Licensed Marks or attack the validity of the Amex License.

### 3.    QUALITY STANDARDS

Customer agrees that the nature and quality of: all services rendered by Customer in connection with the Amex Licensed Marks; all goods sold by Customer under the Amex Licensed Marks; and all related advertising, promotional and other related uses of the Amex Licensed Marks by Customer shall conform to standards set by and under the control of American Express.

### 4.    QUALITY MAINTENANCE

Customer agrees to cooperate with American Express in facilitating American Express's control of such nature and quality, to permit reasonable inspection of Customer's operation, and to supply American Express with specimens of use of the Amex Licensed Marks upon request. Customer shall comply with Applicable Laws and obtain all appropriate government approvals pertaining to the sale, distribution and advertising of goods and services covered by the Amex License.

### 5.    FORM OF USE

Customer agrees to use the Amex Licensed Marks only in the form and manner and with appropriate legends as prescribed from time to time by American Express, and not to use any other trademark or service mark in combination with any of the Amex Licensed Marks without prior written approval of American Express.

7

## SCHEDULE 2
## FINANCIAL TERMS

This Schedule 2 describes all fees payable by Service Providers to Customer for or in connection with Customer's provision of Amex Services. In this Schedule 2, references to days, months, quarters, and years shall be to calendar days, calendar months, calendar quarters and calendar years unless specified otherwise.

### 1.    General Obligation

FDMS shall pay Customer a residual percentage of the monthly Charge Volume submitted by each New Program Merchant signed by Customer ("**Amex Residuals**") in accordance with this Schedule 2 until the earlier of: (a) the date that is five (5) years after the date such New Program Merchant executes a CAA Contract; (b) the date the New Program Merchant ceases to accept Amex Cards; or (c) the date the New Program Merchant stops receiving merchant processing services pursuant to the Agreement. A "**New Program Merchant**" is a One Point Program Merchant that does not accept Amex Cards under any American Express Card Service program at the time of signing. Customer shall not receive Amex Residuals for any One Point Program Merchant accepting Amex Cards pursuant to a Card Acceptance Agreement that was solicited by American Express or another service agent of American Express. FDMS shall pay to Customer the Amex Residuals in the second month following the month in which they are earned. For purposes of this Schedule 2, "**Charge Volume**" means, with respect to each New Program Merchant, total Charges on net purchases less Chargebacks, Credits, and any other amounts owed to American Express by such New Program Merchant.

### 2.    Amex Residuals Calculation

Amex Residuals shall be calculated each month for each New Program Merchant by multiplying the Amex OnePoint Compensation Percent (defined below) by the Charge Volume for the month for each New Program Merchant for which a Amex Residual is payable under this Schedule, up to a maximum of $500,000 Charge Volume in each CAA Contract Year ("**Annual Charge Volume Maximum**") (e.g., if the Amex OnePoint Compensation Percent is 25 basis points (0.25%) and Charge Volume for a New Program Merchant in a CAA Contract Year is $1,000,000, then the Amex Residual for that CAA Contract Year would be $1,250.00, calculated by multiplying 0.0025 * the $500,000 maximum). For purposes of this Schedule 2, a CAA Contract Year is each 12-month period beginning on the date the One Point Program Merchant signs an Application Set-Up Form. On the first day of each CAA Contract Year, the New Program Merchant Charge Volume will reset to zero for purposes of tracking against the Annual Charge Volume Maximum for that CAA Contract Year. The "**Amex OnePoint Compensation Percent**" is 25 basis points (or .0025%). Notwithstanding anything in the Agreement to the contrary, the Amex OnePoint Compensation Percent and this Schedule 2 may be modified by FDMS upon 60 days prior written notice to Customer

9

## 6. INFRINGEMENT PROCEEDINGS

Customer agrees to notify American Express of any unauthorized use of the Amex Licensed Marks by others promptly as it comes to Customer's attention. American Express shall have the sole right and discretion to bring infringement or unfair competition proceedings involving the Amex Licensed Marks but is under no obligation to do so.

## 7. TERMINATION/EXPIRATION

The Amex License granted in this Schedule 1 is valid only for the term of this Amendment. Upon expiration or termination of this Amendment, Customer agrees to immediately discontinue all use of the Amex Licensed Marks and any term confusingly similar thereto, and to delete the same from its corporate or business name, to cooperate with American Express or its appointed agent to apply to the appropriate authorities to cancel recording of this Amendment from all government records, to destroy all printed materials bearing any of the Amex Licensed Marks and that all rights in the Amex Licensed Marks and the goodwill connected therewith shall remain the property of American Express.

## 8. MISCELLANEOUS

The Amex License shall not be construed as: (a) requiring the maintenance of the Amex Licensed Marks; (b) a warranty as to the validity, enforceability or scope of the Amex Licensed Marks; (c) a warranty or representation that any product or service shall be free from infringement of trademarks or other intellectual property rights of third parties; (d) an agreement to bring or prosecute actions against third party infringers of the Amex Licensed Marks; (e) conferring any express or implied right under the Amex Licensed Marks except as provided herein; or (f) creating any American Express liability to Customer or to any other party as a result of the license granted hereunder or as a result of Customer's use of the Amex License.

---

### EXHIBIT A TO SCHEDULE 1
### MARKS

| Amex Licensed Mark | Registration Number | Class |
|---|---|---|
| AMERICAN EXPRESS | 1024840 | 35, 36, 39, and 42 |
| AMERICAN EXPRESS & DESIGN | 1032516 | 36, 39, and 42 |



8

## AMENDMENT TO MARKETING AGREEMENT

This Amendment to Marketing Agreement (this "<u>Amendment</u>") is made and entered into as of this ____ day of ____ M ᴄ ᴦ ᴄ ᴋ ____, 2010 between Bank Transactions, Inc., a Nevada corporation ("<u>ISO</u>"), First Data Merchant Services Corporation, a Florida corporation ("<u>FDMS</u>") and Wells Fargo Bank, N.A. ("BANK").

### RECITALS

A.      ISO, FDMS and BANK (as assignee of BancorpSouth Bank) have previously entered into a Marketing Agreement dated as of July 1, 2006, as amended (the "<u>Agreement</u>").

B.      ISO desires to board Merchants through FDMS' affiliate CTS Holdings, LLC ("<u>CTS</u>") on the "Stratus" platform for which the Processing Fees are different than the current Processing Fees set forth in Section 1 (c) of Schedule A to the Agreement, CTS will perform the services necessary to facilitate ISO's access to the Stratus platform.

C.      ISO, FDMS and BANK desire to amend the Agreement as set forth herein.

### AGREEMENT

In consideration of the foregoing, ISO, FDMS and BANK hereby agree as follows:

1.      The terms of this Amendment are effective on ____ 1 7 ᵗʰ March, 20 1 0.

2.      The title "Omaha Platform Processing Fees Schedule" is hereby added above the current Processing Fees schedule in Section 1 (c) of Schedule A of the Agreement. ISO shall pay Service Providers the Processing Fees set forth in the "Omaha Platform Processing Fees Schedule" for all Merchant accounts that are boarded on the "Omaha" platform.

3.      Section 1(c) of Schedule A to the Agreement is hereby amended by the addition of the "Stratus Platform Processing Fees Schedule" attached as Exhibit I to this Amendment which shall come after the Omaha Platform Processing Fees Schedule. ISO shall pay Service Providers the Processing Fees set forth in the "Stratus Platform Processing Fees Schedule" for all Merchant accounts that are boarded on the "Stratus" platform.

4.      CTS is now a party to the Agreement and any reference to FDMS and Service Providers shall include CTS.

5.      Capitalized terms used but not otherwise defined in this Amendment will have the meanings set forth in the Agreement. This Amendment, together with all exhibits attached hereto, constitutes the entire agreement between the parties regarding the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings. In the event of a conflict between this Amendment and the Agreement as it relates to the subject matter hereof, the terms of this Amendment shall control. Otherwise, all terms and conditions of the Agreement will remain in full force and effect and likewise apply to this Amendment.

The parties have executed this Amendment as of the date first above written.

Bank Transactions, Inc.,
a Nevada corporation

By: _____

Name: _____Adam Friedman_____

Title: _____Pres_____

Date: ____3/17/10____

First Data Merchant Services Corporation,
a Florida corporation

By: _____

Name: _____

Title: _____

Date: _____

Wells Fargo Bank, N.A.

By: _____

Name: _____

Title: _____

Date: _____

CTS Holdings, LLC

By: _____

Name: _____

Title: _____

Date: _____

2

## EXHIBIT I

### "Stratus Platform Processing Fees Schedule"

-the Processing Fees set forth in this schedule shall apply to all Merchant accounts boarded on the "Stratus" platform under Agency 862-

| Agency Name: | Bank Transactions, Inc | | |
|---|---|---|---|
| **Agency :** | **862** | | |
| | | | |
| **DESCRIPTION** | **TIERS** | **DRIVER** | **RATE** |
| **Revenue, Liability Share and Reserve** | | | |
| Revenue Share (ISO) | | | |
| Liability Share (ISO) | | Losses | |
| Liability Share (ISO) | | Refunds | |
| Reserve (basis points) | | Gross bankcard volume | |
| | | | |
| **Interchange, Association and Network Rates and Fees** | | | |
| Interchange | | | |
| Card Association Dues and Assessments | | | |
| Base I & Base II | | | |
| Debit Network Processing Rates and Fees | | | |
| | | | |
| **BIN Sponsorship** | | | |
| BIN Sponsorship | | Gross bankcard volume | |
| | | | |
| **Merchant Core Processing** | | | |
| Account on File | | Per account per month | |
| Statement | | Per statement | |
| | | | |
| Transaction Processing and Settlement | | Per settled item | |
| | | | |
| ACH | | Per item | |
| | | | |
| **Merchant Front-End Processing** | | | |
| Authorizations | Monthly Grid | Per item | |
| | 0 – 250,000 | | |
| | 250,001 – 500,000 | | |
| | 500,001 – 1,000,000 | | |
| | 1,000,001 – 2,000,000 | | |
| | Over 2,000,000 | | |
| | | | |
| Voice Authorizations | | Per item | |
| | | | |
| | | | |

3



109

| **Back Office Services** | | | |
|---|---|---|---|
| Chargeback Processing | | Per item | |
| Retrievals | | Per item | |
| Fraud Monitoring – Optional Service | | Per item | |
| Customer Service & Help Desk | | Per active merchant per month | |
| | | | |
| Annual Fee | | Per billed item | |
| ClientLine | | Per agency per month | |
| Postage | | | |

4